# EXHIBIT - B

*Execution Version*

THIS STOCK PURCHASE AGREEMENT is made as of May 29 2015, by and among GLD FOREMOST HOLDINGS, LLC, a Delaware limited liability company ("Buyer"), FOREMOST INDUSTRIES, INC., a Pennsylvania corporation ("Company"), and RALPH C. MICHAEL (the "Seller"), an individual residing in the Commonwealth of Pennsylvania.

## RECITALS

A.  The Company is engaged in the business of designing, marketing, manufacturing and selling manufactured homes and panelized systems.

B.  Seller owns all of the issued and outstanding shares of the capital stock of the Company.

C.  Buyer desires to purchase from Seller, and the Seller desires to sell to the Buyer, all of the Purchased Stock (as hereinafter defined) upon the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the Recitals and the respective representations, warranties, covenants, agreement and conditions hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound hereby, do hereby agree as follows:

1.  DEFINITIONS. For purposes of this Agreement, the following definitions shall apply:

Acquired Business. "Acquired Business" shall mean the business operated by the Company up to the Closing (including without limitation the designing, marketing, manufacturing and selling manufactured homes and panelized systems).

Agreement. "Agreement" shall mean this Stock Purchase Agreement.

Annual Financial Statements. "Annual Financial Statements" shall mean the annual financial statements (balance sheets, statements of income and retained earnings, statements of cash flow and supplementary statements, together with footnotes) for the Company for the fiscal years ended December 31, 2012, 2013 and 2014.

Benefit Plans. "Benefit Plans" shall mean any pension plan, profit sharing plan, bonus plan, incentive compensation plan, stock ownership plan, stock purchase plan, stock option plan, stock appreciation plan, employee benefit plan, employee benefit policy, retirement plan, deferred compensation plan or agreement, cafeteria plan, dependent care plan, fringe benefit program, employee insurance plan, severance plan or agreement, change in control plan or agreement, employment agreement, disability plan, health care plan, sick leave plan, death benefit plan, multi-employer pension or welfare benefit plan, or any other plan or program to provide retirement income, fringe benefits or other benefits to former or current employees.

Buyer.  "Buyer" shall have the meaning set forth in the introductory paragraph of this Agreement.

Claim.  "Claim" shall have the meaning specified in Section 9.6 of this Agreement.

Closing.  "Closing" shall mean the conference, on the Closing Date, at which the transactions contemplated by this Agreement shall be consummated.  By agreement of Buyer and the Seller, the Closing may be effected by mail, facsimile or electronic transmission or other acceptable means.

Closing Date.  "Closing Date" shall mean the date specified in Section 3.1 of this Agreement.

COBRA.  "COBRA" shall have the meaning specified in Section 4.24(j) of this Agreement.

Code.  "Code" shall mean the Internal Revenue Code of 1986, as amended.

Common Stock.  "Common Stock" shall mean the 586 authorized shares of common stock of the Company, without par value.

Company.  "Company" shall have the meaning set forth in the introductory paragraph of this Agreement.

Conditions.  "Conditions" shall have the meaning specified in Section 9.5(c) of this Agreement.

Consultant.  "Consultant" shall have the meaning specified in Section 9.5(c) of this Agreement.

Contracts.  "Contracts" shall mean the contracts, leases and agreements of the Company.

Cut-Off Date.  "Cut-Off Date" shall have the meaning specified in Section 9.1(e) of this Agreement.

Environmental Claim.  "Environmental Claim" shall mean any claim, action, cause of action, investigation or notice by any person or entity alleging liability (including, without limitation, liability for investigatory costs, cleanup costs, government response costs, natural resources damages, property damages, personal injuries or penalties) arising out of, based on or resulting from (i) the presence, or release into the environment, of any Material of Environmental Concern at any location, or (ii) any violation, or alleged violation, of any Environmental Law.

2

*Execution Version*

Environmental Laws. "Environmental Laws" shall mean all Laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata), including, without limitation, Laws relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or to the generation, manufacture, processing, handling, distribution, use, treatment, storage, disposal, transport or handling of Materials of Environmental Concern.

ERISA. "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

ERISA Affiliate. "ERISA Affiliate" shall mean a Person aggregated with another Person as a single employer under any of Sections 414(b), 414(c), 414(m) or 414(o) of the Code.

Existing Plans. "Existing Plans" shall mean the existing Benefit Plans of the Company listed and described on Schedule 1.1 attached hereto.

Financial Statements. "Financial Statements" shall mean the Annual Financial Statements and Interim Financial Statements, collectively.

GAAP. "GAAP" shall mean United States generally accepted accounting principles.

Gift Agreement. "Gift Agreement" shall mean that agreement to be entered into between the Company and Appalachian Bible College ("ABC").

Income Taxes. "Income Taxes" shall mean all Taxes based on income determined under provisions of the Code and foreign, state and other taxes (including franchise taxes) based on income or gross receipts, including a Tax assessed on a corporate by reference to its income, gains or profits, and shall include, for the avoidance of any doubt, any withholding tax and in each instance any interest, penalties or additions to tax attribution to such Tax.

Indebtedness. "Indebtedness" shall mean all liabilities or obligation of the relevant Person, whether primary or secondary or absolute or contingent: (a) for borrowed money; (b) evidenced by notes, bonds, debentures, guaranties or similar obligations; (c) under leases which in accordance with GAAP constitute capital leases; (d) secured by liens on any assets of that Person; or (e) resulting from cash, book or bank overdrafts.

Indemnified Party. "Indemnified Party" shall have the meaning specified in Section 9.6(a) of this Agreement.

Indemnifying Party. "Indemnifying Party" shall have the meaning specified in Section 9.6(a) of this Agreement.

Intellectual Property Rights. "Intellectual Property Rights" shall mean patents, trademarks, service marks, logos, trade names, internet domain names, rights in designs, brand names, logos, copyrights, moral rights, database rights, rights in know-how, trade secrets,

3

*Execution Version*

discoveries, inventions, formulae, process, procedures, computer software programs and subsequent versions thereof, including all source code, object, executable or binary code, and other intellectual property rights, in each case whether registered or unregistered, licensed or owned, and including applications for registration, licenses pertaining thereto, and all rights or forms of protection having equivalent or similar effect anywhere in the world.

Interim Financial Statements. "Interim Financial Statements" shall mean the unaudited, internally prepared financial statements (balance sheet and statement of income) for the Company for the period beginning January 1, 2015 through March 31, 2015, as provided on **Schedule 4.5**.

Inventory means all inventories of raw materials, work in process, component parts and finished goods (including goods in transit from or to the locations at which the Acquired Business is conducted), including any of the foregoing purchased subject to conditional sales or title retention agreements in favor of any third party.

Investment. "Investment" by any Person shall mean: (a) any transfer or delivery of cash, stock or other property or value by such Person in exchange for Indebtedness, stock or any other security of another Person; (b) any loan, advance or capital contribution to or in any other Person; (c) any guaranty, creation or assumption of any liability or obligation of any other Person; or (d) any investments in any fixed property or fixed assets other than fixed properties and fixed assets acquired and used in the ordinary course of the business of that Person.

Knowledge of the Seller. "Knowledge of the Seller" and terms of similar import shall mean the actual knowledge of the following individuals: Ralph Michael, Laurie Myers and James Rockwell.

Law. "Law" shall mean any federal, state, local, foreign, provincial or other governmental law, rule or regulation of any kind, and any and all rules and regulations promulgated thereunder.

Line of Credit. "Line of Credit" shall mean that certain Revolving Line of Credit Agreement by and between the Company and Susquehanna Bank (successor to The First National Bank of Greencastle) which line of credit is secured by a portion of the Company's Owned Real Estate located in Montgomery and Peters Townships, Franklin County, Pennsylvania, commonly referred to as 6100 Buchanan Trail West, Mercersburg, Pennsylvania 17236.

Losses. "Losses" shall mean damages, liabilities, deficiencies, claims, actions, demands, judgments, interest, losses, diminutions in value or costs or expenses of whatever kind or nature (including, without limitation, reasonable attorney's fees).

Materials of Environmental Concern. "Materials of Environmental Concern" shall mean any substance or material that is as of the Closing Date prohibited, controlled or regulated by any governmental authority under any Environmental Law, including, without limitation, chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances,

petroleum, petroleum derivatives or other hydrocarbons, petroleum products, dangerous substances, designated substances, controlled products or subject waste, all as defined in or pursuant to any Environmental Law.

Noncompetition Agreement. "Noncompetition Agreement" shall mean the noncompetition agreement to be entered into by and among the Company and the Seller in the form of **Exhibit B** attached hereto.

Owned Real Estate. "Owned Real Estate" shall mean the real property located at (a) 2371 Buchanan Trail West, Greencastle, Pennsylvania and (b) 6100 Buchanan Trail West, Mercersburg, Pennsylvania, each of the foregoing titled in the name of the Company, together with all buildings, structures, improvements and fixtures thereon and all rights pertaining thereto.

Person. "Person" shall mean a natural person, corporation, trust, partnership, limited liability company, governmental entity, agency or brand or department thereof, or any other legal entity.

Purchase Price. "Purchase Price" shall mean Three Million Dollars ($3,000,000.00).

Purchased Stock. "Purchased Stock" shall mean, collectively, all of the issued and outstanding shares of the Common Stock.

Remediation Costs and Expenses. "Remediation Costs and Expenses" shall have the meaning specified in Section 9.5(c) of this Agreement.

Seller. "Seller" shall have the meaning set forth in the introductory paragraph of this Agreement.

Taxes. "Taxes" shall mean all taxes of any kind, levies or other like assessments, customs, duties, imposts, charges or, including without limitation, income, gross receipts, ad valorem, value-added, excise, real or personal property, asset, sales, use, license, payroll, transaction, capital, net worth, franchise taxes (if not based on income), estimated taxes, withholding, employment, social security, workers' compensation, utility, severance, production, unemployment compensation, occupation, premium, windfall profits, transfer and gains taxes or other governmental taxes imposed or payable to the United States, or any state, county, local or foreign government or subdivision or agency thereof, and in each instance such term shall include any interest, penalties or additions to tax attributable to any such Tax.

Tax Returns. "Tax Returns" shall mean all returns, declaration, reports, claims for refund and information returns and statements of any Person required to be filed or sent by or with respect to it in respect of any Taxes, including any schedule or attachment thereto and any amendment thereof.

## 2. PURCHASE OF PURCHASE STOCK.

2.1 Stock Purchased.  On the Closing Date, subject to and upon the terms and conditions set forth in this Agreement, Seller will validly sell, transfer, assign and convey to Buyer, and Buyer will accept and purchase from Seller the Purchased Stock.

2.2 Delivery of Stock.  At the Closing, the Seller shall deliver, transfer and assign all of the Purchased Stock to Buyer by delivering stock certificates representing all of the Purchased Stock duly endorsed or accompanied by stock powers duly executed in blank, with any required transfer stamps affixed thereto, and otherwise in proper form for transfer, as shall be necessary to vest in Buyer, full, complete, good and marketable title to such Purchased Stock free and clear of all liens, claims, and encumbrances of any kind whatsoever, all such documents to be in form and substance satisfactory to counsel for Buyer.

2.3 Purchase Price.  The Purchase Price shall be payable to the Seller by wire transfer of immediately available funds to an account or accounts designated in writing by the Seller.

3.  CLOSING.

3.1 Closing Date.  The Closing shall take place on May __, 2015, or at such other time and date as the Seller and Buyer may mutually agree (the "Closing Date").

3.2 Closing Deliveries.

(a)  By the Company and Seller.  At the Closing (unless noted otherwise), the Company and the Seller, as applicable, shall deliver to Buyer and/or others, as appropriate, the following:

(i)  The Noncompetition Agreement, duly executed by the Seller;

(ii)  The Gift Agreement, duly executed by the Company and ABC, along with resolutions by the Buyer, as the new sole shareholder of the Company; immediately after Closing, (x) authorizing and ratifying the actions of the Company in entering into the Gift Agreement at or immediately before Closing, and (y) acknowledging the Gift Agreement as a legally binding obligation of the Company;

(iii)  The Acknowledgment and Consent letter executed by Marjorie Michael, the spouse of the Seller;

(iv)  the certificates, documents and instruments of transfer and conveyance set forth in Section 2.2 of this Agreement, duly endorsed or executed by the Seller as provided therein;

(v)  the Articles of Incorporation of the Company certified as of the most recent practicable date by the Secretary of the Commonwealth of Pennsylvania;

(vi)    a certificate of the Secretary of the Commonwealth of Pennsylvania and the States listed on <u>Schedule 4.2(a)</u> as to the good standing of the Company as of the most recent practicable date in each of such jurisdictions;

(vii)    the duly executed resignations of all officers and directors of the Company from all offices and directorships of the Company held by them;

(viii)    a certificate of the Seller dated the Closing Date and signed by the Seller (A) certifying to the accuracy of the copies of the Articles of Incorporation and Bylaws of the Company, as amended to date, attached thereto, and (B) certifying to the names of all officers and directors of the Company as of immediately prior to the Closing;

(ix)    Evidence that any and all indebtedness due to Seller from the Company shall have been converted into Common Stock of the Company prior to the Closing Date;

(x)    the original corporate record books and stock record books of the Company;

(xi)    a termination of any shareholder agreement or similar agreement among the Seller and/or the Company;

(xii)    UCC terminations and satisfactory releases for any security interests encumbering any assets of the Company, including the Line of Credit, as well as a payoff letter from any secured creditor of the Company setting forth (a) the amount required to be paid on the Closing Date to satisfy all outstanding obligations of the Company and the Seller, and (b) the agreement of each secured creditor to release all of its liens and security interests against the Purchased Stock or any assets of the Company upon the payment of such amount.

(b)    <u>By Buyer</u>. At the Closing, Buyer shall deliver the following:

a.  To Seller:

(i)    the Noncompetition Agreement, duly executed by the Company;

(ii)    a payment by wire transfer of the Purchase Price as provided in Section 2.3 of this Agreement; and

(iii)    written assurances by all creditors of the Company for which the Seller or Seller and his spouse have provided guaranties of debt of the Company, as listed on <u>Schedule 3.2(b)</u>, that Seller and, if applicable, his spouse will be fully released from all such guaranties such that Seller and his spouse, as of the Closing Date, will no longer be legally responsible for any Company debt pursuant to a personal guaranty previous provided and as listed on <u>Schedule 3.2(b)</u>; final written releases of these guaranty obligations shall be provided to Seller and his spouse promptly after the Closing Date.

*Execution Version*

b. To the Company:

(I) a capital contribution (the "Capital Contribution"), by wire transfer, in an amount necessary to satisfy in full the obligations of the Company as set forth on Schedule 3.2(b), provided, however, that the required Capital Contribution shall not be more than Two Million Six Hundred Twenty Five Thousand Dollars ($2,625,000.00).

4.    REPRESENTATIONS AND WARRANTIES OF SELLER. For the purposes of inducing the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller represents and warrants to Buyer and agrees that:

4.1 Ownership of Purchased Stock; Authority; Consents.

(a)    Ownership. Seller is the owner of, and has good and marketable title to the shares of Purchased Stock free and clear of all liens, claims and encumbrances, and has full legal title and power and the authorizations and approvals necessary to sell, transfer and deliver such shares of the Purchased Stock to the Buyer. Seller has not granted a currently effective power of attorney or proxy to any Person with respect to all or any portion of its shares of the Purchased Stock. Upon delivery of the certificates for such shares of Purchased Stock by Seller pursuant to this Agreement, Buyer will acquire good and marketable title to such shares of Purchased Stock, free and clear of all liens, claims and encumbrances.

(b)    Authority. Seller has all requisite power and authority to enter into this Agreement, and the related agreements referred to herein, and to carry out such Seller's obligations hereunder. This Agreement and the related agreements, documents and instruments referred to herein have been duly executed and delivered by Seller who is a party thereto and constitute the valid and legally binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

(c)    Consents. No consent, approval, authorization or order of any court, governmental agency or body is required for the consummation by the Seller of the transactions contemplated by this Agreement. The execution, delivery and performance by the Company and the Seller of this Agreement, and the consummation by the Company and the Seller of the transactions contemplated hereby, does not and will not, with or without the giving of notice or the lapse of time or both, require the consent of any third party under any contract, agreement, lease or license to which the Company or the Seller is a party.

4.2 Corporate Matters.

(a)    Organization and Qualification; Power. The Company is a corporation duly organized, validly existing and in good standing under the Laws of the Commonwealth of Pennsylvania. The Company is duly qualified and/or licensed, as the case may be, and in good standing in each of the jurisdictions listed on **Schedule 4.2(a)**, which are the only jurisdictions where the nature of its activities or the character of the properties owned, leased or operated by it require such qualification or licensing. The Company has all requisite corporate power and

authority to own, lease and operate all of its properties and assets and to carry on its business as it is now being conducted.

(b) <u>Subsidiaries</u>. Except as shown on <u>**Schedule 4.2(b)**</u>, the Company has no subsidiaries and does not own any stock, limited liability company interest or other equity interests in any Person.

(c) <u>Compliance; Binding Effect</u>. The execution and delivery of this Agreement and the related agreements, documents and instruments referred to herein, and the consummation of the transactions contemplated hereby, will not: (i) violate any provision of the Articles of Incorporation or Bylaws of the Company; (ii) constitute a default under, or constitute an event which with the giving of notice or the lapse of time or both would become a default under, or result in the creation or imposition of any lien, charge, pledge, security interest or other encumbrance upon any of the assets of the Company under, or create any rights of termination, cancellation, purchase or acceleration in any Person under, any mortgage, lien, lease, agreement or other instrument or obligation to which the Company is a party or by which the Company or its assets are bound; or (iii) violate or conflict with any Law, order, writ, injunction, judgment, arbitration award, decree or other restriction of any kind or character to which the Company or its assets are subject or bound.

(d) <u>Capitalization of the Company; Ownership of Common Stock</u>.

a. The entire authorized capital stock of the Company consists of the Common Stock, of which 585 shares are issued and outstanding prior to the making of the Capital Contribution. The Seller is the only owner of any equity interest in the Company. All of the issued and outstanding shares of the Common Stock have been duly authorized and validly issued, are fully paid and non-assessable and are owned of record by the Seller free and clear of all liens, claims, encumbrances and restrictions whatsoever. No shares of Common Stock or other ownership interests in the Company are reserved for issuance or are held as treasury shares.

b. Except for this Agreement, there are no outstanding options, warrants, conversion rights or other rights to subscribe for or purchase, or other contracts with respect to, any capital stock of the Company pursuant to which the Company is or may become obligated to issue or redeem or exchange any shares of the Company's capital stock.

(e) <u>Articles of Incorporation; Bylaws; Minute Books; Records</u>. The Company has heretofore delivered to Buyer true and complete copies of the Articles of Incorporation and Bylaws of the Company, as amended and in effect on the date of this Agreement. The minute books of the Company which heretofore have been provided to Buyer for examination contain complete and accurate records of all written corporate action taken by the board of directors and stockholders of the Company through the date hereof, and completely and accurately reflect all transactions in the shares of capital stock of the Company. The accounting books and records of the Company are complete and correct. The officers and directors of the Company as of the date of this Agreement are as set forth in <u>**Schedule 4.2(e)**</u> to this Agreement.

9

*Execution Version*

4.3 <u>Authority; Validity</u>. The execution and delivery by the Company of this Agreement and the other documents and instruments to be executed and delivered by the Company pursuant hereto and the consummation by the Company of the transactions contemplated hereby and thereby have been duly authorized by the Company. No further corporate act or proceeding on the part of the Company is necessary to authorize this Agreement or the other documents and instruments to be executed and delivered pursuant hereto or the consummation by the Company of the transactions contemplated hereby and thereby. This Agreement and the related agreements, documents and instruments referred to herein to which the Company is a party have been duly executed and delivered by the Company and constitute the valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms.

4.4 <u>Financial</u>.

(a) The Seller previously furnished to Buyer true and correct copies of the Financial Statements, copies of all of which are attached hereto as <u>Schedule 4.4(a)</u>. Except as indicated in <u>Schedule 4.4(b)</u> attached hereto, the Financial Statements were prepared in accordance with GAAP consistently applied through the applicable periods involved (except that the Interim Financial Statements are subject to normal year-end adjustments and do not include footnotes), and present fairly the financial condition of the Company as of the respective dates of such Financial Statements and the results of operations for the respective periods then ended. Since December 31, 2014, there has been no change in the accounting methods or practices of the Company, no change in the Company's policies with respect to depreciation or amortization including useful lives of assets or rates for depreciation or amortization, and no change in the Company's policies with respect to pricing inventory or capitalizing costs.

(b) All accounts receivable, unbilled invoices, costs in excess of billings, work in process and other amounts due to the Company (collectively, the "Accounts Receivable") have arisen in the ordinary course of business, represent legal, valid, binding and enforceable obligations to the Company and, to the Knowledge of Seller, are not and will not be subject to any contests, claims, counterclaims or setoffs. There has been no material adverse change since March 31, 2015 in the amount or collectability of the Accounts Receivables due the Company. Except as set forth in <u>Schedule 4.4(c)</u>, (i) no account debtor or note debtor is delinquent for payments in excess of $10,000 or for more than ninety (90) days, (ii) no account debtor or note debtor has refused or, to the Knowledge of Seller, threatened to refuse to pay its obligations to the Company for any reason, or has otherwise made a claim to set-off or similar claim, and (iii) to the Knowledge of Seller no account debtor or note debtor is insolvent or bankrupt.

(c) All Inventory of the Company, whether or not reflected in the Financial Statements, consists of a quality and quantity usable and salable in the ordinary course of business, except for obsolete items and items of below-standard quality, all of which have been written off or reserved for in the Financial Statements or on the accounting records of the Company as of the Closing Date, as the case may be.

*Execution Version*

4.5 <u>Absence of Changes</u>.

(a)      Except as set forth in **Schedule 4.5** attached hereto and except as disclosed in the Financial Statements, since January 1, 2015, there has been no (i) adverse change in the business, property or condition (financial or otherwise) or results of operations of the Company, either individually or taken as a whole, from that shown in the Financial Statements, (ii) damage, destruction or loss (whether or not covered by insurance) which singly or in the aggregate adversely affects the Company's assets or the business or financial condition of the Company, (iii) commitment to increase or effected increase in either the rate of compensation or the actual compensation payable to or to become payable by the Company to any of its officers or employees, (iv) new contract, agreement, license or transaction or termination of any previously existing contract, agreement or license other than in the ordinary course of business, (v) actual or, to the Knowledge of the Seller, threatened labor trouble or strike affecting the Company, (vi) cancellation or other written termination of a relationship with the Company, or written notice to the Company of a future cancellation or other termination of a relationship with the Company, by any single supplier or customer of the Company, (vii) commitment for, declaration, setting aside, or payment of any dividend or other distribution in respect of the Company's capital stock, or (viii) transaction or transactions by the Company outside of the ordinary course of business.

(b)      Except as set forth in **Schedule 4.5** attached hereto, since January 1, 2015, the Company has not granted or permitted any increase in the compensation payable to or to become payable to any of the Company's officers or employees, or granted or permitted any increase in the benefits under any bonus, insurance, pension or other benefit plan, payment or arrangement made to, for or with any such employees or officers (including without limitation any sale bonus or stay bonus to employees with respect to the transactions contemplated hereby).

4.6 <u>Absence of Undisclosed Liability</u>. Except as disclosed in **Schedule 4.6** attached hereto and as disclosed on the Financial Statements, to the Knowledge of the Seller there are no liabilities or obligations of any kind whatsoever, whether direct, indirect, accrued, contingent or absolute, and whether nor not determined or determinable to which the Company or the Acquired Business will be subject following the consummation of the transactions contemplated hereby, and there is no existing claim, condition, situation or set of circumstances which could reasonably be except to result in any such liability or obligation.

4.7 <u>Powers of Attorney</u>. Except as set forth in **Schedule 4.7** attached hereto, there are no employees or agents of the Company who hold powers of attorney to act with respect to the Company, its assets, the Purchased Stock or the Acquired Business.

4.8 <u>Litigation</u>. Except as set forth in **Schedule 4.8** attached hereto, the Company is not bound by any order, judgment, stipulation or consent decree of any court or governmental agency affecting its assets, or limited or affecting its operations; there is no suit, action or legal, administrative, arbitration or other proceeding or governmental investigation pending or, to the Knowledge of Seller, threatened against the Company; there are no labor strikes, filed grievances or other labor troubles pending or, to the Knowledge of the Seller, threatened against the Company, and there are not currently pending or, to the Knowledge of the Seller, threatened against the Company any investigations of charges or complaints, and there are no outstanding

11

*Execution Version*

uncorrected or unresolved citations, charges, complaints, orders or judgments, issued or made by any governmental agency, or by a court, with respect to its application or enforcement of the Laws relating to the Company's business operations, environmental protection, labor relations, employee safety and health, wages, hours and other labor standards, and fair employment.

### 4.9 Licenses: Compliance with Laws and Regulations.

(a)      Governmental Licenses.  Except as set forth in **Schedule 4.9(a)** attached hereto, to the Knowledge of the Seller, the Company has all governmental licenses and permits necessary to conduct its business, and such licenses and permits are in full force and effect and listed on **Schedule 4.9(a)** attached hereto.  Except as set forth in **Schedule 4.9(a)** attached hereto, no violations are or have been recorded and remain outstanding in respect of such licenses or permits and no proceeding looking toward the revocation or limitation of any of them is pending or threatened.  Set forth in **Schedule 4.9(a)** is a complete list of all inspection reports, complaints, citations and notices of violations or alleged violations received by the Company within the period of two (2) years prior to the date hereof from any governmental agency having jurisdiction over the Company or its business.

(b)      Compliance with Laws and Regulations.  The Company is in compliance with all applicable Laws relating to the operation of its business and its products, the Owned Real Estate, and its other assets, including, without limitation, all zoning, building, fire, plumbing, product, health and safety Laws including applicable product, safety and consumer protection specifications, guidelines and standards, and no notice has been served upon its claiming violation of any of the foregoing.  The Owned Real Estate and all buildings and improvements situated thereon, and the use thereof by the Company complies with all Laws, easements and restrictions, if any.

### 4.10      Title and Condition of Property.

(a)      Real Property Used.  The Owned Real Estate constitutes all real property used by the Company in the Acquired Business.  The Company does not lease any real estate.

(b)      Title.  The Company owns good and marketable title to, and has undisputed possession of, all of its assets and properties (including the Owned Real Estate), free and clear of all options, adverse claims, restrictions, tenancies, debts, claims, security interests, defects of title, mortgages, liens, pledges, charges or encumbrances of any nature whatsoever, except, however for mortgage lien held by Susquehanna Bank on that portion of the Company's Owned Real Estate generally identified as 6100 Buchanan Trail West, Mercersburg, Pennsylvania to secure the Line of Credit.

(c)      Condition; Sufficiency.  The assets of the Company (together with the Owned Real Estate) constitute all of the property relating to or used or held for use in connection with the Acquired Business on this date, and comprise all property necessary for the continued conduct of the Acquired Business after the Closing by the Company as conducted prior to the Closing by the Company.  To the Knowledge of the Seller, subject only to ordinary wear and tear, the assets of the Company are usable and used in the Acquired Business, have been well

maintained and are in good operating condition and repair. Since January 1, 2015, no such asset essential to the operation of the Acquired Business has been destroyed, diverted by the Company to other uses, or otherwise disposed of by the Company without having been adequately replaced.

(d)   Insurance.   The Company, the Acquired Business, the Owned Real Estate and all of the Company's assets have been and are insured, and will be insured through the Closing Date, in the amounts and against risks set forth in **Schedule 4.10(d)** attached hereto. The Company is not in default with respect to any provision contained in any insurance policy for the Company and has not failed to give notice or present any claim under any such policy in due and timely fashion. During the last two years, the Company has not had any insurance policy or coverage thereunder cancelled, withdrawn or not renewed by the insurer.   The Company has not received notice of and the Seller is not aware of any cancellation or threat of cancellation of such insurance. Except as set forth in **Schedule 4.10(d)** attached hereto, no property damage, personal injury or products liability claims have been made, or are pending, against the Company that are not fully covered by insurance (except to the extent of co-insurance and deductibles reflected in the applicable insurance policies).

4.11   Taxes.

(a)   Except for federal and state income tax returns for the calendar year ending 2014, the Company (i) has timely filed with the appropriate governmental agencies all Tax Returns required to be filed by it as of the date of this Agreement for all periods ended prior to the date of this Agreement, (ii) has not requested any extensions with respect to such Tax Returns that are still outstanding, and (iii) has paid all Taxes shown as payable on such Tax Returns and has not executed or filed with the Internal Revenue Service or any other taxing authority any agreement, waiver or other document or arrangement that is currently in effect and that extends or has the effect of extending the period for assessment or collection of Taxes (including without limitation any applicable statute of limitation), and no power of attorney with respect to any Tax matter is currently in force. All Tax Returns filed by the Company were correct and complete.

(b)   All Taxes that the Company is required by Law to pay, withhold or collect for all periods ending on or prior to the Closing Date have been correctly reported and fully paid, withheld or collected, or adequately reserved for.

(c)   Neither the Internal Revenue Service nor any other taxing authority has audited any Tax Return filed by the Company for any open years of the Company preceding the Closing Date.   No notice has been received from, and no claim has been made by, a taxing authority in a jurisdiction where the Company does not file Tax Returns such that it may be subject to taxation by that jurisdiction.

(d)   The Company has not executed or entered into a closing agreement pursuant to Section 7121 of the Code or any predecessor provision thereof or any similar provision of state, local or foreign Law.

13

(e)     There are no audits or investigations by any taxing authority in progress of which the Company has received notice and the Company has not received any written notice from any taxing authority that it intends to conduct such an audit or investigation. No issue has been raised in any written notice to the Company by a federal, state, local or foreign taxing authority in any current or prior examination which, by application of the same or similar principles, could reasonably be expected to result in a proposed deficiency for any subsequent taxable period.

(f)     Schedule 4.11(f) lists all federal, state, local and foreign Income Tax Returns filed with respect to the Company for the taxable periods ending on or after December 31, 2009, indicates those Income Tax Returns that have been audited and indicates those Income Tax Returns that currently are the subject of an audit or examination.

(g)     The Company has duly and validly elected to be treated as an S corporation pursuant to Code Section 1362(a) (and the Laws of each state in which it does business that allows for S corporation treatment), effective January 1, 1987. This election is currently effective and valid, and no event has occurred that would terminate the Company's S status. No taxing authority has challenged the effectiveness of this election. The Company has no potential liability for Taxes under Code Section 1374 (or any similar provision of foreign, state or local Law). The Company has not in the past five years (i) acquired assets from another company in a transaction in which the Company's basis for the acquired assets was determined, in whole or in part, by reference to the tax basis of the acquired assets (or any other property) in the hands of the transferor, or (ii) acquired the stock of any corporation that is a "qualified subchapter S subsidiary" within the meaning of Code Section 1361(b)(3)(B).

4.12     Vacation Pay.    Schedule 4.12 attached hereto sets forth the true and correct amount of vacation, holiday and sick pay unpaid as of the date hereof for all employees of the Company (i) who have not as of the date hereof taken vacation, holiday or sick time earned prior to the date hereof, or (ii) who have not earned vacation, holiday or sick time as of the date hereof but will earn vacation, holiday or sick time for any period or partial period of employment prior to the date hereof if they continued as employees of the Company to the date when such vacation, holiday or sick time will accrue to them. Except as set forth in Schedule 4.12 attached hereto, as of the date hereof, the Company does not have any liability, obligation or commitment to any of its employees for vacation, holiday or sick pay earned or accrued up to and including the date hereof, whether or not vested.

4.13     Contracts and Commitments.

(a)     Significant Contracts.    Except for the Contracts set forth in Schedule 4.13(a) to this Agreement, the Company and the Seller are not a party to, and are not in any way obligated under (i) any agreement, contract or commitment containing any covenant limiting the freedom of the Company to engage in any line of business or compete with any Person; (ii) any contract, agreement or commitment with the Company's present or past officers, employees, agents, consultants or advisors that is not cancelable by the Company on notice of no longer than thirty (30) days and without liability, penalty or premium; (iii) any contract, agreement or

14

*Execution Version*

commitment relating to the disposition of assets of the Company; (iv) any agreement requiring the consent of any other person to the transfer or the sale by the Company of all or substantially all of the Company's assets or to a change in control with respect to the Company; (v) any lease of, or agreement to purchase or sell, any capital asset; (vi) any management, consulting, personal service, agency or other contract which provides for rendition of services or for any commission, bonus, incentive, consulting or additional compensation; (vii) any agreement or note evidencing any Indebtedness; (viii) any license, other than licenses for off-the-shelf software applications; (ix) any agreement with an agent, dealer, distributor, sales representative or franchisee; (x) any agreement for the storage, transportation, treatment or disposal of any Materials of Environmental Concern; (xi) any agreement restricting the right of the Company to use or disclose any information in its possession; (xii) any partnership, joint venture or similar relationship; (xiii) other than in the ordinary course of business, any open purchase order by the Company to any vendor, or from any customer of the Company, which involves an amount in excess of $25,000; (xiv) any other agreement which involves an amount in excess of $25,000, or is not in the ordinary course of business of the Company; or (xv) any agreement with any third party for the manufacture of the Company's products.

(b) <u>Consents; Renewals; Defaults</u>. The Company has not received any notice or other written information indicating (i) that any of the Contracts set forth in the attached <u>Schedule 4.13(a)</u> will not be renewed upon expiration or (ii) that with respect to any Contract set forth in the attached <u>Schedule 4.13(a)</u> requiring consent as a result of the transactions contemplated by this Agreement, the party whose consent is required will not give that consent. The Company is not in default under any of the Contracts, and there has not occurred any event which with the lapse of time or giving of notice of both would constitute a default by the Company. To the Knowledge of the Seller the Contracts are valid and binding in accordance with their respective terms and are in full force and effect without any default, waiver or indulgence thereunder by the Company, or, to the Knowledge of the Seller, by any other party thereto.

4.14 <u>Patents, Trademarks and Trade Names</u>. <u>Schedule 4.14</u> attached hereto sets forth a true and correct listing of all patents, trade names, trademarks, service marks, common-law trademarks, copyrights and domain names, and all registrations and applications for any of the foregoing, owned, possessed, licensed or used by the Company or otherwise used in the Acquired Business. Except as set forth on <u>Schedule 4.14</u> attached hereto, the Company owns the entire right, title and interest in and to the items listed on <u>Schedule 4.14</u> and such items are not subject to any pending or, to the Knowledge of the Seller, threatened litigation or other adverse claims. To the Knowledge of the Seller such items do not violate any Intellectual Property Rights of any other Person. There have been no written claims or assertions by any other Person of infringement of any of such items by the Company. None of the items listed on <u>Schedule 4.14</u> is invalid or unenforceable, and all filings required to keep such items effective and enforceable have been made by the Company. All Intellectual Property Rights owned or held by the Seller, by any employee of the Company or by any Person affiliated with the Seller or the Company and used in the Acquired Business have been duly and effectively assigned and transferred to the Company. To the Knowledge of the Seller, the Company has not infringed, misappropriated or otherwise conflicted with, and the operation of the Acquired Business as currently conducted will not infringe, misappropriate or otherwise conflict with, any Intellectual

15

*Execution Version*

Property Rights of any Person and the Company has not received notice of any claims alleging any of the foregoing. The Company owns and possesses, or has a valid and enforceable right to use, all Intellectual Property Rights used in the operation of the Acquired Business as presently conducted.

      4.15    Environmental Matters.

      (a)    To the Knowledge of the Seller, the Company is and has been in compliance with all Environmental Laws. The Company has not received any communication (written or oral), whether from a governmental authority, citizens group, employee or otherwise, that alleges that the Company is not in compliance with applicable Environmental Laws, and to the Knowledge of the Seller there are no present circumstances that may prevent or interfere with such compliance in the future. All permits and other governmental authorizations currently held by the Company pursuant to the Environmental Laws are identified in **Schedule 4.15(a)**.

      (b)    Except as set forth in **Schedule 4.15(b)** attached hereto, there is no Environmental Claim pending or, to the Knowledge of the Seller, threatened against the Company, or against any person or entity whose liability for any Environmental Claim the Company has or may have retained or assumed either contractually or, to the Knowledge of the Seller, by operation of law.

      (c)    The Company has not caused any past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the release, emission, discharge, presence, or disposal of any Material of Environmental Concern, that could form the basis of any Environmental Claim the Company has or may have retained or assumed either contractually or, to the Knowledge of the Seller, by operation of Law. To the Knowledge of the Seller, no Person has caused any past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the release, emission, discharge, presence or disposal of any Material of Environmental Concern, that could form the basis of any Environmental Claim against the Company or any person or entity whose liability for any Environmental Claim the Company has or may have retained or assumed either contractually or, to the Knowledge of the Seller, by operation of Law.

      (d)    Without in any way limiting the generality of the foregoing, (i) all on site and off site locations where the Company stored, disposed or arranged for disposal of Materials of Environmental Concern are identified in **Schedule 4.15(d)**, (ii) to the Knowledge of the Seller, there are no underground storage tanks located on property at any time owned or leased by the Company, (iii) to the Knowledge of the Seller, there is no asbestos contained in or forming part of the Owned Real Estate or any building, building component, structure or office space owned or leased by the Company and (iv) to the Knowledge of the Seller no polychlorinated biphenyls (PCB's) are used or stored at the Owned Real Estate or any property owned, leased or used by the Company.

      4.16    Computer Systems. All of the computer hardware and software systems, and all equipment owned, leased or used by the Company are fully operational and are operating properly as designed.

*Execution Version*

4.17    Transactions with Affiliates. Since December 31, 2011, the Company has not, directly or indirectly, purchased, leased from or otherwise acquired property or obtained services from, or sold, leased to or otherwise disposed of any property or furnished any services to, or otherwise dealt with, in the ordinary course of business or otherwise, the Seller or any other Person which, directly or indirectly, controls, is controlled by or is under common control with the Company.

4.18    Bank Accounts. **Schedule 4.18** attached hereto contains a complete list of each bank, financial institution and brokerage company at which the Company has an account together with the type of account and the names of all persons authorized to draw thereon or have access thereto.

4.19    No Pending Transactions.    Except for this Agreement, neither the Company nor the Seller is a party to or is bound by any agreement, undertaking or commitment: (a) to merge or consolidate the Company with, or to have the Company acquire all or substantially all of the properties and assets of, any other Person; (b) to sell, lease or exchange all or substantially all of the Company's properties and assets to any other Person; (c) to sell or exchange all or substantially all of the capital stock of the Company to any other Person; or (d) to reorganize the Company.

4.20    Indebtedness; Investments.

(a)    Except for the Line of Credit and as otherwise disclosed in **Schedule 4.20(a)** attached hereto, the Company does not have any Indebtedness.

(b)    The Company does not own, or have any right or obligation to acquire, any Investment.

4.21    Product Warranties. Attached as **Schedule 4.21** to this Agreement are true and accurate copies of all of the forms of product warranty or guaranty now in effect or outstanding with respect to products sold or leased by the Company and all of the forms of product warranty or guaranty which have been issued by the Company during the past two years.

4.22    Warranty Claims and Customer Complaints. Subject to **Schedule 4.22**, there are no existing or, to the Knowledge of the Seller, threatened claims or customer complaints against the Company (i) for or related to any alleged defective product or (ii) for or related to any product which alleges failure to meet any service or product warranties of the Company or any applicable standard or specification of any contract or purchase order for such product or any applicable foreign, federal, state or local Law.    **Schedule 4.22** accurately describes all such claims or customer complaints received by the Company during the past two years including, with respect to each such claim or customer complaint, a description of (i) the nature of the claim or customer complaint and (ii) the date of the claim or customer complaint.

4.23    Employees.

*Execution Version*

(a)    To the Knowledge of the Seller the Company is in compliance with all applicable Laws respecting labor and employment, applicant and employee background checking, immigration, discrimination in employment, terms and conditions of employment, wages, hours and occupational safety and health and employment practices, and is not engaged in any unfair labor practice. There are no outstanding claims against the Company for any payment to any trust or other fund or to any governmental entity, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees other than routine payments to be made in the ordinary course. There are no pending claims against the Company under any workers compensation plan or policy or for long term disability. There is not currently, and there has not been in the past three years, any legal proceeding against the Company based on actual or alleged wrongful termination, unlawful or unfair dismissal, or race, age, sex, disability or other harassment or discrimination. To the Knowledge of the Seller there are not currently, and there have not been in the past three years, any activities or proceedings of any labor union to organize any employees of the Company. None of the managers or corporate staff department heads of the Company have given written notice to the Company within the past six months that any such employee intends to terminate his or her employment with the Company.

(b)    **Schedule 4.23(b)** contains a complete and accurate list of the following information for each employee of the Company, including each employee on leave of absence or layoff status: name; job title; and the current and the prior year's compensation or remuneration (including any bonus). Except as set forth on **Schedule 4.23(b)**, the Company has not made any promises for the payment of any bonuses, back-pay or other remuneration to any employees, contractors or other Persons in any way related to the transactions contemplated by this Agreement.

(c)    The Company is not a party to, and is not negotiating, any collective bargaining or other labor union contract or employment agreements with its employees or with any organization representing any of its employees, and is not bound by any other agreement with a labor organization.

4.24    Benefit Plans.

(a)    Except for the Existing Plans, the Company does not maintain any Benefit Plan. The Seller has delivered to the Buyer true and correct copies of the Existing Plans for which written documentation exists, together with copies of any summary plan or similar description thereof and the most recent actuarial reports, reviewed financial statements and Form 5500 and schedules, if any, with respect thereto. Each of the Existing Plans is in compliance in all respects with applicable Laws, including without limitation, the Code and ERISA, and any Benefit Plan terminated by the Company during the five year period ending with the date of this Agreement was in compliance with such Laws and was terminated in compliance with such Laws. All of the Existing Plans which are intended to meet the requirements of Section 401(a) of the Code have been determined by the Internal Revenue Service to be "qualified" within the meaning of Section 401(a) of the Code or timely application has been made therefor, and there are no facts Known to the Seller which would adversely affect the qualified status of such Existing Plans. The Company is not in default in any respect in performing its obligations under

18

*Execution Version*

any of the Existing Plans, and all contributions, payments, liabilities or obligations under any Existing Plans that are required to have been paid on or before the date hereof have been paid or that are required to have been accrued on the date hereof on the books of account of the Company by GAAP applied consistently with the past practice of the Company for year-end financial statements have been so accrued.

(b)     With respect to each Existing Plan, all reports required under ERISA or any other applicable Law or regulation to be filed by or on behalf of such Plan with the relevant governmental authority the failure of which to file could reasonably result in liability to the Company, have been duly filed, and all such reports are true and correct as of the date given.

(c)     Neither the Company nor any of its ERISA Affiliates nor any Existing Plan has engaged in a "prohibited transaction" (as such term is defined in Section 4975 of the Code and Sections 406 and 408 of ERISA), which would subject the Company (after giving effect to any exemption) or any Existing Plan to the tax or penalty on prohibited transactions imposed by Section 4975 of the Code, Section 502 of ERISA or any other liability.

(d)     There are no claims (other than claims for benefits in the normal course), actions or lawsuits asserted or instituted against, and there are no pending or to the Knowledge of the Seller threatened litigation or claims against, the assets of any Existing Plan or against any fiduciary of such Existing Plan with respect to the operation of such Existing Plan, which, if adversely determined, could have an adverse effect on the business, operations, properties, assets or condition (financial or otherwise) of the Company.

(e)     Each of the Existing Plans can be terminated by the Company within a period of 30 days following the Closing Date, without payment of any additional compensation or amount or the additional vesting or acceleration of any benefits under any of such plans, and none of the transactions contemplated by this Agreement shall result in the acceleration of any payments under any Existing Plan.

(f)     The Company does not maintain and has not established any "welfare benefit plan" (within the meaning of Section 3(1) of ERISA), other than those listed on **Schedule 1.1** to this Agreement, which provides for continuing benefits or coverage for any participant or any beneficiary of a participant after such participant's termination of employment except as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), and the regulations thereunder.

(g)     The Company and each of its ERISA Affiliates maintaining a "welfare benefit plan" (within the meaning of Section 3(1) of ERISA) has complied with all applicable notice and continuation coverage requirements of COBRA and the regulations thereunder such that there would not result any tax, penalty or liability to the Company.

(h)     The Company does not maintain any Existing Plan or other agreements, arrangements or commitments that contain any severance or termination pay liabilities or obligations, whether legally binding or not, with any employee or former employee, and the

*Execution Version*

Company is not presently paying any severance or termination payments to any former employee.

4.25 Multi-Employer Plans. Neither the Company nor any of its ERISA Affiliates contributes, is required to contribute and since January 1, 1976 has contributed, to any multiemployer plan within the meaning of Section 3(37) of ERISA.

4.26 Benefit Claims. No person has asserted any claim under which the Company has any liability under any Benefit Plan maintained by the Company or to which the Company is a party, or under any worker's compensation or similar Law, which, to the Knowledge of the Seller, is not fully covered by insurance maintain with unaffiliated, financially sound, reputable insurers.

4.27 Disclosure. To the Knowledge of the Seller, no representation or warranty by the Seller in this Agreement, and no statement, certificate or schedule furnished or to be furnished by or on behalf of the Company or the Seller pursuant to this Agreement, or any document or certificate to Buyer pursuant to this Agreement or in connection with actions contemplated hereby, contains or shall contain any untrue statement of material fact or omits or shall omit a material fact necessary to make the statements contained therein, in light of the circumstances in which they were made, not misleading.

4.28 Representations and Warranties True at Closing. The representations and warranties of Seller, set forth in this Section 4, shall be true and correct on the Closing Date as if made again on and as of the Closing Date.

5. REPRESENTATIONS AND WARRANTIES OF BUYER. For the purposes of inducing the Company and the Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer represents and warrants to the Company, and the Seller and agrees, that:

5.1 Corporate Matters Regarding Buyer.

(a) Organization and Qualification: Power. Buyer is a limited liability company duly organized and validly existing under the Laws of the State of Delaware. Buyer has all requisite corporate power and authority to own, lease and operate all of its properties and assets and to carry on its business as it is now being conducted.

(b) Authorization. Buyer has all requisite corporate power and authority to enter into this Agreement and the related agreements referred to herein and to carry out its obligations hereunder and thereunder. No further corporate proceedings on the part of Buyer are necessary to authorize this Agreement or the transactions contemplated hereby, and this Agreement and the related agreements, documents and instruments referred to herein to which the Buyer is a party, have been duly executed and delivered by Buyer and constitute the valid and legally binding obligations of Buyer, enforceable against it in accordance with their respective terms.

20

*Execution Version*

(c)  Compliance: Binding Effect.   The execution and delivery of this Agreement and the related agreements, documents and instruments referred to herein, and the consummation of the transactions contemplated hereby, by Buyer will not: (i) violate any provisions of the Articles of Organization of Buyer or (ii) constitute a default under, or constitute an event which with the giving of notice or the lapse of time or both would become a default under, or create any rights of termination, cancellation, purchase or acceleration in any Person under, any mortgage, lien, lease, agreement or other instrument or obligation to which Buyer is a party or by which Buyer is bound, or (iii) violate or conflict with any Law, statute, regulation, order, writ, injunction, judgment, arbitration award, degree or other restrictions of any kind or character to which Buyer is subject or by which Buyer is bound.

(d)  Consents.  No consent, approval, authorization or order of any court, governmental agency or body, or third party is required for the consummation and performance by Buyer of the transactions contemplated by this Agreement.

5.2 Disclosure.  No representation or warranty by the Buyer in this Agreement, and no statement, certificate or scheduled furnished or to be furnished by or on behalf of it pursuant to this Agreement, or any document or certificate delivered to the Company or the Seller pursuant to this Agreement or in connection with actions contemplated hereby, contains or shall contain any untrue statement of material fact or omits or shall omit a material fact necessary to make the statements contained therein, in light of the circumstances in which they were made, not misleading.

5.3 Representations and Warranties True at Closing.   The representations and warranties of Buyer, set forth in this Section 5, shall be true and correct on the Closing Date as if made again on and as of the Closing Date.

## 6.  COVENANTS OF SELLER AND THE COMPANY

6.1 Further Acts.  On the Closing Date, or thereafter if necessary, the Seller shall without cost or expense to Buyer, execute and deliver to or cause to be executed and delivered to Buyer such further instruments of transfer and conveyance and take such other action as Buyer may reasonably require to carry out more effectively and completely the transactions contemplated by this Agreement, including, without limitation, all reasonable requests by Buyer with respect to updating the title to the intangible property set forth on **Schedule 4.14** in the name of the Company.

6.2 Transition Period.  Commencing on the Closing Date and continuing thereafter for a period of thirty (30) days, Seller shall, at no cost to Buyer, provide such managerial, advisory and transition-related services to Buyer as Buyer may request.

6.3 **SELLER RELEASE.** EFFECTIVE AS OF THE CLOSING, SELLER DOES FOR HIMSELF AND HIS RESPECTIVE AFFILIATES, HEIRS, BENEFICIARIES, SUCCESSORS AND ASSIGNS, IF ANY (EACH, A "RELEASING PARTY"), RELEASE AND ABSOLUTELY FOREVER DISCHARGE THE BUYER, COMPANY AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS,

*Execution Version*

AFFILIATES, EMPLOYEES AND AGENTS (EACH, A "RELEASED PARTY") FROM AND AGAINST ALL RELEASED MATTERS. "RELEASED MATTERS" MEANS ANY AND ALL CLAIMS, DEMANDS, DAMAGES, DEBTS, LIABILITIES, OBLIGATIONS, COSTS, EXPENSES (INCLUDING ATTORNEYS' AND ACCOUNTANTS' FEES AND EXPENSES), ACTIONS AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, ARISING ON OR PRIOR TO THE CLOSING DATE, WHETHER NOW KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, THAT SUCH SELLER NOW HAS, OR AT ANY TIME PREVIOUSLY HAD, OR SHALL OR MAY HAVE IN THE FUTURE, (A) WITH RESPECT TO ANY CONTRACTS BETWEEN THE COMPANY, ON THE ONE HAND, AND A RELEASING PARTY, ON THE OTHER, AND (B) AS A SHAREHOLDER, OFFICER, DIRECTOR, CONTRACTOR, CONSULTANT OR EMPLOYEE OF THE COMPANY, ARISING BY VIRTUE OF OR IN ANY MATTER RELATED TO ANY ACTIONS OR INACTIONS WITH RESPECT TO THE COMPANY OR ITS AFFAIRS ON OR BEFORE THE CLOSING DATE; PROVIDED THAT RELEASED MATTERS SHALL NOT INCLUDE ANY RIGHT PURSUANT TO THIS AGREEMENT. IT IS THE INTENTION OF THE SELLER IN EXECUTING THIS RELEASE, AND IN GIVING AND RECEIVING THE CONSIDERATION CALLED FOR UNDER THIS AGREEMENT, THAT THE RELEASE CONTAINED IN THIS SECTION 6.3 SHALL BE EFFECTIVE AS A FULL AND FINAL ACCORD AND SATISFACTION AND GENERAL RELEASE OF AND FROM ALL RELEASED MATTERS AND THE FINAL RESOLUTION BY SELLER AND THE RELEASED PARTIES OF ALL RELEASED MATTERS.

## 7. COVENANTS OF BUYER

7.1 Further Acts. On the Closing Date, or thereafter if necessary, Buyer shall, without cost or expense to the Seller, execute and deliver to or cause to be executed and delivered to the Seller such further instruments and take such other action as the Seller may reasonably require to carry out more effectively and completely the transactions contemplated by this Agreement.

## 8. MUTUAL COVENANTS AND WARRANTIES.

8.1 Publicity. No public announcement or statement, press release or other publicity regarding the transactions referred to herein shall be made by any party hereto without the prior written approval of the Buyer and Seller.

8.2 Specific Performance. Because of the unique nature of the Purchased Stock and the assets of the Company, Buyer shall have the right to specific performance of the obligations of Seller hereunder to convey ownership of the Company to Buyer, including the obligations (i) to transfer good and marketable title to, and deliver possession of, the Purchased Stock to Buyer to the extent and in the manner contemplated by this Agreement, (ii) to obtain any required consents necessary on the part of the Seller and the Company to consummate the transactions contemplated by this Agreement and (iii) to perfect and confirm the Company's title to and possession of the assets of the Company as contemplated by this Agreement, including any required transfers of intellectual property as provided in Section 4.14 of this Agreement. This

*Execution Version*

right of Buyer to specific performance shall be in addition to any and all other remedies granted to Buyer in the same proceeding in the form of monetary damages.

8.3 <u>Brokerage</u>. Seller and Buyer respectively warrant to each other that no Person provided services as a broker, agent or finder in this transaction. Seller and Buyer shall respectively indemnify the other for any claim asserted by any Person purporting to act on behalf of the respective indemnitor as a broker, agent, or finder in connection with this transaction, including any claim for fees, costs or expenses of such Person.

8.4 <u>Reasonable Efforts</u>. Upon the terms and subject to the conditions hereof, each of the parties hereto agrees to use its commercially reasonable efforts (i) to perform its obligations hereunder and (ii) to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby.

8.5 <u>Tax Matters</u>. The following provisions shall govern the allocation of responsibility as between Buyer and Seller for certain tax matters following the Closing Date:

(a) <u>Tax Indemnification</u>. The Seller shall indemnify the Company and Buyer and each of their respective affiliates and hold them harmless from and against any Loss, Claim, liability, expense or other damage attributable to all Taxes (or the non-payment thereof) as of the Closing Date for any taxable period that includes (but does not end on) the Closing Date (any such period described in this subsection (a) is referred to herein as a "Pre-Closing Tax Period").

(b) <u>Straddle Period</u>. In the case of any taxable period that includes (but does not end on) the Closing Date (a "Straddle Period"), the amount of any Taxes based on or measured by income or receipts of the Company for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass-through entity in which the Company holds a beneficial interest shall be deemed to terminate at such time), and the amount of other Taxes of the Company for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

(c) <u>Responsibility for Filing Tax Returns</u>. Seller shall prepare or cause to be prepared and filed or cause to be filed all income Tax Returns for the Company for any taxable period ending on or prior to the Closing Date; provided, however, the Tax Returns for 2014 (the "2014 Returns") shall be prepared and filed by Seller no later than June 30, 2015. If the 2014 Returns are not prepared and filed by June 30, 2015, then the Buyer may prepare the 2014 Returns. In the event that Buyer prepares the 2014 Return, Seller acknowledges and agrees that (i) the 2014 Returns may have a direct impact on Seller's personal income tax return(s), (ii) the Seller forever waives, disclaims and releases any claim that it may have against the Buyer in conjunction with the preparation of the 2014 Returns and (iii) Seller shall indemnify and hold harmless Buyer against any claim, cause of action or liability that may arise in connection with the Buyer's preparation of the 2014 Returns. Buyer shall prepare or cause to be prepared and file

*Execution Version*

or cause to be filed all Tax Returns for the Company that are filed after the Closing Date other than the Tax Returns referenced in the preceding sentence.

       (d)    Cooperation on Tax Matters.

       a.    Buyer, the Company and the Seller shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to Section 8.5(c) above, and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Company and the Seller agree (i) to retain all books and records with respect to Tax matters pertinent to the Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer or the Seller, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, the Company or the Seller, as the case may be, shall allow the other party to take possession of such books and records.

       b.    Buyer and Seller further agree, upon request, to use their reasonable efforts to obtain any certificate or other document from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

       (e)    Certain Taxes and Fees. All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred by the Company or the Seller in connection with the consummation of the transactions contemplated by this Agreement, shall be paid by the Seller when due, and the Seller will, at his own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable Law, Buyer will, and will cause its affiliates to, join in the execution of any such Tax Returns and other documentation.

## 9. SURVIVAL OF REPRESENTATIONS, WARRANTIES, AGREEMENTS AND COVENANTS: INDEMNIFICATION.

### 9.1 Survival of Representations, Warranties, Agreement and Covenants.

       (a)    Each and every representation and warranty made by the Company, the Seller or Buyer in this Agreement or in any exhibits, schedules, instruments of transfer or other documents delivered pursuant thereto or in connection therewith shall be effective regardless of any investigation that may have been or may be made at any time by or on behalf of the party to whom such representation or warranty is made and shall survive the Closing, but except as

*Execution Version*

otherwise provided in this Section 9.1, shall terminate on the date that is eighteen (18) months after the Closing Date, and thereafter shall be of no further force and effect.

(b) Any representation or warranty of the Seller relating to any Tax or Tax Return or employee benefits, retirement or to any other matter governed by ERISA shall extend until thirty (30) days after the expiration of the applicable statutory period of limitations, including any extension thereof.

(c) Any representation or warranty of the Seller relating to title to or ownership of the Purchased Stock, capitalization of the Company or ownership of assets by the Company shall extend for an unlimited period after the Closing Date.

(d) All covenants and agreements contained in this Agreement or in any related agreement, certificate, document or instrument delivered pursuant to this Agreement shall survive the Closing Date in accordance with their terms.

(e) The date on which any covenant, agreement, representation or warranty terminates in accordance with this Section 9 is referred to herein as the "Cut-off Date" for such covenant, agreement, representation or warranty. Any representation, warranty, covenant or agreement that would otherwise terminate at the Cut-off Date with respect thereto shall survive if notice in reasonable specificity of the breach, inaccuracy or nonperformance thereof shall have been given on or prior to Cut-off Date with respect thereto to the party against whom indemnification may be sought for the purpose of allowing the assertion of a claim based thereon.

(f) The covenants and agreements contained in this Section 9 shall survive until such time as any claim for indemnification is finally settled in accordance with the terms thereof.

9.2 Indemnification by Buyer.

(a) Buyer agrees to indemnify the Seller and hold him harmless from and against any and all Losses incurred or sustained by, or imposed upon, the Seller with respect to or by reason of (i) any breach or inaccuracy on the part of Buyer of any of its representations and warranties contained in this Agreement or in any related agreement, certificate, document or instrument delivered by Buyer hereunder, or (ii) any breach, default or lack of performance on the part of Buyer of any of its agreements or covenants contained in this Agreement or in any related agreement, certificate, document or instrument delivered by Buyer hereunder.

(b) Notwithstanding anything to the contrary in this Agreement:

a. The Seller shall not be entitled to indemnification under Section 9.2(a) with respect to any claim for indemnification thereunder, unless the Seller has given Buyer written notice of such claim prior to the applicable Cut-off Date; and

25

*Execution Version*

b.    The Seller shall not be entitled to indemnification or payment under Section 9.2(a)(i) of this Agreement unless and until the aggregate amount of Losses under Section 9.2(a)(i) exceeds $10,000 and then shall be entitled to indemnification and payment for all such Losses; provided, however, that this $10,000 limitation shall not apply to any Losses arising from the failure to obtain the guaranty releases under Section 3.2(b)a.(iii); and

c.    The Seller's entitlement to indemnification or payment under Section 9.2(a)(i) of this Agreement for Losses under Section 9.2(a)(i) shall be limited to $25,000; provided, however, that this $25,000 limitation shall not apply to any Losses arising from the failure to obtain the guaranty releases under Section 3.2(b)a.(iii).

9.3 Indemnification by Seller.

(a)    The Seller agrees to indemnify Buyer and the Company and hold them harmless from and against any and all Losses incurred or sustained or suffered by, or imposed upon, Buyer of the Company, with respect to or by reason of (i) any breach or inaccuracy on the part of the Seller of any of the Seller's representations and warranties contained in this Agreement or in any related agreement, certificate, document or instrument delivered by the Seller hereunder; (ii) any breach, default or lack of performance on the part of the Seller of any of the Seller's agreements or covenants contained in this Agreement or in any related agreement, certificate, document or instrument delivered by the Seller hereunder; and (iii) any suit, action, proceeding or claim now pending or which may be made or brought hereafter based upon any breach by Seller of any representation, warranty or covenant hereunder.

(b) Notwithstanding anything to the contrary in this Agreement:

a.    Buyer and the Company shall not be entitled to indemnification under Section 9.3(a) with respect to any claim for indemnification, unless Buyer has given the Seller written notice of such claim prior to the applicable Cut-off Date; and

b.    Buyer and the Company shall not be entitled to indemnification or payment under Section 9.3(a)(i) of this Agreement unless and until the aggregate amount of Losses under Section 9.3(a)(i) exceeds $10,000 and then shall be entitled to indemnification and payment for all such Losses; and

c.    Buyer's and the Company's entitlement to indemnification or payment under Section 9.3(a)(i) of this Agreement for Losses under Section 9.3(a)(i) cumulatively shall be limited to the sum of the Purchase Price and the Capital Contribution; and

d.    the limitations in Section 9.3(b)(b) and Section 9.3(b)(c) of this Agreement shall not apply to the obligations of the Seller to indemnify Buyer and the Company with respect to the representations and warranties of the Seller set forth in Sections 4.1, 4.2, 4.3, 4.11 and 4.20 of this Agreement.

9.4 Interest. Any payment required to be made by Buyer or the Seller pursuant to this Section 9 shall be made with interest for the period from the date the indemnification claim is

*Execution Version*

made to the date of payment at an annual rate equal to the sum of (a) five percent (5%) plus (b) the one year LIBOR rate as published by Thomson Reuters from time to time, and the rate of interest hereunder shall change with each change in such rate.

9.5 Procedures for Third-Party Claims.

(a)     Any party seeking indemnification pursuant to this Section 9 (the "Indemnified Party") in respect of any legal proceeding, action, claim or demand (in each case, a "Claim") instituted by any third party or governmental entity shall give the party from whom indemnification with respect to such claim is sought (the "Indemnifying Party") (i) prompt written notice (but in no event more than twenty (20) days after the Indemnified Party acquires knowledge thereof) of such Claim and (ii) copies of all documents and information relating to any such Claim within twenty (20) days of their being obtained by the Indemnified Party; provided, that the failure by the Indemnified Party to so notify or provide copies to the Indemnifying Party shall not relieve the Indemnifying Party from any liability to the Indemnified Party for any liability hereunder except to the extent that such failure shall have actually and materially prejudiced the defense of the Claim.

(b)     Subject to Section 9.5(c) of this Agreement, the Indemnifying Party shall have the right, at its option and expense, to defend against, negotiate, settle or otherwise deal with any Claim with respect to which it is the Indemnifying Party and to be represented by counsel mutually acceptable to the Indemnifying Party and the Indemnified Party, and the Indemnified Party will not admit any liability with respect thereto or settle, compromise, pay or discharge the same without the consent of the Indemnifying Party, which consent shall not be unreasonably withheld, so long as the Indemnifying Party is contesting or defending the same with reasonable diligence and in good faith. The Indemnified Party may participate in any proceeding with counsel of its choice and at its expense. The Indemnifying Party may not enter into a settlement of any such claim without the consent of the Indemnified Party, which consent shall not be unreasonably withheld, unless such settlement requires no more than a monetary payment for which the Indemnified Party is fully indemnified by the Indemnifying Party or involves other matters not binding upon the Indemnified Party. In the event the Indemnifying Party does not, within fifteen (15) days after it receives written notice of the Claim from the Indemnified Party, agree in writing to accept the defense or, and assume all responsibility for, such Claim as provided above in Section 9.5(b), then the Indemnified Party shall have the right to defend against, negotiate, settle or otherwise deal with the Claim in such manner as the Indemnified Party deems appropriate, in its sole discretion, and the Indemnified Party shall be entitled to indemnification therefor from the Indemnifying Party under this Section 9.

(c)     In the event the Claim subject to this Section 9 is an Environmental Claim, the parties agree that the following provisions shall apply, but subject to indemnification dollar limitations under Section 9.3:

a.     Buyer shall have control of all actions that may be necessary in order (i) to resolve the Environmental Claim and (ii) to address, remediate and repair conditions giving rise to such Environmental Claim (the "Conditions") so that such Conditions are in full compliance with Environmental Laws;

*Execution Version*

       b.    Buyer and Seller shall retain a qualified environmental consulting/services company mutually acceptable to both Buyer and Seller ("Consultant") to review such Environmental Claim and associated Conditions and to determine the extent to which correlation, remediation or repair of the Conditions is necessary to be in full compliance with Environmental Laws, and the Consultant shall prepare a written report for Buyer and the Seller setting forth such review and determination and the specific actions to be taken so as to correct, remediate and repair the Conditions without unreasonably interrupting the business operations of the Company. Except as to mutually retaining the Consultant, to the extent practicable under the circumstances, Buyer shall consult with the Seller as to the matters described in this Section 9.5(c)(b), but the Seller shall not have a right of approval or disapproval as to such matters;

       c.    Subject to Buyer complying with this Section 9.5(c), the Seller shall be solely responsible for and shall pay and, if applicable, shall reimburse Buyer or the Company for (i) all Remediation Costs and Expenses (as defined below) and (ii) any damages, fines, penalties and other reasonable costs and expenses resulting from or attributable to resolution of the Environmental Claim or relating to the Conditions not being in full compliance as of the Closing with applicable Environmental Laws, to the extent indemnification is provided therefor under this Section 9.

       d.    For the purposes of this Section 9.5(c), "Remediation Costs and Expenses" shall mean the fees, costs and expenses reasonably incurred by Buyer or the Company in undertaking and completing the actions recommended by the Consultant to so correct, remediate and repair the Conditions including, without limitation, environmental consultants' and contractors' fees, attorneys' fees, laboratory and analytical costs and expenses, equipment charges, industrial or hazardous waste disposal costs, and all other fees, costs or expenses reasonably incurred in connection with sampling, monitoring, investigation and remediation activities; and

       e.    Any amounts payable by the Seller pursuant to this Section 9.5(c) shall be paid within thirty (30) days of the date an invoice therefor is given to the Seller.

       (d)    The parties agree to treat any indemnification payment made pursuant to this Section 9 as an adjustment to the Purchase Price for all purposes, including with respect to income Taxes.

     10.    GOVERNING LAW. This Agreement shall be governed by and construed under and in accordance with the substantive Laws of the State of New York, excluding any choice of law rules that might direct the application of the Laws of another jurisdiction.

     11.    NOTICES. Any notice or other communication required or permitted hereunder shall be in writing and shall be considered delivered in all respects when it has been delivered by hand or overnight courier, by acknowledged facsimile transmission followed by the original mailed by certified mail, return receipt requested, or three (3) days after it is mailed by certified mail, return receipt requested, first class postage prepaid, addressed as follows:

*Execution Version*

To Buyer:

GLD FOREMOST HOLDINGS LLC
1325 Avenue of the Americas
28th FL
New York, NY 10019

To Company:                    With a copy to:

FOREMOST INDUSTRIES, INC.     GLD FOREMOST HOLDINGS, LLC
2371 Buchanan Trail West       1325 Avenue of the Americas 28th FL
Greencastle, PA 17225          New York, NY 10019


To Seller:                     With a copy to:

RALPH C. MICHAEL               ED WINE, ESQ.
3300 Hill Road                 Dick, Stein, Schemel, Wine & Frey, LLP
Greencastle, PA 17224          119 East Baltimore Street
                               Greencastle, PA 17225


or such other addresses as shall be similarly furnished in writing by either party.


    12.    EXHIBITS. All exhibits and schedules hereto are by reference incorporated herein and made a part hereof.

    13.    ENTIRE AGREEMENT; BINDING EFFECT. This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated herein; and there are no agreements or understandings between the parties other than those set forth herein or executed simultaneously or in connection herewith. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

    14.    HEADINGS. The headings in this Agreement are inserted for convenience only and shall not constitute a part hereof.

    15.    EXPENSES. The parties hereto shall bear their respective expenses incurred in connection with the negotiation, execution and performance of this Agreement without obligation to pay or contribute to the expenses incurred by any other party.

    16.    AMENDMENT. This Agreement may be amended, modified, superseded or cancelled, and any of the terms, covenants, representations, warranties or conditions hereof may

*Execution Version*

be waived, only by a written instrument executed on behalf of all of the parties hereto or, in the case of a waiver, by the party waiving compliance.

17.    WAIVER.  The failure of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right to enforce that provision or any other provision hereof at any time thereafter, except as specifically limited herein.

18.    TIME OF THE ESSENCE.  Time is deemed to be of the essence with respect to all of the terms, conditions, representations and warranties of this Agreement.

19.    ASSIGNMENT.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by any of the parties hereto without the prior written consent of the other parties.  Notwithstanding the foregoing, nothing herein will prevent the Buyer from assigning its rights, interests and obligations hereunder to an affiliate of the Buyer.

20.    COUNTERPARTS; FACSIMILE SIGNATURE.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same agreement.  Each of the parties to this Agreement agrees that a signature affixed to a counterpart of this Agreement and delivered by facsimile or other electronic transmission by any person is intended to be its, his or her signature and shall be valid, binding and enforceable against such person.

21.    NO THIRD PARTY BENEFICIARIES.  Nothing contained in this Agreement will confer any third party beneficiary or other rights upon any person (specifically including any employees of the Seller or the Company) or entity that is not a party to this Agreement.

22.    DISPUTE RESOLUTION.

(a)    The parties to this Agreement shall act in good faith and use commercially reasonable efforts to resolve, within thirty (60) days after written notice thereof, any claim, action, dispute, controversy or disagreement (each a "Dispute") between the parties or any of their respective successors and assigns under or related to this Agreement or the transactions contemplated hereunder. The party bringing any Dispute shall give to the other party a statement setting forth in reasonable detail the nature of the claims involved in such Dispute, the amount involved, if any, and the remedy sought. No party hereto shall seek, nor shall be entitled to seek, binding outside resolution of the Dispute unless and until the parties have been unable to amicably resolve the dispute as set forth in this Section 22 and then, only in compliance with the procedures set forth in this Section 22; provided, however, that notwithstanding anything to the contrary in this Section 22, nothing herein shall limit or restrict the parties from seeking equitable or other judicial relief to enforce the provisions under this Agreement, the Non-Competition Agreement or any of the other transaction documents or to preserve the status quo pending resolution of the Dispute.

(b)    If the parties are unable to amicably resolve the Dispute within such 60-day period, then in order to resolve the Dispute, either of the parties may initiate legal action in the Pennsylvania Court of Common Pleas, 39th Judicial District (Franklin County Branch) which

*Execution Version*

shall have exclusive jurisdiction of the Dispute, and all parties shall submit to the jurisdiction of this Court. Any decision by this Court is appealable as allowed by Pennsylvania and federal rules of civil procedure. Provided, however, that if federal diversity of citizenship applies to any dispute, then any party may initiate legal action in the United States District Court for the Middle District of Pennsylvania sitting in Harrisburg, Pennsylvania to resolve the Dispute.

(c)     Each party shall pay the fees of its own attorneys, expenses of witnesses and all other expenses and costs in connection with the presentation of such party's case regarding the Dispute.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*Execution Version*

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement all as of the day and year first above written.

**BUYER:**

By: _____

Title: MANAGER

**COMPANY:**

By: _____

Title: President

**SELLER:**

By: _____

Title: _____

32

*Execution Version*

## EXHIBIT A

*Intentionally Left Blank*

*Execution Version*

## EXHIBIT B

*Non-Competition Agreement*

*Execution Version*

## SCHEDULE 1.1

1.  Group Health Insurance Plan
2.  Vision Plan
3.  Disability Insurance
4.  401K Plan

Initials

Buyer

Seller

Company

# aetna :   PA PPO 3000 100/50 $30 10/50/75RX

Coverage Period: 05/01/2015 - 04/30/2016

Coverage for: Individual + Family | Plan Type: PPO

## Summary of Benefits and Coverage: What this Plan Covers & What it Costs

⚠ **This is only a summary.** If you want more detail about your coverage and costs, you can get the complete terms in the policy or plan document at www.HealthReformPlanSBC.com or by calling 1-888-802-3862.

| Important Questions | Answers | Why this Matters: |
|---|---|---|
| **What is the overall deductible?** | For each Plan Year, Network: Individual $3,000 / Family $6,000. Out-of-Network: Individual $5,000 / Family $10,000. Does not apply to network for certain office visits, urgent care, preventive care and prescription drugs. | You must pay all the costs up to the deductible amount before this plan begins to pay for covered services you use. Check your policy or plan document to see when the deductible starts over (usually, but not always, January 1st). See the chart starting on page 2 for how much you pay for covered services after you meet the deductible. |
| **Are there other deductibles for specific services?** | No. | You don't have to meet deductibles for specific services, but see the chart starting on page 2 for other costs for services this plan covers. |
| **Is there an out-of-pocket limit on my expenses?** | Yes. Network: Individual $6,350 / Family $12,700. Out-of-Network: Individual $10,000 / Family $20,000. | The out-of-pocket limit is the most you could pay during a coverage period (usually one year) for your share of the cost of covered services. This limit helps you plan for health care expenses. |
| **What is not included in the out-of-pocket limit?** | Premiums, balance-billed charges, penalties for failure to obtain pre-authorization for services and health care that this plan doesn't cover. | Even though you pay these expenses, they don't count toward the out-of-pocket limit. |
| **Is there an overall annual limit on what the plan pays?** | No. | The chart starting on page 2 describes any limits on what the plan will pay for specific covered services, such as office visits. |
| **Does this plan use a network of providers?** | Yes. See www.aetna.com or call 1-888-802-3862 for a list of network providers. | If you use an in-network doctor or other health care provider, this plan will pay some or all of the costs of covered services. Be aware, your in-network doctor or hospital may use an out-of-network provider for some services. Plans use the term in-network, preferred, or participating for providers in their network. See the chart starting on page 2 for how this plan pays different kinds of providers. |
| **Do I need a referral to see a specialist?** | No. | You can see the specialist you choose without permission from this plan. |
| **Are there services this plan doesn't cover?** | Yes. | Some of the services this plan doesn't cover are listed on page 5. See your policy or plan document for additional information about excluded services. |

Questions: Call 1-888-802-3862 or visit us at www.HealthReformPlanSBC.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary. You can view the Glossary

072800-100020-381423

1 of 8

# aetna

## PA PPO 3000 100/50 $30 10/50/75RX

Coverage Period: 05/01/2015 – 04/30/2016

Coverage for: Individual + Family | Plan Type: PPO

## Summary of Benefits and Coverage: What this Plan Covers & What it Costs

- **Copayments** are fixed dollar amounts (for example, $15) you pay for covered health care, usually when you receive the service.
- **Coinsurance** is *your* share of the costs of a covered service, calculated as a percent of the <u>allowed amount</u> for the service. For example, if the plan's <u>allowed amount</u> for an overnight hospital stay is $1,000, your <u>coinsurance</u> payment of 20% would be $200. This may change if you haven't met your <u>deductible</u>.
- The amount the plan pays for covered services is based on the <u>allowed amount</u>. If an out-of-network <u>provider</u> charges more than the <u>allowed amount</u>, you may have to pay the difference. For example, if an out-of-network hospital charges $1,500 for an overnight stay and the <u>allowed amount</u> is $1,000, you may have to pay the $500 difference. (This is called <u>balance billing</u>.)
- This plan may encourage you to use network <u>providers</u> by charging you lower <u>deductibles</u>, <u>copayments</u> and <u>coinsurance</u> amounts.

| Common Medical Event | Services You May Need | Your Cost If You Used a Network Provider | Your Cost If You Used an Out-of-Network Provider | Limitations & Exceptions |
|---|---|---|---|---|
| If you visit a health care provider's office or clinic | Primary care visit to treat an injury or illness | $30 copay/visit, deductible waived | 50% coinsurance | ----none---- |
| | Specialist visit | $50 copay/visit, deductible waived | 50% coinsurance | ----none---- |
| | Other practitioner office visit | 25% coinsurance, deductible waived for Chiropractic care | 25% coinsurance for Chiropractic care | Coverage is limited to 20 visits for Chiropractic care. |
| | Preventive care /screening /immunization | No change | 50% coinsurance, except deductible waived for child immunizations and routine gynecological exam | Age and frequency schedules may apply. |
| If you have a test | Diagnostic test (x-ray, blood work) | 0% coinsurance | 50% coinsurance | ----none---- |
| | Imaging (CT/PET scans, MRIs) | 0% coinsurance | 50% coinsurance | ----none---- |

Questions: Call 1-888-802-3862 or visit us at www.HealthReform.PlanSBC.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary. You can view the Glossary

072800-100020-381425
2 of 8

# aetna

**PA PPO 3000 100/50 $30 10/50/75RX**

Coverage Period: 05/01/2015 - 04/30/2016

Coverage for: Individual + Family | Plan Type: PPO

## Summary of Benefits and Coverage: What this Plan Covers & What it Costs

| Common Medical Event | Services You May Need | Your Cost If You Use a Network Provider | Your Cost If You Use an Out-of-Network Provider | Limitations & Exceptions |
|---|---|---|---|---|
| **If you need drugs to treat your illness or condition.** More information about prescription drug coverage is available at www.aetna.com/pharmacy-insurance/individuals-families | Preferred generic drugs | $10 copay (for up to a 30 day supply), $20 copay (for up to a 90 day supply) | 50% coinsurance for up to 30 day supply | Covers up to a 90-day supply (retail or mail order prescription). Applicable cost share plus difference (brand minus generic cost) applies for brand when generic available unless Dispense as Written. No charge for network preferred generic FDA-approved women's contraceptives. Precertification and step therapy required |
| | Preferred brand drugs | $50 copay (for up to a 30 day supply), $100 copay (for up to a 90 day supply) | 50% coinsurance for up to 30 day supply | |
| | Non-preferred generic/brand drugs | $75 copay (for up to a 30 day supply), $150 copay (for up to a 90 day supply) | 50% coinsurance for up to 30 day supply | |
| | Specialty drugs | 50% coinsurance up to a $500 maximum for up to a 30 day supply | Not covered | Aetna Specialty CareRx℠ - First Prescription must be filled at a participating retail pharmacy or Aetna Specialty Pharmacy®. Subsequent fills must be through Aetna Specialty Pharmacy®. |
| **If you have outpatient surgery** | Facility fee (e.g., ambulatory surgery center) | 0% coinsurance | 50% coinsurance | ———none——— |
| | Physician/surgeon fees | 0% coinsurance | 50% coinsurance | ———none——— |
| **If you need immediate medical attention** | Emergency room services | $200 copay/visit | Paid same as network | Copay waived if admitted. Out-of-network emergency room services cost share same as network. No coverage for non-emergency care. |
| | Emergency medical transportation | 0% coinsurance | Paid same as network | Out-of-network cost share same as network. |
| | Urgent care | $50 copay/visit, deductible waived | 50% coinsurance | No coverage for non-urgent care. |

Questions: Call 1-888-802-3862 or visit us at www.HealthReform/PlanSBC.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary. You can view the Glossary

072800-100020-381423

3 of 8

# aetna :   PA PPO 3000 100/50 $30 10/50/75RX

Coverage Period: 05/01/2015 - 04/30/2016

Coverage for: Individual + Family | Plan Type: PPO

## Summary of Benefits and Coverage: What this Plan Covers & What it Costs

| Common Medical Event | Services You May Need | Your Cost If You Use a Network Provider | Your Cost If You Use an Out-of-Network Provider | Limitations & Exceptions |
|---|---|---|---|---|
| If you have a hospital stay | Facility fee (e.g. hospital room) | 0% coinsurance | 50% coinsurance | Out-of-network (OON) precert required or 50% up to $400 penalty applies per service or supply. |
| | Physician/surgeon fee | 0% coinsurance | 50% coinsurance | --none-- |
| If you have mental health, behavioral health, or substance abuse needs | Mental/Behavioral health outpatient services | $50 copay/visit, deductible waived | 50% coinsurance | --none-- |
| | Mental/Behavioral health inpatient services | 0% coinsurance | 50% coinsurance | OON precert required or 50% up to $400 penalty applies per service or supply. |
| | Substance use disorder outpatient services | $50 copay/visit, deductible waived | 50% coinsurance | --none-- |
| | Substance use disorder inpatient services | 0% coinsurance | 50% coinsurance | OON precert required or 50% up to $400 penalty applies per service or supply. |
| If you are pregnant | Prenatal and postnatal care | Prenatal: No charge; Postnatal: 0% coinsurance | 50% coinsurance | --none-- |
| | Delivery and all inpatient services | 0% coinsurance | 50% coinsurance | OON precert required or 50% up to $400 penalty applies per service or supply. |
| | Home health care | 0% coinsurance | 50% coinsurance | Coverage is limited to 60 visits. OON precert required or 50% up to $400 penalty applies per service or supply. |
| If you need help recovering or have other special health needs | Rehabilitation services | 0% coinsurance | 50% coinsurance | Coverage is limited to 30 visits for Physical Therapy (PT) and Occupational Therapy (OT) combined and 30 visits for Speech Therapy (ST). Benefit limits are shared between rehabilitation and autism. |
| | Habilitation services | 0% coinsurance | 50% coinsurance | Coverage is limited to 30 visits for PT and OT combined and 30 visits for ST. Benefits limits are shared between rehabilitation PT/OT/ST and autism PT/OT/ST services. |

Questions: Call 1 888 802-3862 or visit us at www.HealthReformPlanSBC.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary. You can view the Glossary

# aetna

**Summary of Benefits and Coverage: What this Plan Covers & What it Costs**

Coverage Period: 05/01/2015 - 04/30/2016

Coverage for: Individual + Family | Plan Type: PPO

**PA PPO 3000 100/50 $30 10/50/75RX**

| Common Medical Event | Services You May Need | Your Cost If You Use a Network Provider | Your Cost If You Use an Out-of-Network Provider | Limitations & Exceptions |
|---|---|---|---|---|
| | Skilled nursing care | 0% coinsurance | 50% coinsurance | Coverage is limited to 120 days. OON precert required or 50% up to $400 penalty applies per service or supply. |
| | Durable medical equipment | 0% coinsurance | 50% coinsurance | OON precert required or 50% up to $400 penalty applies per service or supply. |
| | Hospice service | 0% coinsurance | 50% coinsurance | OON precert required or 50% up to $400 penalty applies per service or supply. |
| If your child needs dental or eye care | Eye exam | No charge | 50% coinsurance | Coverage is limited to 1 exam per 24 months. |
| | Glasses | Not covered | Not covered | Not covered |
| | Dental check-up | Not covered | Not covered | Not covered |

## Excluded Services & Other Covered Services:

**Services Your Plan Does NOT Cover** (This isn't a complete list. Check your policy or plan document for other excluded services.)

- Acupuncture - except as form of anesthesia.
- Bariatric surgery
- Cosmetic surgery - except when medically necessary.
- Dental care (Adult & Child) - except accidental injury.

- Glasses (Child)
- Hearing aids
- Infertility treatment - except the diagnosis and surgical treatment of underlying conditions.
- Long-term care

- Non-emergency care when traveling outside the U.S.
- Private-duty nursing
- Routine foot care
- Weight loss programs

**Other Covered Services** (This isn't a complete list. Check your policy or plan document for other covered services and your costs for these services.)

- Chiropractic care - limited to 20 visits.

- Routine eye care (Adult) - limited to 1 exam per 24 months.

**Questions: Call 1-888-802-3862 or visit us at www.HealthReformPlanSBC.com.**
If you aren't clear about any of the underlined terms used in this form, see the Glossary. You can view the Glossary

# aetna

## PA PPO 3000 100/50 $30 10/50/75RX

Coverage Period: 05/01/2015 - 04/30/2016

Coverage for: Individual + Family | Plan Type: PPO

## Summary of Benefits and Coverage: What this Plan Covers & What it Costs

### Your Rights to Continue Coverage:

If you lose coverage under the plan, then, depending upon the circumstances, Federal and State laws may provide protections that allow you to keep health coverage. Any such rights may be limited in duration and will require you to pay a premium, which may be significantly higher than the premium you pay while covered under the plan. Other limitations on your rights to continue coverage may also apply.

For more information on your rights to continue coverage, contact the plan at 1-888-802-3862. You may also contact your state insurance department, the U.S. Department of Labor, Employee Benefits Security Administration at 1-866-444-3272 or www.dol.gov/ebsa, or the U.S. Department of Health and Human Services at 1-877-267-2323 x61565 or www.cciio.cms.gov.

### Your Grievance and Appeals Rights:

If you have a complaint or are dissatisfied with a denial of coverage for claims under your plan, you may be able to appeal or file a grievance. For questions about your rights, this notice, or assistance, you can contact us by calling the toll free number on your Medical ID Card. You may also contact the Department of Labor's Employee Benefits Security Administration at 1-866-444-EBSA (3272) or www.dol.gov/ebsa/healthreform. You may also contact your State Department of Insurance at Commonwealth of Pennsylvania, (717) 783-0442, www.insurance.pa.gov

Additionally, a consumer assistance program can help you file an appeal. Contact Pennsylvania Consumer Assistance Program, Pennsylvania Insurance Department, Bureau of Consumer Services, 1209 Strawberry Square, Harrisburg, PA 17111, (877) 881-6388, http://www.pahealthoptions.com

### Does this Coverage Provide Minimum Essential Coverage?

The Affordable Care Act requires most people to have health care coverage that qualifies as "minimum essential coverage". This plan or policy does provide minimum essential coverage.

### Does this Coverage Meet Minimum Value Standard?

The Affordable Care Act establishes a minimum value standard of benefits of a health plan. The minimum value standard is 60% (actuarial value). This health coverage does meet the minimum value standard for the benefits it provides.

### Language Access Services:

Para obtener asistencia en Español, llame al 1-888-802-3862.

Kung kailangan ninyo ang tulong sa Tagalog tumawag sa 1-888-802-3862.

如果需要中文的帮助，请拨打这个号码 1-888-802-3862.

Dinek'ehgo shika at'ohwol ninisingo, kwiijigo holne' 1-888-802-3862.

--------To see examples of how this plan might cover costs for a sample medical situation, see the next page.--------

Questions: Call 1-888-802-3862 or visit us at www.HealthReformPlanSBC.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary. You can view the Glossary

072800-100020-387423
6 of 8

**aetna** : PA PPO 3000 100/50 $30 10/50/75RX

Coverage Period: 05/01/2015 - 04/30/2016

Coverage Examples

Coverage for: Individual + Family | Plan Type: PPO

## About these Coverage Examples:

These examples show how this plan might cover medical care in given situations. Use these examples to see, in general, how much financial protection a sample patient might get if they are covered under different plans.



**This is not a cost estimator.**

Don't use these examples to estimate your actual costs under this plan. The actual care you receive will be different from these examples, and the cost of that care also will be different.

See the next page for important information about these examples.

### Having a baby
(normal delivery)

☒ Amount owed to providers: $7,540
☒ Plan pays: $4,370
☒ Patient pays: $3,170

**Sample care costs:**

| | |
|---|---|
| Hospital charges (mother) | $2,700 |
| Routine obstetric care | $2,100 |
| Hospital charges (baby) | $900 |
| Anesthesia | $900 |
| Laboratory tests | $500 |
| Prescriptions | $200 |
| Radiology | $200 |
| Vaccines, other preventive | $40 |
| Total | $7,540 |

**Patient pays:**

| | |
|---|---|
| Deductibles | $3,000 |
| Copays | $20 |
| Coinsurance | $0 |
| Limits or exclusions | $150 |
| Total | $3,170 |

### Managing type 2 diabetes
(routine maintenance of a well-controlled condition)

☒ Amount owed to providers: $5,400
☒ Plan pays: $2,500
☒ Patient pays: $2,900

**Sample care costs:**

| | |
|---|---|
| Prescriptions | $2,900 |
| Medical Equipment and Supplies | $1,300 |
| Office Visits and Procedures | $700 |
| Education | $300 |
| Laboratory tests | $100 |
| Vaccines, other preventive | $100 |
| Total | $5,400 |

**Patient pays:**

| | |
|---|---|
| Deductibles | $2,420 |
| Copays | $400 |
| Coinsurance | $0 |
| Limits or exclusions | $80 |
| Total | $2,900 |

Questions: Call 1-888-802-3362 or visit us at www.HealthReformPlanSBC.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary. You can view the Glossary

072800-100020-381423
7 of 8

# aetna : PA PPO 3000 100/50 $30 10/50/75RX

Coverage Period: 05/01/2015 - 04/30/2016

Coverage Examples

Coverage for: Individual + Family | Plan Type: PPO

## Questions and answers about the Coverage Examples:

### What are some of the assumptions behind the Coverage Examples?

- Costs don't include premiums.
- Sample care costs are based on national averages supplied by the U.S. Department of Health and Human Services, and aren't specific to a particular geographic area or health plan.
- The patient's condition was not an excluded or preexisting condition.
- All services and treatments started and ended in the same coverage period.
- There are no other medical expenses for any member covered under this plan.
- Out-of-pocket expenses are based only on treating the condition in the example.
- The patient received all care from in-network providers. If the patient had received care from out-of-network providers, costs would have been higher.

### What does a Coverage Example show?

For each treatment situation, the Coverage Example helps you see how deductibles, copayments, and coinsurance can add up. It also helps you see what expenses might be left up to you to pay because the service or treatment isn't covered or payment is limited.

### Does the Coverage Example predict my own care needs?

✖ **No.** Treatments shown are just examples. The care you would receive for this condition could be different, based on your doctor's advice, your age, how serious your condition is, and many other factors.

### Does the Coverage Example predict my future expenses?

✖ **No.** Coverage Examples are not cost estimators. You can't use the examples to estimate costs for an actual condition. They are for comparative purposes only. Your own costs will be different depending on the care you receive, the prices your providers charge, and the reimbursement your health plan allows.

### Can I use Coverage Examples to compare plans?

✓ **Yes.** When you look at the Summary of Benefits and Coverage for other plans, you'll find the same Coverage Examples. When you compare plans, check the "Patient Pays" box in each example. The smaller that number, the more coverage the plan provides.

### Are there other costs I should consider when comparing plans?

✓ **Yes.** An important cost is the premium you pay. Generally, the lower your premium, the more you'll pay in out-of-pocket costs, such as copayments, deductibles, and coinsurance. You should also consider contributions to accounts such as health savings accounts (HSAs), flexible spending arrangements (FSAs) or health reimbursement accounts (HRAs) that help you pay out-of-pocket expenses.

Questions: Call 1-888-802-3862 or visit us at www.HealthReformPlanSBC.com.
If you aren't clear about any of the underlined terms used in this form, see the Glossary. You can view the Glossary

072800-100020-381423
8 of 8



**BlueCross**_Vision_

*Issued by*
CAPITAL ADVANTAGE INSURANCE COMPANY®
A Capital BlueCross Company

# Vision
## Plan 12/10 Plus

| HIGHLIGHTS | AMOUNTS COVERED | |
|---|---|---|
| Benefit frequencies are based on date of service | In-Network | Out-of-Network |
| **EXAMINATION** | | |
| Once every 12 months | 100% after $10 copay | $32 |
| **CONTACT LENS EVALUATION AND FITTING** | | |
| Once every 12 months | 100% | $20 daily; $30 extended |
| **FRAMES\*** | | |
| Once every 12 months; overages at retail less 30% for in-network only | $120 retail | $60 retail |
| **EYEGLASS LENSES (per pair)\*** Once every 12 months | | |
| Single Vision Standard Lenses | 100% | $24 |
| Bifocal Standard Lenses | 100% | $36 |
| Trifocal Standard Lenses | 100% | $46 |
| Aphakic/Lenticular Standard Lenses | 100% | $72 |
| Polycarbonate Standard Lenses (under age 19) | 100% | Not covered |
| **CONTACT LENSES\*** Once every 12 months | | |
| Disposable (unlimited boxes); overages at retail less 25% for in-network only | $115 retail | $75 |
| Conventional including, but not limited to: Hard/soft daily wear and spherical; overages at retail less 25% for in-network only | $115 retail | $75 |
| Specialty lenses including but not limited to: Bifocal, toric or gas permeable; overages at retail less 25% for in-network only | $115 retail | $75 |
| Medically necessary (per pair) | 100% | $225 |

| VALUE ADDED BENEFITS | AMOUNTS DISCOUNTED | |
|---|---|---|
| Lens Options purchased from a participating provider will be provided to the member at the amounts listed below. Lens Options not listed will be discounted 20%. Lens options that are purchased from a Non-Participating provider, will not be discounted and are the full responsibility of the member. | | |
| **LENS OPTIONS** | | |
| Solid Tint | $10 | No discount |
| Fashion / Gradient Tint | $12 | No discount |
| Standard Scratch-Resistant Coating | $10 | No discount |
| Ultraviolet Coating | $12 | No discount |
| Standard Anti-reflective Coating | $40 | No discount |
| Glass Photogrey | $20 (SV); $30 (bifocal / trifocal) | No discount |
| Polarized | $75 | No discount |
| Standard Progressive Lenses | $50 | No discount |
| Transitions | $55 (SV);$70 (bifocal / trifocal) | No discount |
| Polycarbonate Standard Lenses (age 19 and older) | $25 (SV); $30 (bifocal / trifocal) | No discount |
| Blended Bifocal (Segment) | $30 | No discount |
| High Index | $55 | No discount |
| **ADDITIONAL SUPPLIES** | | |
| Additional purchases of lenses and frames (excluding any contact lenses) at time of service | Retail less 20% | No discount |
| **LASIK SURGERY** | | |
| Surgery must be through participating providers | Retail Discount | No discount |

\*Payment will be made for either lenses or contact lenses within a benefit period. Payment will not be made for both.

Programs are subject to change. This is not a contract. This information highlights vision benefits when you visit a participating provider and is not intended to be a complete list or complete description of available services. Contact your employer, marketing representative, or broker for additional benefit details.

Walmart stores: In order to maintain comparable value with Walmart's pricing structure, your frame allowance at Walmart stores will be 50% of the amount shown on this benefit summary, and your contact lens allowance will be 75% of the amount. Walmart stores except BlueCross Vision for materials. Doctors affiliated with Walmart are not Walmart employees; therefore, participation for exams varies.

Deductibles, coinsurance and copayments under this program are separate from any deductibles, coinsurance and copayments described in your company's other health benefits coverage.

On behalf of Capital BlueCross, National Vision Administrators, LLC (NVA®) provides the network and assists in the administration of network management services for the BlueCross Vision benefits program. NVA is an independent company.

Benefits are underwritten by Capital Advantage Insurance Company, a subsidiary of Capital BlueCross. Independent licensee of the Blue Cross and Blue Shield Association. Communications issued by Capital BlueCross in its capacity as administrator of programs and provider relations for all companies.

CBC-055 (1/1/2011)
Standard Benefits

## Plan 12/10 Plus– Standard Benefit Exclusions

The benefits set forth on this highlight sheet are subject to the specific benefit exclusions and limitations contained in your Certificate of Coverage. Examples of categories of benefit exclusions to coverage include, but are not limited to the following:

1. For examinations or materials which are not listed herein as a Covered Service;

2. For medical attention or surgical treatment of the eye;

3. For diagnostic services, such as diagnostic X-rays, cardiographic, encephalographic examinations and pathological or laboratory tests;

4. For drugs or any other medications;

5. For procedures determined to be special or unusual (orthoptics, vision training, subnormal vision aids, tonography, etc.);

6. For eye examinations or materials sponsored by the Subscriber's employer without charge to the Subscriber;

7. For any illness or bodily injury which occurs in the course of employment if benefits or compensation are available, in whole or in part, under the provisions of any legislation of the Worker's Compensation Act as amended from time to time. This Exclusion applies whether or not the Subscriber claims the benefits or compensation;

8. For which a Subscriber would have no legal obligation to pay;

9. Received from a medical department maintained by or on behalf of an employer, a mutual benefit association, labor union, trust, or similar person or group;

10. Incurred prior to the member's effective date;

11. Incurred after the date of termination of the Subscriber's coverage;

12. For telephone consultations, charges for failure to keep a scheduled visit, or charges for completion of a claim form;

13. For duplicate and temporary devices, appliances, and services;

14. For which the Subscriber incurs no charge;

15. In a facility performed by a Professional Provider who in any case is compensated by the facility for similar Covered Services performed for patients;

16. No payment will be made for replacement of lost, stolen, broken or damaged lenses, contact lenses or frames, unless the member would otherwise meet the frequency limitations;

17. Parts or repair of frame;

18. To the extent payment has been made under Medicare when Medicare is primary or would have been made if the Subscriber had applied for Medicare and claimed Medicare benefits; however, this Exclusion shall not apply when the Group is obligated by law to offer the Subscribers all the benefits of this Contract and the Subscribers so elect this coverage as primary;

19. Treatment or services for injuries resulting from the maintenance or use of a motor vehicle if such treatment or service is paid or payable under a plan or policy of motor vehicle insurance, including a certified self-insured plan, or payable in any manner under the Pennsylvania Motor Vehicle Financial Responsibility Law;

20. For any loss sustained or expenses incurred during military service while on active duty; or as a result of an act of war, whether declared or undeclared;

21. Resulting from the commission or attempt to commit a felony by the Subscriber;

22. Covered under the Group's Medical-Surgical Contract;

23. Any Professional Services other than those specifically provided in the Professional Services Vision Care Benefits Section of the Contract;

24. Lenses which do not require a prescription; and

25. Cost of any insurance premiums indemnifying the subscriber against losses for lenses or frames.

The foregoing list highlights categories of vision benefit exclusions and is not intended to be a complete list or complete description of all categories of benefit exclusions. Please contact your employer, marketing representative or broker for additional details concerning benefit exclusions, or you may refer to the Schedule of Exclusions set forth in your Certificate of Coverage.

© 2008 Capital BlueCross
All rights reserved




## GUARDIAN®

**VOLUNTARY SHORT TERM DISABILITY**
PLAN D8

Most of us take for granted our ability to work and bring home a paycheck. We depend on it — our family depends on it. But what happens if you became disabled and could not work? That's when disability benefits can help.

The plan provides monthly benefit payments in the event of a total disability resulting from a non-occupational accident, illness or pregnancy. No benefits are payable for disabilities covered under a Workers' Compensation or similar law. When you really think about the risks of everyday life, you realize the importance of insuring your paycheck with a Voluntary Short-term Disability Income Insurance plan.

### Your Voluntary Short Term Disability Benefit

**Eligibility**
All active full-time members under age 70. Persons not actively at work on the effective date of the plan will not be eligible for coverage until they return to active employment.

**Benefit Amount**
Your Monthly Disability Benefit is determined by your Covered Monthly Compensation, up to a maximum monthly disability benefit of $6,000. Your monthly disability benefit may not exceed 60% of your Covered Monthly Compensation. Covered Monthly Compensation equals your base compensation, including overtime, bonuses, and other such compensation. Benefits are also available for partial disability status, following a period of total disability.

**Elimination Period**
Accident benefits will be payable on the 8th day of continuous disability. Illness benefits will be payable on the 8th day of continuous disability.

**Benefit Period**
Accident and illness benefits will be paid up to 13 weeks.

**Pre-existing Conditions**
There are no pre-existing condition limitations under the Voluntary Short Term Disability Income Insurance plan.

**Guaranteed Issue Plan**
When you apply for coverage you are guaranteed to receive a maximum monthly benefit of up to $1,200 (not to exceed 60% of your Covered Monthly Compensation) as determined by net income. Enrolling outside of the initial enrollment period will result in no guaranteed issue and you will be required to prove good health for any benefit amount elected.

**Premium Plan**
To receive a higher monthly benefit (not to exceed 60% of your Covered Monthly Compensation), you must answer the health questions on your application during the enrollment session. Please contact your employer for details.

**Paying for the Coverage and Waiver of Premium**
Once you select the plan level you want, you pay for the coverage through the convenience of payroll deductions. The cost is based on your age. Premiums are waived if you are in a disabled status at time of disability and do not resume until the disability status period has ended.

08/22/2013





Pennsylvania
Chamber
Insurance

**VOLUNTARY SHORT TERM DISABILITY**
PLAN D8

Example: First, locate your monthly salary in the following table. If your salary is $2,500, you can apply for a monthly benefit of $1,500.

| Monthly Salary Benefit | Monthly | Monthly Salary Benefit | Monthly | Monthly Salary | Monthly Benefit |
|---|---|---|---|---|---|
| $ 333.00-$ 415.99 | $ 200 | $4,250.00-$4,332.99 | $2,550 | $8,166.00-$8,249.99 | $4,900 |
| $ 416.00-$ 499.99 | $ 250 | $4,333.00-$4,415.99 | $2,600 | $8,250.00-$8,332.99 | $4,950 |
| $ 500.00-$ 582.99 | $ 300 | $4,416.00-$4,499.99 | $2,650 | $8,333.00-$8,415.99 | $5,000 |
| $ 583.00-$ 665.99 | $ 350 | $4,500.00-$4,582.99 | $2,700 | $8,416.00-$8,499.99 | $5,050 |
| $ 666.00-$ 749.99 | $ 400 | $4,583.00-$4,665.99 | $2,750 | $8,500.00-$8,582.99 | $5,100 |
| $ 750.00-$ 832.99 | $ 450 | $4,666.00-$4,749.99 | $2,800 | $8,583.00-$8,665.99 | $5,150 |
| $ 833.00-$ 915.99 | $ 500 | $4,750.00-$4,832.99 | $2,850 | $8,666.00-$8,749.99 | $5,200 |
| $ 916.00-$ 999.99 | $ 550 | $4,833.00-$4,915.99 | $2,900 | $8,750.00-$8,832.99 | $5,250 |
| $1,000.00-$1,082.99 | $ 600 | $4,916.00-$4,999.99 | $2,950 | $8,833.00-$8,915.99 | $5,300 |
| $1,083.00-$1,165.99 | $ 650 | $5,000.00-$5,082.99 | $3,000 | $8,916.00-$8,999.99 | $5,350 |
| $1,166.00-$1,249.99 | $ 700 | $5,083.00-$5,165.99 | $3,050 | $9,000.00-$9,082.99 | $5,400 |
| $1,250.00-$1,332.99 | $ 750 | $5,166.00-$5,249.99 | $3,100 | $9,083.00-$9,165.99 | $5,450 |
| $1,333.00-$1,415.99 | $ 800 | $5,250.00-$5,332.99 | $3,150 | $9,166.00-$9,249.99 | $5,500 |
| $1,416.00-$1,499.99 | $ 850 | $5,333.00-$5,415.99 | $3,200 | $9,250.00-$9,332.99 | $5,550 |
| $1,500.00-$1,582.99 | $ 900 | $5,416.00-$5,499.99 | $3,250 | $9,333.00-$9,415.99 | $5,600 |
| $1,583.00-$1,665.99 | $ 950 | $5,500.00-$5,582.99 | $3,300 | $9,416.00-$9,499.99 | $5,650 |
| $1,666.00-$1,749.99 | $1,000 | $5,583.00-$5,665.99 | $3,350 | $9,500.00-$9,582.99 | $5,700 |
| $1,750.00-$1,832.99 | $1,050 | $5,666.00-$5,749.99 | $3,400 | $9,583.00-$9,665.99 | $5,750 |
| $1,833.00-$1,915.99 | $1,100 | $5,750.00-$5,832.99 | $3,450 | $9,666.00-$9,749.99 | $5,800 |
| $1,916.00-$1,999.99 | $1,150 | $5,833.00-$5,915.99 | $3,500 | $9,750.00-$9,832.99 | $5,850 |
| $2,000.00-$2,082.99 | $1,200 | $5,916.00-$5,999.99 | $3,550 | $9,833.00-$9,915.99 | $5,900 |
| $2,083.00-$2,165.99 | $1,250 | $6,000.00-$6,082.99 | $3,600 | $9,916.00-$9,999.99 | $5,950 |
| $2,166.00-$2,249.99 | $1,300 | $6,083.00-$6,165.99 | $3,650 | $10,000 and over | $6,000 |
| $2,250.00-$2,332.99 | $1,350 | $6,166.00-$6,249.99 | $3,700 | | |
| $2,333.00-$2,415.99 | $1,400 | $6,250.00-$6,332.99 | $3,750 | Disclaimer: | |
| $2,416.00-$2,499.99 | $1,450 | $6,333.00-$6,415.99 | $3,800 | This information highlights the important features of the | |
| $2,500.00-$2,582.99 | $1,500 | $6,416.00-$6,499.99 | $3,850 | products. These policies have limitations and exclusions. | |
| $2,583.00-$2,665.99 | $1,550 | $6,500.00-$6,582.99 | $3,900 | Your Benefit Administrator can supply you with cost and | |
| $2,666.00-$2,749.99 | $1,600 | $6,583.00-$6,665.99 | $3,950 | complete details of coverage. Refer to the product brochure | |
| $2,750.00-$2,832.99 | $1,650 | $6,666.00-$6,749.99 | $4,000 | for more details. | |
| $2,833.00-$2,915.99 | $1,700 | $6,750.00-$6,832.99 | $4,050 | | |
| $2,916.00-$2,999.99 | $1,750 | $6,833.00-$6,915.99 | $4,100 | | |
| $3,000.00-$3,082.99 | $1,800 | $6,916.00-$6,999.99 | $4,150 | | |
| $3,083.00-$3,165.99 | $1,850 | $7,000.00-$7,082.99 | $4,200 | | |
| $3,166.00-$3,249.99 | $1,900 | $7,083.00-$7,165.99 | $4,250 | | |
| $3,250.00-$3,332.99 | $1,950 | $7,166.00-$7,249.99 | $4,300 | | |
| $3,333.00-$3,415.99 | $2,000 | $7,250.00-$7,332.99 | $4,350 | | |
| $3,416.00-$3,499.99 | $2,050 | $7,333.00-$7,415.99 | $4,400 | | |
| $3,500.00-$3,582.99 | $2,100 | $7,416.00-$7,499.99 | $4,450 | | |
| $3,583.00-$3,665.99 | $2,150 | $7,500.00-$7,582.99 | $4,500 | | |
| $3,666.00-$3,749.99 | $2,200 | $7,583.00-$7,665.99 | $4,550 | | |
| $3,750.00-$3,832.99 | $2,250 | $7,666.00-$7,749.99 | $4,600 | | |
| $3,833.00-$3,915.99 | $2,300 | $7,750.00-$7,832.99 | $4,650 | | |
| $3,916.00-$3,999.99 | $2,350 | $7,833.00-$7,915.99 | $4,700 | | |
| $4,000.00-$4,082.99 | $2,400 | $7,916.00-$7,999.99 | $4,750 | | |
| $4,083.00-$4,165.99 | $2,450 | $8,000.00-$8,082.99 | $4,800 | | |
| $4,166.00-$4,249.99 | $2,500 | $8,083.00-$8,165.99 | $4,850 | | |

08/22/2013





**Pennsylvania Chamber Insurance**

**VOLUNTARY LONG TERM DISABILITY**
PLAN D22

If you were unable to work due to a serious accident or illness, how long could you maintain your standard of living without your paycheck? Most of us depend on a regular paycheck to pay the bills.

Offering a monthly disability benefit following an established elimination period of 90 days, this plan is payable to you in the event of a total disability resulting from an accident or illness. When you really think about the risks of everyday life, you realize the importance of insuring your paycheck with a Voluntary Long-term Disability Income Insurance plan.

### Your Voluntary Long Term Disability Benefit

Eligibility - All active full-time members under age 70. Persons not on active service on the effective date of the plan will not be eligible for coverage until they return to active employment. Benefits are also available for partial disability status, following a period of total disability.

Benefit Amount - Your Monthly Disability Benefit is determined by your Covered Monthly Compensation, up to a maximum monthly disability benefit of $6,000. Your monthly disability benefit may not exceed 60% of your Covered Monthly Compensation as determined by net income.

Elimination Period - Accident and sickness benefits will be payable on the 91st day of continuous disability.

Benefit Period - Accident benefits will be paid up to age 65, or for five years, whichever is greater, but not beyond age 70. Sickness benefit will be paid for five years, or to age 70, whichever first occurs. If you become disabled on or after age 69, the maximum payment period is one year.

Pre-existing Conditions - If Total Disability is due to a pre-existing condition, no benefit will be available to be paid. This limitation will be waived for Total Disability resulting from a pre-existing condition which begins more than 12 months after your effective date of coverage.

A pre-existing condition is an injury or sickness for which you were diagnosed, received treatment, incurred expense, took medication or received advice from a physician during a 90 day period immediately preceding the effective date of coverage.

Guaranteed Issue Plan - When you apply for coverage, you are guaranteed to receive a maximum monthly benefit of up to $1,200 (not to exceed 60% of your Covered Monthly Compensation). Enrolling outside of the initial enrollment period will result in no guaranteed issue and you will be required to prove good health for any benefit amount elected.

Premium Plan - To receive a higher monthly benefit (not to exceed 60% of your Covered Monthly Compensation), you must answer the health questions on your application during the enrollment session. Please contact your employer for more details.

Paying for the Coverage & Waiver of Premium - Once you select the plan level you want, you pay for the coverage through the convenience of payroll deductions. The cost is based on your age. Premiums are waived if you are in a disabled status at time of disability and do not resume until the disability status period has ended.



# GUARDIAN®

**Pennsylvania Chamber Insurance** — PCI

**VOLUNTARY LONG TERM DISABILITY**
PLAN D22

Example: First, locate your monthly salary in the following table. If your salary is $3,000, you can apply for a monthly benefit of $1,800.

| Monthly Salary | Monthly Benefit | Monthly Salary | Monthly Benefit | Monthly Salary | Monthly Benefit |
|---|---|---|---|---|---|
| $ 333.00-$ 415.99 | $ 200 | $4,250.00-$4,332.99 | $2,550 | $8,166.00-$8,249.99 | $4,900 |
| $ 416.00-$ 499.99 | $ 250 | $4,333.00-$4,415.99 | $2,600 | $8,250.00-$8,332.99 | $4,950 |
| $ 500.00-$ 582.99 | $ 300 | $4,416.00-$4,499.99 | $2,650 | $8,333.00-$8,415.99 | $5,000 |
| $ 583.00-$ 665.99 | $ 350 | $4,500.00-$4,582.99 | $2,700 | $8,416.00-$8,499.99 | $5,050 |
| $ 666.00-$ 749.99 | $ 400 | $4,583.00-$4,665.99 | $2,750 | $8,500.00-$8,582.99 | $5,100 |
| $ 750.00-$ 832.99 | $ 450 | $4,666.00-$4,749.99 | $2,800 | $8,583.00-$8,665.99 | $5,150 |
| $ 833.00-$ 915.99 | $ 500 | $4,750.00-$4,832.99 | $2,850 | $8,666.00-$8,749.99 | $5,200 |
| $ 916.00-$ 999.99 | $ 550 | $4,833.00-$4,915.99 | $2,900 | $8,750.00-$8,832.99 | $5,250 |
| $1,000.00-$1,082.99 | $ 600 | $4,916.00-$4,999.99 | $2,950 | $8,833.00-$8,915.99 | $5,300 |
| $1,083.00-$1,165.99 | $ 650 | $5,000.00-$5,082.99 | $3,000 | $8,916.00-$8,999.99 | $5,350 |
| $1,166.00-$1,249.99 | $ 700 | $5,083.00-$5,165.99 | $3,050 | $9,000.00-$9,082.99 | $5,400 |
| $1,250.00-$1,332.99 | $ 750 | $5,166.00-$5,249.99 | $3,100 | $9,083.00-$9,165.99 | $5,450 |
| $1,333.00-$1,415.99 | $ 800 | $5,250.00-$5,332.99 | $3,150 | $9,166.00-$9,249.99 | $5,500 |
| $1,416.00-$1,499.99 | $ 850 | $5,333.00-$5,415.99 | $3,200 | $9,250.00-$9,332.99 | $5,550 |
| $1,500.00-$1,582.99 | $ 900 | $5,416.00-$5,499.99 | $3,250 | $9,333.00-$9,415.99 | $5,600 |
| $1,583.00-$1,665.99 | $ 950 | $5,500.00-$5,582.99 | $3,300 | $9,416.00-$9,499.99 | $5,650 |
| $1,666.00-$1,749.99 | $1,000 | $5,583.00-$5,665.99 | $3,350 | $9,500.00-$9,582.99 | $5,700 |
| $1,750.00-$1,832.99 | $1,050 | $5,666.00-$5,749.99 | $3,400 | $9,583.00-$9,665.99 | $5,750 |
| $1,833.00-$1,915.99 | $1,100 | $5,750.00-$5,832.99 | $3,450 | $9,666.00-$9,749.99 | $5,800 |
| $1,916.00-$1,999.99 | $1,150 | $5,833.00-$5,915.99 | $3,500 | $9,750.00-$9,832.99 | $5,850 |
| $2,000.00-$2,082.99 | $1,200 | $5,916.00-$5,999.99 | $3,550 | $9,833.00-$9,915.99 | $5,900 |
| $2,083.00-$2,165.99 | $1,250 | $6,000.00-$6,082.99 | $3,600 | $9,916.00-$9,999.99 | $5,950 |
| $2,166.00-$2,249.99 | $1,300 | $6,083.00-$6,165.99 | $3,650 | $10,000.00 and over | $6,000 |
| $2,250.00-$2,332.99 | $1,350 | $6,166.00-$6,249.99 | $3,700 | | |
| $2,333.00-$2,415.99 | $1,400 | $6,250.00-$6,332.99 | $3,750 | Disclaimer: This information highlights the |
| $2,416.00-$2,499.99 | $1,450 | $6,333.00-$6,415.99 | $3,800 | important features of the products. These policies |
| $2,500.00-$2,582.99 | $1,500 | $6,416.00-$6,499.99 | $3,850 | have limitations and exclusions. Your Benefit |
| $2,583.00-$2,665.99 | $1,550 | $6,500.00-$6,582.99 | $3,900 | Administrator can supply you with cost and |
| $2,666.00-$2,749.99 | $1,600 | $6,583.00-$6,665.99 | $3,950 | complete details of coverage. Refer to the |
| $2,750.00-$2,832.99 | $1,650 | $6,666.00-$6,749.99 | $4,000 | product brochure for more details. |
| $2,833.00-$2,915.99 | $1,700 | $6,750.00-$6,832.99 | $4,050 | |
| $2,916.00-$2,999.99 | $1,750 | $6,833.00-$6,915.99 | $4,100 | |
| $3,000.00-$3,082.99 | $1,800 | $6,916.00-$6,999.99 | $4,150 | |
| $3,083.00-$3,165.99 | $1,850 | $7,000.00-$7,082.99 | $4,200 | |
| $3,166.00-$3,249.99 | $1,900 | $7,083.00-$7,165.99 | $4,250 | |
| $3,250.00-$3,332.99 | $1,950 | $7,166.00-$7,249.99 | $4,300 | |
| $3,333.00-$3,415.99 | $2,000 | $7,250.00-$7,332.99 | $4,350 | |
| $3,416.00-$3,499.99 | $2,050 | $7,333.00-$7,415.99 | $4,400 | |
| $3,500.00-$3,582.99 | $2,100 | $7,416.00-$7,499.99 | $4,450 | |
| $3,583.00-$3,665.99 | $2,150 | $7,500.00-$7,582.99 | $4,500 | |
| $3,666.00-$3,749.99 | $2,200 | $7,583.00-$7,665.99 | $4,550 | |
| $3,750.00-$3,832.99 | $2,250 | $7,666.00-$7,749.99 | $4,600 | |
| $3,833.00-$3,915.99 | $2,300 | $7,750.00-$7,832.99 | $4,650 | |
| $3,916.00-$3,999.99 | $2,350 | $7,833.00-$7,915.99 | $4,700 | |
| $4,000.00-$4,082.99 | $2,400 | $7,916.00-$7,999.99 | $4,750 | |
| $4,083.00-$4,165.99 | $2,450 | $8,000.00-$8,082.99 | $4,800 | |
| $4,166.00-$4,249.99 | $2,500 | $8,083.00-$8,165.99 | $4,850 | |

06122013
RCM
RCM

**FOREMOST INDUSTRIES, INC.**
**401(K) PROFIT SHARING PLAN**

**SUMMARY PLAN DESCRIPTION**

What happens if I terminate employment before death, disability or retirement? ................................................. 10
What happens if I terminate employment at Normal Retirement Date? ........................................................... 10
What happens if I terminate employment at Early Retirement Date? ............................................................ 10
What happens if I terminate employment due to disability? ..................................................................... 10
How will my benefits be paid to me? ................................................................................... 10

## ARTICLE VIII
### BENEFITS AND DISTRIBUTIONS UPON DEATH

What happens if I die while working for the Employer? ........................................................................ 11
Who is the beneficiary of my death benefit? ............................................................................. 11
How will the death benefit be paid to my beneficiary? ..................................................................... 11
When must the last payment be made to my beneficiary? .................................................................. 11
What happens if I'm a Participant, terminate employment and die before receiving all my benefits? ...................... 12

## ARTICLE IX
### TAX TREATMENT OF DISTRIBUTIONS

What are my tax consequences when I receive a distribution from the Plan? ............................................... 12
Can I elect a rollover to reduce or defer tax on my distribution? ........................................................... 12

## ARTICLE X
### PROTECTED BENEFITS AND CLAIMS PROCEDURES

Are my benefits protected? ............................................................................................. 13
Are there any exceptions to the general rule? ........................................................................... 13
Can the Plan be amended? ............................................................................................. 13
What happens if the Plan is discontinued or terminated? ................................................................. 13
How do I submit a claim for Plan benefits? .............................................................................. 13
What if my benefits are denied? ....................................................................................... 13
What is the Claims Review Procedure? ................................................................................. 14
What are my rights as a Plan Participant? .............................................................................. 15
What can I do if I have questions or my rights are violated? ............................................................. 16

## ARTICLE XI
### GENERAL INFORMATION ABOUT THE PLAN

Plan Name ............................................................................................................. 16
Plan Number .......................................................................................................... 16
Plan Effective Dates ................................................................................................... 16
Other Plan Information ................................................................................................. 16
Employer Information .................................................................................................. 16
Administrator Information .............................................................................................. 16
Plan Trustee Information and Plan Funding Medium ..................................................................... 17

2

- attainment of age 20 1/2.

- completion of six (6) months of service.

**Entry Date.** Your Entry Date will be the first day of the Plan Year coinciding with or next following the date you satisfy the eligibility requirements.

## What service is counted for purposes of Plan eligibility?

**Service with the Employer.** In determining whether you satisfy the minimum service requirements to participate under the Plan, all service you perform for the Employer will generally be counted. However, there are some exceptions to this general rule.

**Break in Service rules.** If you terminate employment and are rehired, you may lose credit for prior service under the Plan's Break in Service rules.

For eligibility purposes, you will have a 1-Year Break in Service if you are not employed with the Employer for a period of at least twelve consecutive months. However, if you are absent from work for certain leaves of absence such as a maternity or paternity leave, the twelve consecutive month period beginning on the first anniversary of your first day of such absence will not constitute a Break in Service.

**Five-year eligibility Break in Service rule.** The five-year Break in Service rule applies only to employees who had no vested interest in the Plan when employment had terminated. If you were not vested in any amounts when you terminated employment and you have five 1-Year Breaks in Service (as defined above), all the service you earned before the 5-year period no longer counts for eligibility purposes. Thus, if you were to return to employment after incurring five 1-Year Breaks in Service, you would have to resatisfy any minimum service requirements under the Plan.

**Military service.** If you are a veteran and are reemployed under the Uniformed Services Employment and Reemployment Rights Act of 1994, your qualified military service may be considered service with the Employer. If you may be affected by this law, ask the Administrator for further details.

## What happens if I'm a Participant, terminate employment and then I'm rehired?

If you are no longer a Participant because you terminated employment, and you are rehired, then you will be able to participate in the Plan on your date of rehire provided your prior service had not been disregarded under the Break in Service rules and you are otherwise eligible to participate in the Plan.

## ARTICLE II
## EMPLOYEE CONTRIBUTIONS

## What are salary deferrals and how do I contribute them to the Plan?

**Salary deferrals.** As a Participant under the Plan, you may elect to reduce your compensation by a specific percentage or dollar amount and have that amount contributed to the Plan on a pre-tax basis as a salary deferral. Your taxable income is reduced by the deferral contribution so you pay less in federal income taxes (however, the amount you defer is still counted as compensation for purposes of Social Security taxes). Later, when the Plan distributes the deferrals and earnings, you will pay the taxes on those deferrals and the earnings. Therefore, federal income taxes on the deferral contributions and on the earnings are only postponed. Eventually, you will have to pay taxes on these amounts.

**Deferral procedure.** The amount you elect to defer will be deducted from your pay in accordance with a procedure established by the Administrator. The procedure will require that you enter into a salary deferral agreement after you satisfy the Plan's eligibility requirements. You may elect to defer a portion of your salary as of your Entry Date or on the first day of the Plan Year or the first day of the 7th month of the Plan Year. Such election will become effective as soon as administratively feasible after it is received by the Administrator. Your election will remain in effect until you modify or terminate it unless your salary deferrals are automatically suspended under the terms of the Plan.

**Deferral modifications.** You are permitted to revoke your salary deferral election at any time during the Plan Year. You may make any other modification on the first day of the Plan Year and the first day of the seventh month of the Plan Year or in accordance with any other procedure that your Employer provides. Any modification will become effective as soon as administratively feasible after it is received by the Administrator.

**Deferral Limit.** As a Participant, you may elect to defer a percentage of your compensation each year instead of receiving that amount in cash. Such election will also apply to irregular pay (e.g., bonuses) unless a separate elective deferral election is made for irregular pay. Your total deferrals in any taxable year may not exceed a dollar limit which is set by law. The limit for 2015 is $18,000. After 2015, the dollar limit may increase for cost-of-living adjustments. See the paragraph below on Annual dollar limit. The Administrator will notify you of the maximum percentage you may defer.

**Catch-up contributions.** If you are at least age 50 or will attain age 50 before the end of a calendar year, then you may elect to defer additional amounts (called "catch-up contributions") to the Plan as of the January 1st of that year. The additional amounts may be

2

**What is the Employer profit sharing contribution and how is it allocated?**

**Profit sharing contribution.** Each year, your Employer may make a discretionary profit sharing contribution to the Plan. Your share of any contribution is determined below.

**Allocation conditions.** In order to share in the profit sharing contribution for a Plan Year, you must satisfy the following conditions:

- If you are employed on the last day of the Plan Year, you will share if you completed a Year of Service during the Plan Year.

- If you terminate employment (not employed on the last day of the Plan Year), you will not share regardless of the amount of service you completed during the Plan Year.

- You will share in the profit sharing contribution for the year regardless of the amount of service you completed during the Plan Year in the year of your death, disability, termination of employment after Normal Retirement Age or termination of employment after Early Retirement Date. This waiver of allocation conditions will only apply once during your employment history with the Employer (e.g., if you retire, are rehired and then retire again, the waiver only applies to your initial retirement).

**Your share of the contribution.** The profit sharing contribution will be "allocated" or divided among Participants eligible to share in the contribution for the Plan Year.

Your share of the profit sharing contribution is determined by the following fraction:

$$\text{Profit Sharing Contribution} \quad X \quad \frac{\text{Your Compensation}}{\substack{\text{Total Compensation of All} \\ \text{Participants Eligible to} \\ \text{Share}}}$$

For example: Suppose the profit sharing contribution for the Plan Year is $20,000. Employee A's compensation for the Plan Year is $25,000. The total compensation of all Participants eligible to share, including Employee A, is $250,000. Employee A's share will be:

$$\$20,000 \quad X \quad \frac{\$25,000}{\$250,000} \quad \text{or} \quad \$2,000$$

**How is my service determined for allocation purposes?**

**Year of Service.** You will have completed a Year of Service for a Plan Year if you have completed at least 1,000 Hours of Service during the Plan Year.

**Hour of Service-employees for whom hourly records are kept.** You will be credited with your actual Hours of Service for:

(a) each hour for which you are directly or indirectly compensated by the Employer for the performance of duties during the Plan Year;

(b) each hour for which you are directly or indirectly compensated by the Employer for reasons other than the performance of duties (such as vacation, holidays, sickness, disability, lay-off, military duty, jury duty or leave of absence during the Plan Year); and

(c) each hour for back pay awarded or agreed to by the Employer.

You will not be credited for the same Hours of Service both under (a) or (b), as the case may be, and under (c).

**Hour of Service-employees for whom hourly records are not kept.** The Plan does not credit you with your actual Hours of Service. Instead the Plan uses an "equivalency" method. Under this method you will be credited with 190 Hours of Service for each month during the year in which you would otherwise be credited with at least one Hour of Service.

**What are forfeitures and how are they allocated?**

**Definition of forfeitures.** In order to reward employees who remain employed with the Employer for a long period of time, the law permits a "vesting schedule" to be applied to certain contributions that your Employer makes to the Plan. This means that you will not be "vested" in (entitled to) all of the contributions until you have been employed with the Employer for a specified period of time (see the Article entitled "Vesting"). If a Participant terminates employment before being fully vested, then the non-vested portion of the Terminated Participant's account balance remains in the Plan and is called a forfeiture.

**Allocation of forfeitures.** The Employer may use forfeitures to pay Plan expenses or to reduce amounts otherwise required to be contributed to the Plan.

Effective Date: January 1, 2015

investments. You should remember that the amount of your benefits under the Plan will depend in part upon your choice of investments. Gains as well as losses can occur and your Employer, the Administrator, and the Trustee will not provide investment advice or guarantee the performance of any investment you choose.

Periodically, you will receive a benefit statement that provides information on your account balance and your investment returns. It is your responsibility to notify the Administrator of any errors you see on any statements within 30 days after the statement is provided or made available to you.

## Will Plan expenses be deducted from my account balance?

**Expenses allocated to all accounts.** The Plan permits the payment of Plan expenses to be made from the Plan's assets. If expenses are paid using the Plan's assets, then the expenses will generally be allocated among the accounts of all Participants in the Plan. These expenses will be allocated either proportionately based on the value of the account balances or as an equal dollar amount based on the number of Participants in the Plan. The method of allocating the expenses depends on the nature of the expense itself. For example, certain administrative (or recordkeeping) expenses would typically be allocated proportionately to each Participant. If the Plan pays $1,000 in expenses and there are 100 Participants, your account balance would be charged $10 ($1,000/100) of the expense.

**Terminated employee.** After you terminate employment, your Employer reserves the right to charge your account for your pro rata share of the Plan's administration expenses, regardless of whether your Employer pays some of these expenses on behalf of current employees.

**Expenses allocated to individual accounts.** There are certain other expenses that may be paid just from your account. These are expenses that are specifically incurred by, or attributable to, you. For example, if you are married and get divorced, the Plan may incur additional expenses if a court mandates that a portion of your account be paid to your ex-spouse. These additional expenses may be paid directly from your account (and not the accounts of other Participants) because they are directly attributable to you under the Plan. The Administrator will inform you when there will be a charge (or charges) directly to your account.

Your Employer may, from time to time, change the manner in which expenses are allocated.

## ARTICLE V
## VESTING

### What is my vested interest in my account?

In order to reward employees who remain employed with the Employer for a long period of time, the law permits a "vesting schedule" to be applied to certain contributions that your Employer makes to the Plan. This means that you will not be entitled ("vested") in all of the contributions until you have been employed with the Employer for a specified period of time.

**100% vested contributions.** You are always 100% vested (which means that you are entitled to all of the amounts) in your accounts attributable to the following contributions:

- salary deferrals including "catch-up contributions"

- "rollover" contributions

**Vesting schedules.** Your "vested percentage" for certain Employer contributions is based on vesting Years of Service. This means at the time you stop working, your account balance attributable to contributions subject to a vesting schedule is multiplied by your vested percentage. The result, when added to the amounts that are always 100% vested as shown above, is your vested interest in the Plan, which is what you will actually receive from the Plan.

**Employer Profit Sharing Contributions**

Your "vested percentage" in your account attributable to profit sharing contributions is determined under the following schedule. You will always, however, be 100% vested in your profit sharing contributions if you are employed on or after your Early or Normal Retirement Age or if you die or become disabled.

Vesting Schedule
Profit Sharing Contributions

| Years of Service | Percentage |
|---|---|
| Less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 | 100% |

Effective Date: January 1, 2015

**What happens to my non-vested account balance if I'm rehired?**

If you have no vested interest in the Plan when you leave, your account balance will be forfeited. However, if you are rehired before incurring five 1-Year Breaks in Service, your account balance as of your termination date will be restored, unadjusted for any gains or losses.

If you are partially vested in your account balance when you leave, the non-vested portion of your account balance will be forfeited on the earlier of the date:

    (a) of the distribution of your vested account balance, or

    (b) when you incur five consecutive 1-Year Breaks in Service.

If you received a distribution of your vested account balance and are rehired, you may have the right to repay this distribution. If you repay the entire amount of the distribution, your Employer will restore your account balance with your forfeited amount. You must repay this distribution within five years from your date of reemployment, or, if earlier, before you incur five 1-Year Breaks in Service. If you were 100% vested when you left, you do not have the opportunity to repay your distribution.

**What happens if the Plan becomes a "top-heavy plan"?**

**Top-heavy plan.** A retirement plan that primarily benefits "key employees" is called a "top-heavy plan." "Key employees" are certain owners or officers of your Employer. A plan is generally a "top-heavy plan" when more than 60% of the plan assets are attributable to "key employees." Each year, the Administrator is responsible for determining whether the Plan is a "top-heavy plan."

**Top-heavy rules.** If the Plan becomes top-heavy in any Plan Year, then non-key employees may be entitled to certain "top-heavy minimum benefits," and other special rules will apply. These top-heavy rules include the following:

- Your Employer may be required to make a contribution on your behalf in order to provide you with at least "top-heavy minimum benefits."

- If you are a Participant in more than one Plan, you may not be entitled to "top-heavy minimum benefits" under both Plans.

**ARTICLE VI**
**DISTRIBUTIONS PRIOR TO TERMINATION AND HARDSHIP DISTRIBUTIONS**

**Can I withdraw money from my account while working?**

**In-service distributions.** You may be entitled to receive an in-service distribution. However, this distribution is not in addition to your other benefits and will therefore reduce the value of the benefits you will receive at retirement. This distribution is made at your election and will be made in accordance with the forms of distributions available under the Plan.

**Conditions and limitations.** Generally you may receive a distribution from the Plan from certain accounts prior to your termination of employment provided you satisfy the condition described below:

- you have attained age 59 1/2

The following limitations apply to in-service distributions from certain accounts:

- In-service distributions can only be made from accounts which are 100% vested.

Also, the law restricts any in-service distributions from certain accounts which are maintained for you under the Plan before you reach age 59 1/2. These accounts are the ones set up to receive your salary deferral contributions and other Employer contributions which are used to satisfy special rules for 401(k) plans. Ask the Administrator if you need more details.

**Qualified reservist distributions.** Effective as of September 12, 2001, if you were/are: (i) a reservist or national guardsman; (ii) called to active duty after September 11, 2001; and (iii) called to duty for at least 180 days or for an indefinite period, you may take a distribution of your elective deferrals under the Plan while you are on active duty, regardless of your age. The 10% premature distribution penalty tax, normally applicable to Plan distributions made before you reach age 59 1/2, will not apply to the distribution. You also may repay the distribution to an IRA, without limiting amounts you otherwise could contribute to the IRA, provided you make the repayment within 2 years following your completion of active duty.

**Can I withdraw money from my account in the event of financial hardship?**

**Hardship distributions.** You may withdraw money for financial hardship if you satisfy certain conditions. This hardship distribution is not in addition to your other benefits and will therefore reduce the value of the benefits you will receive at retirement.



8

**Military service.** If you are a veteran and are reemployed under the Uniformed Services Employment and Reemployment Rights Act of 1994, your qualified military service may be considered service with the Employer. There may also be benefits for employees who die or become disabled while on active duty. Employees who receive wage continuation payments while in the military may benefit from various changes in the law. If you think you may be affected by these rules, ask the Administrator for further details.

**Distributions for deemed severance of employment.** If you are on active duty for more than 30 days, then, effective January 1, 2007, the Plan generally treats you as having severed employment for distribution purposes. This means that you may request a distribution from the Plan. If you request a distribution on account of this deemed severance of employment, then you are not permitted to make any contributions to the Plan for six (6) months after the date of the distribution.

**What happens if I terminate employment before death, disability or retirement?**

If your employment terminates for reasons other than death, disability or early or normal retirement, you will be entitled to receive only the "vested percentage" of your account balance.

You may elect to have your vested account balance distributed to you as soon as administratively feasible following your termination of employment. However, if the value of your vested account balance does not exceed $5,000, then a distribution will be made to you regardless of whether you consent to receive it. (See the question entitled "How will my benefits be paid to me?" for additional information.)

**Treatment of "rollover" contributions for consent to distribution.** In determining if the value of your vested account balance exceeds the $5,000 threshold described above used to determine whether you must consent to a distribution, your "rollover account" will not be considered as part of your benefit.

**What happens if I terminate employment at Normal Retirement Date?**

**Normal Retirement Date.** You will attain your Normal Retirement Age when you reach age 65. Your Normal Retirement Date is the first day of the month coinciding with or next following your Normal Retirement Age.

**Payment of benefits.** You will become 100% vested in all of your accounts under the Plan once you attain your Normal Retirement Age. However, the actual payment of benefits generally will not begin until you have terminated employment and reached your Normal Retirement Date. In such event, a distribution will be made, at your election, as soon as administratively feasible. If you remain employed past your Normal Retirement Date, you may generally defer the receipt of benefits until you actually terminate employment. In such event, benefit payments will begin as soon as feasible at your request, but generally not later than age 70 1/2. (See the question entitled "How will my benefits be paid to me?" for an explanation of how these benefits will be paid.)

**What happens if I terminate employment at Early Retirement Date?**

**Early Retirement Date.** Your Early Retirement Date is the first day of the month coinciding with or next following the date you have attained age 55 and completed 20 Years of Service with your Employer (early retirement age). Your Years of Service will be determined using Years of Service for vesting. You may elect to retire when you reach your Early Retirement Date.

**Payment of benefits.** If you are employed on the date you attain your early retirement age, you will become 100% vested in all of your accounts under the Plan. However, the payment of benefits generally will not begin until you actually retire after reaching your Early Retirement Date. In such event, a distribution will be made, at your election, as soon as administratively feasible. However, if you retire after reaching your Early Retirement Date but prior to your Normal Retirement Date and the value of your account balance does not exceed $5,000, then a distribution of your account balance will be made to you, regardless of whether you consent to receive it. (See the question entitled "How will my benefits be paid to me?" for an explanation of how these benefits will be paid.)

**What happens if I terminate employment due to disability?**

**Definition of disability.** Under the Plan, disability is defined as a physical or mental condition resulting from bodily injury, disease, or mental disorder which renders you incapable of continuing any gainful occupation and which has lasted or can be expected to last for a continuous period of at least twelve (12) months. Your disability must be determined by a licensed physician. However, if your condition constitutes total disability under the federal Social Security Act, then the Administrator may deem that you are disabled for purposes of the Plan.

**Payment of benefits.** If you become disabled while an employee, you will become 100% vested in all of your accounts under the Plan. Payment of your disability benefits will be made to you as if you had retired. However, if the value of your account balance does not exceed $5,000, then a distribution of your account balance will be made to you, regardless of whether you consent to receive it. (See the question entitled "How will my benefits be paid to me?" for an explanation of how these benefits will be paid.)

**How will my benefits be paid to me?**

**Forms of distribution.** If your vested account balance does not exceed $5,000, then your vested account balance may only be distributed to you in a single lump-sum payment. In determining whether your vested account balance exceeds the $5,000 threshold, "rollover" contributions (and any earnings allocable to "rollover" contributions) will not be taken into account.

Effective Date: January 1, 2015

elect to have the entire death benefit paid by the end of the fifth year following the year of your death (the "5-year rule"). Generally, if your beneficiary is not a person, your entire death benefit must be paid under the "5-year rule."

Since your spouse has certain rights to the death benefit, you should immediately report any change in your marital status to the Administrator.

**What happens if I'm a Participant, terminate employment and die before receiving all my benefits?**

If you terminate employment with the Employer and subsequently die, your beneficiary will be entitled to your remaining interest in the Plan at the time of your death. The provision in the Plan providing for full vesting of your benefit upon death does not apply if you die after terminating employment.

## ARTICLE IX
## TAX TREATMENT OF DISTRIBUTIONS

**What are my tax consequences when I receive a distribution from the Plan?**

Generally, you must include any Plan distribution in your taxable income in the year in which you receive the distribution. The tax treatment may also depend on your age when you receive the distribution. Certain distributions made to you when you are under age 59 1/2 could be subject to an additional 10% tax.

**Qualified reservist distributions.** Effective as of September 12, 2001, if you were/are: (i) a reservist or National Guardsman; (ii) called to active duty after September 11, 2001; and (iii) called to duty for at least 180 days or for an indefinite period, you may take a distribution of your elective deferrals under the Plan while you are on active duty, regardless of your age. The 10% premature distribution penalty tax, normally applicable to Plan distributions made before you reach age 59 1/2, will not apply to the distribution. You also may repay the distribution to an IRA, without limiting amounts you otherwise could contribute to the IRA, provided you make the repayment within 2 years following your completion of active duty.

**Can I elect a rollover to reduce or defer tax on my distribution?**

**Rollover or direct transfer.** You may reduce, or defer entirely, the tax due on your distribution through use of one of the following methods:

60-day rollover. The rollover of all or a portion of the distribution to an Individual retirement account or annuity (IRA) or another employer retirement plan willing to accept the rollover. This will result in no tax being due until you begin withdrawing funds from the IRA or other qualified employer plan. The rollover of the distribution, however, MUST be made within strict time frames (normally, within 60 days after you receive your distribution). Under certain circumstances, all or a portion of a distribution (such as a hardship distribution) may not qualify for this rollover treatment. In addition, most distributions will be subject to mandatory federal income tax withholding at a rate of 20%. This will reduce the amount you actually receive. For this reason, if you wish to roll over all or a portion of your distribution amount, then the direct transfer option described in paragraph (b) below would be the better choice.

Direct rollover. For most distributions, you may request that a direct transfer (sometimes referred to as a "direct rollover") of all or a portion of a distribution be made to either an individual retirement account or annuity (IRA) or another employer retirement plan willing to accept the transfer. A direct transfer will result in no tax being due until you withdraw funds from the IRA or other employer plan. Like the rollover, under certain circumstances all or a portion of the amount to be distributed may not qualify for this direct transfer. If you elect to actually receive the distribution rather than request a direct transfer, then in most cases 20% of the distribution amount will be withheld for federal income tax purposes.

**Automatic IRA rollover.** If a mandatory distribution is being made to you because your vested interest in the Plan exceeds $1,000 but does not exceed $5,000, then the Plan will rollover your distribution to an IRA if you do not make an affirmative election to either receive or roll over the distribution. The IRA provider selected by the Plan will invest the rollover funds in a type of investment designed to preserve principal and provide a reasonable rate of return and liquidity (e.g., an interest-bearing account, a certificate of deposit or a money market fund). The IRA provider will charge your account for any expenses associated with the establishment and maintenance of the IRA and with the IRA investments. You may transfer the IRA funds to any other IRA you choose. You will be provided with details regarding the IRA at the time you are entitled to a distribution. However, you may contact the Administrator at the address and telephone number indicated in this SPD for further information regarding the Plan's automatic rollover provisions, the IRA provider, and the fees and expenses associated with the IRA.

**Tax notice.** WHENEVER YOU RECEIVE A DISTRIBUTION THAT IS AN ELIGIBLE ROLLOVER DISTRIBUTION, THE ADMINISTRATOR WILL DELIVER TO YOU A MORE DETAILED EXPLANATION OF THESE OPTIONS. HOWEVER, THE RULES WHICH DETERMINE WHETHER YOU QUALIFY FOR FAVORABLE TAX TREATMENT ARE VERY COMPLEX. YOU SHOULD CONSULT WITH QUALIFIED TAX COUNSEL BEFORE MAKING A CHOICE.

Effective Date: January 1, 2015

issues that prevent a decision on the claim, and the additional information needed to resolve those issues, and you will be afforded at least 45 days within which to provide the specified information.

The Administrator's written or electronic notification of any adverse benefit determination must contain the following information:

    (a)  The specific reason or reasons for the adverse determination.

    (b)  Reference to the specific Plan provisions on which the determination is based.

    (c)  A description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary.

    (d)  Appropriate information as to the steps to be taken if you or your beneficiary want to submit your claim for review.

    (e)  In the case of disability benefits where disability is determined by a physician:

        (i)  If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided to you free of charge upon request.

        (ii)  If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to your medical circumstances, or a statement that such explanation will be provided to you free of charge upon request.

If your claim has been denied, and you want to submit your claim for review, you must follow the Claims Review Procedure in the next question.

What is the Claims Review Procedure?

Upon the denial of your claim for benefits, you may file your claim for review, in writing, with the Administrator.

    (a)  YOU MUST FILE THE CLAIM FOR REVIEW NOT LATER THAN 60 DAYS AFTER YOU HAVE RECEIVED WRITTEN NOTIFICATION OF THE DENIAL OF YOUR CLAIM FOR BENEFITS.

    HOWEVER, IF YOUR CLAIM IS FOR DISABILITY BENEFITS AND DISABILITY IS DETERMINED BY A PHYSICIAN, THEN INSTEAD OF THE ABOVE, YOU MUST FILE THE CLAIM FOR REVIEW NOT LATER THAN 180 DAYS FOLLOWING RECEIPT OF NOTIFICATION OF AN ADVERSE BENEFIT DETERMINATION.

    (b)  You may submit written comments, documents, records, and other information relating to your claim for benefits.

    (c)  You may review all pertinent documents relating to the denial of your claim and submit any issues and comments, in writing, to the Administrator.

    (d)  You will be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits.

    (e)  Your claim for review must be given a full and fair review. This review will take into account all comments, documents, records, and other information submitted by you relating to your claim, without regard to whether such information was submitted or considered in the initial benefit determination.

In addition to the Claims Review Procedure above, if your claim is for disability benefits and disability is determined by a physician, then the Claims Review Procedure provides that:

    (a)  Your claim will be reviewed without deference to the initial adverse benefit determination and the review will be conducted by an appropriate named fiduciary of the Plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual.

    (b)  In deciding an appeal of any adverse benefit determination that is based in whole or part on medical judgment, the appropriate named fiduciary will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

    (c)  Any medical or vocational experts whose advice was obtained on behalf of the Plan in connection with your adverse benefit determination will be identified, without regard to whether the advice was relied upon in making the benefit determination.

    (d)  The health care professional engaged for purposes of a consultation under (b) above will be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual.



14

**What can I do if I have questions or my rights are violated?**

If you have any questions about the Plan, you should contact the Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in the telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## ARTICLE XI
## GENERAL INFORMATION ABOUT THE PLAN

There is certain general information which you may need to know about the Plan. This information has been summarized for you in this Article.

**Plan Name**

The full name of the Plan is Foremost Industries, Inc. 401(k) Profit Sharing Plan.

**Plan Number**

Your Employer has assigned Plan Number 002 to your Plan.

**Plan Effective Dates**

Effective Date. This Plan was originally effective on January 1, 1979. The amended and restated provisions of the Plan become effective on January 1, 2015. However, this restatement was made to conform the Plan to new tax laws and some provisions may be retroactively effective.

**Other Plan Information**

Valuation date. Valuations of the Plan assets are generally made every business day. Certain distributions are based on the Anniversary Date of the Plan. This date is the last day of the Plan Year.

Plan Year. The Plan's records are maintained on a twelve-month period of time. This is known as the Plan Year. The Plan Year begins on January 1st and ends on December 31st.

The Plan and Trust will be governed by the laws of Pennsylvania to the extent not governed by federal law.

Benefits provided by the Plan are NOT insured by the Pension Benefit Guaranty Corporation (PBGC) under Title IV of the Employee Retirement Income Security Act of 1974 because the insurance provisions under ERISA are not applicable to this type of Plan.

Service of legal process may be made upon your Employer. Service of legal process may also be made upon the Trustee or Administrator.

**Employer Information**

Your Employer's name, contact information and identification number are:

Foremost Industries, Inc.
2375 Buchanan Trail West
Greencastle, Pennsylvania 17225
23-1574111
Telephone: 717-597-7166

**Administrator Information**

The Administrator is responsible for the day-to-day administration and operation of the Plan. For example, the Administrator maintains the Plan records, including your account information, provides you with the forms you need to complete for Plan participation, and directs the payment of your account at the appropriate time. The Administrator will also allow you to review the formal Plan document and certain other materials related to the Plan. If you have any questions about the Plan or your participation, you should contact the Administrator. The Administrator may designate other parties to perform some duties of the Administrator.

The Administrator has the complete power, in its sole discretion, to determine all questions arising in connection with the administration, interpretation, and application of the Plan (and any related documents and underlying policies). Any such determination by the Administrator is conclusive and binding upon all persons.

16

**APPENDIX**
**PLAN EXPENSE ALLOCATIONS**

The Plan will assess against an individual Participant's account the following Plan expenses which are incurred by, or are attributable to, a particular Participant based on use of a particular Plan feature, listed by type and the amount charged (*check all that apply, and fill in the charge or method of determining the charge*). All fees are subject to change.

[X]   **Distribution following termination.** Distribution of account upon termination of employment, including preparation of required notices and elections, distribution check or transfer of funds by direct rollover, as appropriate, and tax reporting forms.
Amount: $ 100.00

[X]   **Administrative processing fee to eliminate certain small account distributions.** If the Participant's account is distributable (for example, upon termination of employment) and the distribution process fee equals or exceeds the Participant's account balance, the Plan will charge the processing fee against the vested account balance, resulting in the elimination of the account balance without any distribution to the Participant.

[X]   **QDRO.** "Qualified domestic relations order" (QDRO) review and processing, including notices to parties and preparation of QDRO distribution check. In addition to the amount indicated below, the Plan will charge the Participant's account for actual legal expenses and costs if the Plan consults with legal counsel regarding the qualified status of the order.
Amount: $ 600.00 - $1,000.00

[X]   **Hardship distribution.** Hardship distribution, including application processing and preparation of required notices, elections and distribution check.
Amount: $ 165.00

[X]   **In-service distribution.** Non-hardship in-service distribution, including application processing and preparation of required notices, elections and distribution check.
Amount: $ 100.00

[X]   **RMD.** Required minimum distributions, including annual calculation of required minimum distribution and preparation of required notices, elections and distribution check.
Amount: $ 115.00

[X]   **Other (describe)**
Locator services. If you do not keep your Plan Administrator informed of your current address, a fee will be charged to your account for the costs associated with the use of a locator service.  Amount: $100.00 - $200.00



1

Effective Date: January 1, 2015

*Execution Version*

## SCHEDULE 3.2(b)

1.    Susquehanna Bank Line of Credit – Ralph C. Michael & Marjorie B. Michael

2.    JP Morgan Chase Trust Loan – Ralph C. Michael

Initials

_____ Buyer

_____ Seller

_____ Company

*Execution Version*

## SCHEDULE 4.2(a)

Pennsylvania
Maryland
Washington DC
Virginia
West Virginia*

*As of the Closing Date, the Company has made all necessary filings to comply with the requirements of the State of West Virginia for a foreign corporation to be found to be in "good standing". However, a Certificate of Good Standing for the Company from the State of West Virginia is not available as of the Closing Date. The Seller shall be solely responsible for all filing costs and related compliance costs necessary for the Company to resume its "good standing" status in the State of West Virginia.

Initials

Buyer

Seller

Company

*Execution Version*

## SCHEDULE 4.2(h)

As of December 31, 2014, the Company owns shares of Class A Preferred Stock in Lumbermens Merchandising Corporation.

Initials

_____ Buyer

_____ Seller

_____ Company

*Execution Version*

## SCHEDULE 4.2(e)

Ralph Michael – President
Laurie Myers – Treasurer
Marjorie Michael - Secretary

*Execution Version*

## SCHEDULE 4.4(a)

See Attached

Initials

Buyer

Seller

Company

FOREMOST INDUSTRIES, INC.
BALANCE SHEET
Estimate
3/31/2015

**CURRENT ASSETS**

| | |
|---|---|
| Cash | -$35,097.47 |
| Accounts Receivable | $361,469.48 |
| Inventory | $553,393.26 |
| Work In Process | $411,256.24 |
| TOTAL CURRENT ASSETS | $1,291,021.51 |

**FIXED ASSETS**

| | |
|---|---|
| Land | $342,499.00 |
| Land & Building Improvements | $406,387.47 |
| Buildings | $9,371,981.17 |
| Tools & Equipment | $4,427,696.46 |
| Furniture & Fixtures | $3,571.04 |
| Vehicles | $2,996,008.18 |
| (Less) Accum. Depreciation | -$9,573,363.57 |
| TOTAL FIXED ASSETS | $7,974,779.75 |

**OTHER ASSETS**

| | |
|---|---|
| Warranty Income Receivable | $3,229.04 |
| TOTAL OTHER ASSETS | $3,229.04 |
| TOTAL ASSETS | $9,269,030.30 |

**LIABILITIES & EQUITY**

**CURRENT LIABILITIES**

| | |
|---|---|
| Accounts Payable | $456,411.40 |
| Line of Credit | $2,600,000.00 |
| Accrued Payroll Taxes | $87,898.26 |
| Accrued Profit Sharing | $17,036.08 |
| Accrued Use Tax | $152,315.13 |
| Customer Deposits | $658,576.87 |
| TOTAL CURRENT LIABILITIES | $3,972,237.74 |

**EQUITY**

| | |
|---|---|
| Common Stock | $100,100.00 |
| Treasury Stock | -$50,000.00 |
| Additional Paid in Capital | $5,128,200.00 |
| Accum. Adj. Account | -$1,084,984.07 |
| Undist. Taxable Income | $3,045,642.63 |
| Retained Earnings | -$1,569,467.71 |
| Retained Earnings - Current | -$272,698.29 |
| TOTAL EQUITY | $5,296,792.56 |
| TOTAL LIABILITIES & EQUITY | $9,269,030.30 |

FOREMOST INDUSTRIES, INC.
ESTIMATED INCOME STATEMENT
For the Quarter Ended March 31, 2015

| SALES | 2015 | % |
|---|---|---|
| Sales - PA | $419,186.57 | 14.85% |
| Sales - WV | 90,385.00 | 3.20% |
| Sales - MD | 341,636.25 | 12.11% |
| Sales - VA | 1,305,288.70 | 46.25% |
| Sales - Panels | 640,970.27 | 22.71% |
| Sales - Materials | 572.17 | 0.02% |
| Sales - Equipment Rentals | 5,641.00 | 0.20% |
| Plan Income | 15,158.82 | 0.54% |
| Sales - Special Projects | 3,278.01 | 0.12% |
| TOTAL SALES | 2,822,116.79 | 100.00% |
| Sales, Returns & Allowances | 840.00 | 0.03% |
| NET SALES | 2,821,276.79 | 99.97% |

| COST OF GOODS SOLD | | |
|---|---|---|
| Materials | $1,503,072.34 | 53.26% |
| Direct Labor | 365,131.92 | 12.94% |
| Field Labor | 176,609.89 | 6.26% |
| Superintendent Labor | 9,969.24 | 0.35% |
| Overhead | 44,241.90 | 1.57% |
| Carpet & Tile Installation | 18,432.59 | 0.65% |
| Certification Expense | 18,392.87 | 0.65% |
| Insurance - General Liability | 29,900.00 | 1.06% |
| Insurance - Health | 40,826.30 | 1.45% |
| Insurance - Workers Comp | 65,291.14 | 2.31% |
| Permits | 10,561.60 | 0.37% |
| Plant Expense | 2,148.85 | 0.08% |
| Propane | 12,513.82 | 0.44% |
| R & M - Building | 2,829.02 | 0.10% |
| R & M - T&E | 7,956.51 | 0.28% |
| Small Tools | 1,490.14 | 0.05% |
| Subcontract Labor | 316,576.52 | 11.22% |
| Taxes - Payroll | 35,316.14 | 1.25% |
| Taxes - Unemployment | 54,442.50 | 1.93% |
| Telephone | 1,280.22 | 0.05% |
| Utilities | 29,773.80 | 1.06% |
| Vehicle Expense - Fuel | 40,562.07 | 1.44% |
| Vehicle Expense - R & M | 16,872.00 | 0.60% |
| Warranty - Service | 575.00 | 0.02% |
| TOTAL COST OF GOODS SOLD | 2,804,766.38 | 99.39% |
| GROSS PROFIT ( LOSS) | $16,510.41 | 0.59% |

## G & A EXPENSES

| | | |
|---|---|---|
| Advertising | $5,745.56 | 0.20% |
| Cleaning | 1,135.76 | 0.04% |
| Commissions - Panelized | 14,644.55 | 0.52% |
| Computer Supplies & Expense | 3,906.34 | 0.14% |
| Dental Reimbursements | 2,828.60 | 0.10% |
| Dues & Subscriptions | 1,894.14 | 0.07% |
| Insurance - Health | 20,857.23 | 0.74% |
| Marketing & Sales | 263.80 | 0.01% |
| Miscellaneous Expense | 420.00 | 0.01% |
| Office Supplies | 8,056.78 | 0.29% |
| Postage | 987.71 | 0.03% |
| Professional Fees | 15,443.43 | 0.55% |
| Profit Sharing Expense | 3,112.96 | 0.11% |
| Salaries - Office | 173,300.19 | 6.14% |
| Taxes - Payroll | 13,534.78 | 0.48% |
| Taxes - Unemployment | 14,903.95 | 0.53% |
| Taxes - Real Estate | 1,553.19 | 0.06% |
| Taxes - Other | 634.57 | 0.02% |
| Telephone | 1,145.95 | 0.04% |
| Utilities | 4,518.69 | 0.16% |
| **TOTAL EXPENSES** | 288,888.18 | 10.24% |
| **NET INCOME FROM OPERATIONS** | -$272,377.77 | -9.65% |

## OTHER INCOME & EXPENSES

| | | |
|---|---|---|
| Gain/Loss-Sale of Asset | $13,897.80 | 0.49% |
| Interest Expense | -20,294.82 | -0.72% |
| Miscellaneous Income | 1,097.22 | 0.04% |
| Penalties | -215.65 | -0.01% |
| Rebates | 5,194.93 | 0.18% |
| **TOTAL OTHER INCOME & EXP.** | -320.52 | -0.01% |
| **NET INCOME (LOSS)** | -$272,698.29 | -9.66% |

## FOREMOST INDUSTRIES, INC.
## INCOME STATEMENT
### For the Years Ended December 31, 2013 & 2012

| SALES | 2013 | % | 2012 | % |
|---|---|---|---|---|
| Sales - PA | $1,564,751.34 | 14.95% | $1,753,460.08 | 18.14% |
| Sales - WV | 1,495,971.29 | 14.29% | 1,437,579.19 | 14.87% |
| Sales - MD | 2,123,212.78 | 20.29% | 1,046,272.71 | 10.82% |
| Sales - VA | 2,818,880.49 | 26.93% | 2,608,392.46 | 26.98% |
| Sales - Panels | 1,461,923.81 | 13.97% | 1,396,650.65 | 14.45% |
| Sales - Materials | 9,267.61 | 0.09% | 11,596.32 | 0.12% |
| Sales - Lumber Direct | 745,262.96 | 7.12% | 1,085,728.08 | 11.23% |
| Sales - Subcontract Cabinets | 10,215.00 | 0.10% | 24,900.00 | 0.26% |
| Equipment Rentals | 49,381.60 | 0.47% | 49,407.82 | 0.51% |
| Rental Income | 102,682.00 | 0.98% | 145,984.00 | 1.51% |
| Plan Income | 67,449.16 | 0.64% | 51,984.52 | 0.54% |
| PII Sales to Lumber Direct | | 0.00% | 45,954.39 | 0.48% |
| Sales - Special Projects | 17,181.94 | 0.16% | 8,647.15 | 0.09% |
| **TOTAL SALES** | 10,466,179.98 | 100.00% | 9,666,557.37 | 100.00% |
| Sales, Returns & Allowances | -357.26 | 0.00% | -6,041.07 | -0.06% |
| **NET SALES** | 10,465,822.72 | 100.00% | 9,660,516.30 | 99.94% |
| **COST OF GOODS SOLD** | | | | |
| Materials | $5,725,499.89 | 54.70% | $4,948,884.01 | 51.20% |
| Purchases Discounts | -20,045.37 | -0.19% | -1,931.09 | -0.02% |
| Direct Labor | 1,248,556.55 | 11.93% | 951,981.62 | 9.85% |
| Field Labor | 843,387.52 | 8.06% | 635,999.51 | 6.58% |
| Superintendent Labor | 43,200.04 | 0.41% | 42,277.04 | 0.44% |
| Overhead | -62,074.29 | -0.59% | 3,368.75 | 0.03% |
| Carpet & Tile Installation | 16,044.09 | 0.15% | 25,057.84 | 0.26% |
| Certification Expense | 59,478.72 | 0.57% | 45,633.04 | 0.47% |
| Depreciation | 343,451.89 | 3.28% | 389,872.65 | 4.03% |
| Insurance - General Liability | 138,337.79 | 1.32% | 44,214.22 | 0.46% |
| Insurance - Health | 156,902.58 | 1.50% | 297,590.92 | 3.08% |
| Insurance - Workers Comp | 190,085.54 | 1.82% | 237,059.90 | 2.45% |
| Permits | 28,633.17 | 0.27% | 26,373.20 | 0.27% |
| Plant Expense | 26,204.89 | 0.25% | 39,190.81 | 0.41% |
| Propane | 9,741.12 | 0.09% | 10,492.18 | 0.11% |
| Registration Fees | 17,449.02 | 0.17% | 21,821.09 | 0.23% |
| R & M - Building | 24,725.63 | 0.24% | 55,209.97 | 0.57% |
| R & M - Cranes | 2,548.78 | 0.02% | 12,763.42 | 0.13% |
| R & M - T&E | 38,039.72 | 0.36% | 9,290.58 | 0.10% |
| Small Tools | 19,861.38 | 0.19% | 14,291.17 | 0.15% |
| Subcontract Labor | 587,491.27 | 5.61% | 562,688.07 | 5.82% |
| Taxes - Payroll | 156,589.97 | 1.50% | 130,528.52 | 1.35% |
| Taxes - Unemployment | 88,552.20 | 0.85% | 77,523.31 | 0.80% |
| Telephone | 12,700.86 | 0.12% | 8,623.63 | 0.09% |
| Uniforms | 0.00 | 0.00% | 1,391.96 | 0.01% |
| Utilities | 106,488.81 | 1.02% | 97,824.19 | 1.01% |
| Vehicle Expense - Fuel | 77,305.96 | 0.74% | 92,961.96 | 0.96% |
| Vehicle Expense - R & M | 175,704.48 | 1.68% | 148,685.36 | 1.54% |

| | | | | |
|---|---|---:|---:|---:|
| Warranty - RWC | | 4,655.00 | 0.04% | 3,880.00 | 0.04% |
| Warranty - Service | | 0.00 | 0.00% | 939.42 | 0.01% |
| **TOTAL COST OF GOODS SOLD** | | 10,059,517.21 | 96.11% | 8,934,487.25 | 92.43% |
| **GROSS PROFIT ( LOSS)** | | $406,305.51 | 3.88% | $726,029.05 | 7.51% |
| **G & A EXPENSES** | | | | | |
| Advertising | | $49,565.13 | 0.47% | $45,782.08 | 0.47% |
| Bad Debt Expense | | $39,115.89 | 0.37% | $7,264.43 | 0.08% |
| Cleaning | | 4,739.35 | 0.05% | 3,645.00 | 0.04% |
| Commissions - Panelized | | 34,581.89 | 0.33% | 50,056.16 | 0.52% |
| Computer Supplies & Expense | | 30,797.25 | 0.29% | 23,279.03 | 0.24% |
| Contribtuions | | 100.00 | 0.00% | 1,025.00 | 0.01% |
| Credit Card Fees | | 13,994.78 | 0.13% | 21,366.95 | 0.22% |
| Dental Reimbursements | | 10,917.07 | 0.10% | 11,830.36 | 0.12% |
| Depreciation | | 6,320.07 | 0.06% | 7,465.20 | 0.08% |
| Dues & Subscriptions | | 2,673.00 | 0.03% | 2,554.00 | 0.03% |
| Employee Benefits | | 1,295.37 | 0.01% | 335.53 | 0.00% |
| Insurance - General Liability | | 255.00 | 0.00% | 355.00 | 0.00% |
| Insurance - Health | | 62,986.09 | 0.60% | 153,178.53 | 1.58% |
| Marketing & Sales | | 16,788.53 | 0.16% | 4,482.33 | 0.05% |
| Miscellaneous Expense | | 5,405.75 | 0.05% | 5,495.08 | 0.06% |
| Office Supplies | | 29,288.21 | 0.28% | 22,517.93 | 0.23% |
| Postage | | 8,668.83 | 0.08% | 7,379.57 | 0.08% |
| Professional Fees | | 41,309.40 | 0.39% | 26,737.14 | 0.28% |
| Profit Sharing Expense | | 12,545.02 | 0.12% | 0.00 | 0.00% |
| Repairs & Maintenance | | 1,664.50 | 0.02% | 18,290.55 | 0.19% |
| Salaries - Officers | | 0.00 | 0.00% | 0.00 | 0.00% |
| Salaries - Office | | 730,288.91 | 6.98% | 699,945.56 | 7.24% |
| Sales - Subcontract | | 7,764.12 | 0.07% | 10,713.95 | 0.11% |
| Taxes - Payroll | | 54,392.58 | 0.52% | 53,306.22 | 0.55% |
| Taxes - Real Estate | | 154,253.14 | 1.47% | 146,253.71 | 1.51% |
| Taxes - Unemployment | | 19,580.75 | 0.19% | 10,804.69 | 0.11% |
| Taxes - Other | | 3,301.00 | 0.03% | 1,989.50 | 0.02% |
| Telephone | | 8,576.79 | 0.08% | 7,575.09 | 0.08% |
| Travel | | 5,879.10 | 0.06% | 4,044.46 | 0.04% |
| Utilities | | 12,631.50 | 0.12% | 11,465.60 | 0.12% |
| **TOTAL EXPENSES** | | 1,369,679.02 | 13.09% | 1,359,138.65 | 14.06% |
| **NET INCOME FROM OPERATIONS** | | -$963,373.51 | -9.20% | -$633,109.60 | -6.55% |
| **OTHER INCOME & EXPENSES** | | | | | |
| Gain/Loss-Sale of Asset | | $634,284.61 | 6.06% | $750.00 | 0.01% |
| Interest Expense | | -105,572.55 | -1.01% | -96,697.53 | -1.00% |
| Interest Income | | 2,550.98 | 0.02% | 3,954.57 | 0.04% |
| Miscellaneous Income | | 2,533.61 | 0.02% | 66,274.28 | 0.69% |
| Penalties | | -17,825.43 | -0.17% | -7,123.71 | -0.07% |
| Rebates | | 15,826.59 | 0.15% | 24,362.12 | 0.25% |
| Reserve Warranty Income | | 815.36 | 0.01% | 321.93 | 0.00% |
| Finance Charge Income | | 2,440.30 | 0.02% | 2,137.73 | 0.02% |
| Sales Tax Discount | | 482.20 | 0.00% | 564.82 | 0.01% |
| **TOTAL OTHER INCOME & EXP.** | | 535,535.67 | 5.12% | -5,455.79 | -0.06% |
| **NET INCOME (LOSS)** | | -$427,837.84 | -4.09% | -$638,565.39 | -6.61% |

### FOREMOST INDUSTRIES, INC.
### BALANCE SHEET
### 12/31/2012

**CURRENT ASSETS**

| | |
|---|---:|
| Cash | $5,640.80 |
| Accounts Receivable | $598,565.14 |
| Loans Receivable | $384,032.12 |
| Inventory | $1,331,055.56 |
| Work In Process | $379,240.67 |
| **TOTAL CURRENT ASSETS** | **$2,698,534.29** |

**FIXED ASSETS**

| | |
|---|---:|
| Land | $342,499.00 |
| Land & Building Improvements | $1,035,950.38 |
| Buildings | $10,182,359.95 |
| Tools & Equipment | $6,164,324.86 |
| Furniture & Fixtures | $9,945.80 |
| Vehicles | $3,040,438.54 |
| (Less) Accum. Depreciation | -$12,342,125.10 |
| **TOTAL FIXED ASSETS** | **$8,433,393.43** |

**OTHER ASSETS**

| | |
|---|---:|
| Warranty Income Receivable | $8,152.78 |
| **TOTAL OTHER ASSETS** | **$8,152.78** |
| **TOTAL ASSETS** | **$11,140,080.50** |

### LIABILITIES & EQUITY

**CURRENT LIABILITIES**

| | |
|---|---:|
| Accounts Payable | $1,052,202.75 |
| Notes Payable | $4,905,000.00 |
| Line of Credit | $3,095,597.09 |
| Accrued Payroll Taxes | $33,943.72 |
| Accrued Use Tax | $50,052.51 |
| Customer Deposits | $678,443.58 |
| Fire Deposit | $218,741.35 |
| **TOTAL CURRENT LIABILITIES** | **$10,033,981.00** |

**EQUITY**

| | |
|---|---:|
| Common Stock | $100,100.00 |
| Treasury Stock | -$50,000.00 |
| Accum. Adj. Account | -$1,084,984.07 |
| Undist. Taxable Income | $3,045,642.63 |
| Retained Earnings | -$266,093.67 |
| Retained Earnings - Current | -$638,565.39 |
| **TOTAL EQUITY** | **$1,106,099.50** |
| **TOTAL LIABILITIES & EQUITY** | **$11,140,080.50** |



*FOREMOST INDUSTRIES, INC.*
*BALANCE SHEET*
*12/31/2013*

**CURRENT ASSETS**

| | |
|---|---|
| Cash | $2,198.35 |
| Accounts Receivable | $450,698.94 |
| Loans Receivable | $46,838.44 |
| Inventory | $1,138,520.83 |
| Work In Process | $856,735.19 |
| **TOTAL CURRENT ASSETS** | **$2,494,991.75** |

**FIXED ASSETS**

| | |
|---|---|
| Land | $342,499.00 |
| Land & Building Improvements | $1,053,816.38 |
| Buildings | $9,686,732.95 |
| Tools & Equipment | $4,570,532.62 |
| Furniture & Fixtures | $3,571.04 |
| Vehicles | $3,002,425.35 |
| (Less) Accum. Depreciation | -$10,711,677.07 |
| **TOTAL FIXED ASSETS** | **$7,947,900.27** |

**OTHER ASSETS**

| | |
|---|---|
| Warranty Income Receivable | $2,776.93 |
| **TOTAL OTHER ASSETS** | **$2,776.93** |
| **TOTAL ASSETS** | **$10,445,668.95** |

**LIABILITIES & EQUITY**

**CURRENT LIABILITIES**

| | |
|---|---|
| Accounts Payable | $329,336.68 |
| Notes Payable | $5,090,000.00 |
| Line of Credit | $3,091,004.31 |
| Accrued Payroll Taxes | $35,140.31 |
| Accrued Profit Sharing | $13,921.05 |
| Accrued Use Tax | $22,109.37 |
| Customer Deposits | $942,636.72 |
| Fire/LD Deposit | $238,741.35 |
| **TOTAL CURRENT LIABILITIES** | **$9,762,889.79** |

**EQUITY**

| | |
|---|---|
| Common Stock | $100,100.00 |
| Treasury Stock | -$50,000.00 |
| Accum. Adj. Account | -$1,084,984.07 |
| Undist. Taxable Income | $3,045,642.63 |
| Retained Earnings | -$900,141.56 |
| Retained Earnings - Current | -$427,837.84 |
| **TOTAL EQUITY** | **$682,779.16** |
| **TOTAL LIABILITIES & EQUITY** | **$10,445,668.95** |



### FOREMOST INDUSTRIES, INC.
### BALANCE SHEET
### 12/31/2014

**CURRENT ASSETS**

| | |
|---|---|
| Cash | $1,313.96 |
| Accounts Receivable | $577,725.50 |
| Inventory | $563,291.85 |
| Work In Process | $759,175.72 |
| **TOTAL CURRENT ASSETS** | **$1,901,507.03** |

**FIXED ASSETS**

| | |
|---|---|
| Land | $342,499.00 |
| Land & Building Improvements | $404,127.47 |
| Buildings | $9,427,414.67 |
| Tools & Equipment | $4,427,696.46 |
| Furniture & Fixtures | $3,571.04 |
| Vehicles | $3,024,695.18 |
| (Less) Accum. Depreciation | -$9,979,431.42 |
| **TOTAL FIXED ASSETS** | **$7,650,572.40** |

**OTHER ASSETS**

| | |
|---|---|
| Warranty Income Receivable | $3,229.04 |
| **TOTAL OTHER ASSETS** | **$3,229.04** |
| **TOTAL ASSETS** | **$9,555,308.47** |

### LIABILITIES & EQUITY

**CURRENT LIABILITIES**

| | |
|---|---|
| Accounts Payable | $558,621.80 |
| Notes Payable | $6,800.00 |
| Truck Loan Payable | $25,958.63 |
| Line of Credit | $2,600,000.00 |
| Accrued Payroll Taxes | $27,239.86 |
| Accrued Profit Sharing | $14,074.39 |
| Accrued Use Tax | $73,610.18 |
| Customer Deposits | $1,000,477.31 |
| **TOTAL CURRENT LIABILITIES** | **$4,306,782.17** |

**EQUITY**

| | |
|---|---|
| Common Stock | $100,100.00 |
| Treasury Stock | -$50,000.00 |
| Add'l Paid in Capital | $5,128,200.00 |
| Accum. Adj. Account | -$1,084,984.07 |
| Undist. Taxable Income | $3,045,642.63 |
| Retained Earnings | -$1,327,979.40 |
| Retained Earnings - Current | -$562,452.86 |
| **TOTAL EQUITY** | **$5,248,526.30** |
| **TOTAL LIABILITIES & EQUITY** | **$9,555,308.47** |



## FOREMOST INDUSTRIES, INC.
## INCOME STATEMENT
### For the Year Ended December 31, 2014

| SALES | 2014 | % |
|---|---|---|
| Sales - PA | $562,341.42 | 5.34% |
| Sales - WV | 1,985,848.32 | 18.86% |
| Sales - MD | 1,989,003.39 | 18.89% |
| Sales - VA | 3,023,966.89 | 28.72% |
| Sales - Panels | 2,273,753.82 | 21.60% |
| Sales - Materials | 8,660.79 | 0.08% |
| Sales - Union Beach | 545,146.00 | 5.18% |
| Equipment Rentals | 30,180.14 | 0.29% |
| Plan Income | 82,505.91 | 0.78% |
| Sales - Special Projects | 26,817.78 | 0.25% |
| TOTAL SALES | 10,528,224.46 | 100.00% |
| Sales, Returns & Allowances | -9,911.62 | -0.09% |
| NET SALES | 10,518,312.84 | 99.91% |
| COST OF GOODS SOLD | | |
| Materials | $5,711,955.71 | 54.25% |
| Purchases Discounts | -32,476.49 | -0.31% |
| Direct Labor | 1,373,607.56 | 13.05% |
| Field Labor | 696,006.88 | 6.61% |
| Superintendent Labor | 43,200.04 | 0.41% |
| Overhead | 13,670.38 | 0.13% |
| Carpet & Tile Installation | 49,057.49 | 0.47% |
| Certification Expense | 63,937.96 | 0.61% |
| Depreciation | 320,474.33 | 3.04% |
| Insurance - General Liability | 124,776.18 | 1.19% |
| Insurance - Health | 149,916.46 | 1.42% |
| Insurance - Workers Comp | 194,355.95 | 1.85% |
| Permits | 32,830.52 | 0.31% |
| Plant Expense | 29,219.71 | 0.28% |
| Propane | 13,226.81 | 0.13% |
| Registration Fees | 18,204.05 | 0.17% |
| R & M - Building | 51,565.53 | 0.49% |
| R & M - Cranes | 10,455.91 | 0.10% |
| R & M - T&E | 40,237.67 | 0.38% |
| Small Tools | 25,893.59 | 0.25% |
| Subcontract Labor | 933,383.94 | 8.87% |
| Taxes - Payroll | 146,924.15 | 1.40% |
| Taxes - Unemployment | 76,133.80 | 0.72% |
| Telephone | 7,134.54 | 0.07% |
| Utilities | 103,057.68 | 0.98% |
| Vehicle Expense - Fuel | 102,621.51 | 0.97% |
| Vehicle Expense - R & M | 162,746.52 | 1.55% |
| Warranty - RWC | 4,830.00 | 0.05% |
| Warranty - Service | 1,231.47 | 0.01% |
| TOTAL COST OF GOODS SOLD | 10,468,179.85 | 99.43% |
| GROSS PROFIT ( LOSS) | $50,132.99 | 0.48% |

## G & A EXPENSES

| | | |
|---|---:|---:|
| Advertising | $41,677.55 | 0.40% |
| Bad Debt Expense | $134,403.47 | 1.28% |
| Cleaning | 5,873.11 | 0.06% |
| Commissions | 78,761.83 | 0.75% |
| Computer Supplies & Expense | 22,487.07 | 0.21% |
| Credit Card Fees | 1,034.25 | 0.01% |
| Dental Reimbursements | 11,527.77 | 0.11% |
| Depreciation | 5,259.46 | 0.05% |
| Dues & Subscriptions | 4,970.51 | 0.05% |
| Employee Benefits | 219.32 | 0.00% |
| Insurance - General Liability | 45,562.42 | 0.43% |
| Insurance - Health | 60,941.92 | 0.58% |
| Marketing & Sales | 21,974.32 | 0.21% |
| Miscellaneous Expense | 1,192.69 | 0.01% |
| Office Supplies | 33,004.33 | 0.31% |
| Postage | 9,074.52 | 0.09% |
| Professional Fees | 29,538.17 | 0.28% |
| Profit Sharing Expense | 14,074.39 | 0.13% |
| Repairs & Maintenance | 11,301.52 | 0.11% |
| Salaries | 790,244.05 | 7.51% |
| Sales - Subcontract | 16,934.90 | 0.16% |
| Taxes - Payroll | 62,050.78 | 0.59% |
| Taxes - Real Estate | 127,910.48 | 1.21% |
| Taxes - Unemployment | 22,358.46 | 0.21% |
| Taxes - Other | 1,834.45 | 0.02% |
| Telephone | 6,645.03 | 0.06% |
| Travel | 3,171.00 | 0.03% |
| Utilities | 11,720.90 | 0.11% |
| **TOTAL EXPENSES** | 1,575,748.67 | 14.97% |
| **NET INCOME FROM OPERATIONS** | -$1,525,615.68 | -14.49% |
| **OTHER INCOME & EXPENSES** | | |
| Gain/Loss-Sale of Asset | $788,319.25 | 7.49% |
| Interest Expense | -86,947.83 | -0.83% |
| Interest Income | 340.79 | 0.00% |
| Miscellaneous Income | 238,953.65 | 2.27% |
| Rebates | 13,615.17 | 0.13% |
| Rental Income | 7,410.00 | 0.07% |
| Reserve Warranty Income | 648.27 | 0.01% |
| Finance Charge Income | 102.12 | 0.00% |
| Sales Tax Discount | 721.40 | 0.01% |
| **TOTAL OTHER INCOME & EXP.** | 963,162.82 | 9.15% |
| **NET INCOME (LOSS)** | -$562,452.86 | -5.34% |

Numbers may vary slightly upon final review and completion of tax return

*Execution Version*

## SCHEDULE 4.4(b)

None

Initials
Buyer
Seller
Company

*Execution Version*

## SCHEDULE 4.4(c)

BK Builders
Mary Ann Bobolis
G.B. Cavendar
Exin Solutions
Brandon Fields
GMI Builders
Patricia Lofton
Michael Ratay
Lee Rumbles
Snowberger Homes

*Execution Version*

## SCHEDULE 4.5

None

Initials
Buyer
Seller
Company

*Execution Version*

## SCHEDULE 4.6

None

Initials

Buyer

Seller

Company

*Execution Version*

## SCHEDULE 4.7

### Power of Attorney

NONE

Initials
Buyer
Seller
Company

*Execution Version*

## SCHEDULE 4.8

### Litigation

NONE

*Execution Version*

## SCHEDULE 4.9(a)

Maryland
West Virginia
Virginia
Washington DC
Pennsylvania (See Schedule 4.2(a))

Initials

Buyer

Seller

Company

**90 County**

## State of Maryland
### License

FOREMOST INDUSTRIES INC
2371 BUCHANAN TRAIL WEST
GREENCASTLE PA 17225

FOREMOST INDUSTRIES INC
2371 BUCHANAN TRAIL WEST
GREENCASTLE PA 17225

**06944955**
06741168
02885337

# 15

| CODE | UNIT | TYPE OF LICENSE | NO OF LIC | COST |
|------|------|-----------------|-----------|------|
| 66 | 050 | OUT-OF-STATE CONTRACTOR | 1 | 50.00 |

DATE OF ISSUE
MO DAY YR
04/22/2015

MONTHS PAID
12

| | |
|---|---|
| ISSUING FEES | 2.00 |
| TOTAL | 52.00 |

AMOUNT PAID
52.00

THIS LICENSE MUST BE PUBLICLY DISPLAYED
AND EXPIRES ON **APRIL 30, 2016**

ISSUED BY
DONALD B. SBALING II, CLERK OF CIRCUIT COURT
55 NORTH COURT STREET
WESTMINSTER, MARYLAND 21157-5155 (410)386-8762

LHN



# CONTRACTOR LICENSE

### Authorized by the

## West Virginia Contractor Licensing Board

**Number:** WV052708

**Classification:**

RESIDENTIAL

FOREMOST INDUSTRIES INC
DBA FOREMOST INDUSTRIES INC
2371 BUCHANAN TRAIL WEST
GREENCASTLE, PA 17225

**Date Issued**

SEPTEMBER 05, 2014

**Expiration Date**

SEPTEMBER 05, 2015

Authorized Company Signature

Chair, West Virginia
Licensing Board

This license, or a copy thereof, must be posted in a conspicuous place at every construction performed. This license number must appear in all advertisements, on all bid submissions and binding contracts. This license cannot be assigned or transferred by licensee. Issued Virginia Code, Chapter 21, Article 11.

## DEPARTMENT OF PROFESSIONAL AND OCCUPATIONAL REGULATION
### COMMONWEALTH OF VIRGINIA
9960 Mayland Dr., Suite 400, Richmond, VA 23233
Telephone: (804) 367-8500

EXPIRES ON
03-31-2016

NUMBER
2701023169

BOARD FOR CONTRACTORS
CLASS A CONTRACTOR
*CLASSIFICATIONS* BLD HVA

FOREMOST INDUSTRIES INC
2371 BUCHANAN TRL WEST
GREENCASTLE, PA 17225



Nick A. Christ...
Nick A. Christner, Interim Dir

ALTERATION OF THIS DOCUMENT, USE AFTER EXPIRATION, OR USE BY PERSONS OR FIRMS OTHER
THAN THOSE NAMED MAY RESULT IN CRIMINAL PROSECUTION UNDER THE CODE OF VIRGINIA.

(SEE REVERSE SIDE FOR NAME AND/OR ADDRESS CHANGE)



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Vincent C. Gray,

## Department of Consumer and Regulatory Affairs
Business License Division
1100 4th Street S.W.
Washington DC 20024

| | |
|---|---|
| Date Issued: | 4/6/2014 |
| Category: | 4105 |
| License#: | 410514000280 |
| License Period: | 3/1/2014 - 2/28/201 |

### BASIC BUSINESS LICENSE

| Billing Name and Address: | Premise/Application's Name and Address: | Registered Agent's Name and Ad |
|---|---|---|
| FOREMOST INDUSTRIES, INC. | FOREMOST INDUSTRIES, INC. | KENT NATIRBOV |
| 2371 Buchanan Trail West Greencastle, PA 17225 | 2371 Buchanan Trail West - Greencastle, PA 17225 | 5401 Sherier Place Nw Washington DC20016 |

Owner's Name
Corp. Name  FOREMOST INDUSTRIES, INC.
Trade Name

| CofO/HOP#: | SSL: | Zone: | Ward: | ANC: | PERM NO. |
|---|---|---|---|---|---|
| CLASS: A | | | | | |
| | | | | | |

General Service and Repair - Gen Contr-Construction Mngr

-- THE LAW REQUIRES THIS LICENSE TO BE POSTED IN A CONSPICUOUS PLACE ON THE PREMISES --

*License Effective from the later of Issued or Start of License-Period Date

Director:
Nicholas A. Majett



Case 1:17-cv-00304-JEJ Document 1-2 Filed 02/23/16 Page 89 of 115

*Execution Version*

## SCHEDULE 4.10(d)

### Insurance

See Attached

Initials
Buyer
Seller
Company



DECLARATIONS                    INSURED COPY

ERIE INSURANCE EXCHANGE
BUSINESS CATASTROPHE POLICY

30 Erie Insurance Place
Erie, PA 16530

RENEWAL CERTIFICATE

| Agent | ITEM 2. Policy Period | Policy Number |
|---|---|---|
| AA7822   MICHAEL A STARR INS INC | 07/01/14 TO 07/01/15 | Q31 0170652 H |

| ITEM 1. Named Insured and Address | ITEM 3. Other Interest |
|---|---|
| FOREMOST INDUSTRIES INC<br>& APPALACHIAN MILL INC<br>2371 BUCHANAN TRAIL W<br>GREENCASTLE PA  17225-8306 | |

POLICY PERIOD BEGINS AND ENDS AT 12:01 A.M., STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED.

LEGAL ENTITY - CORPORATION

DESCRIPTION OF OPERATIONS - MANUFACTURED HOME ASSEMBLY

CLASS CODE - 091340

THE ERIE'S LIMIT FOR THIS COVERAGE IS SHOWN BELOW.  THIS INSURANCE IS SUBJECT TO THE TERMS OF THE POLICY AND ITS FORMS.

------------------------------------------------------------------------
COVERAGE AND LIMITS - BUSINESS CATASTROPHE LIABILITY COVERAGE
------------------------------------------------------------------------

        LIMIT OF LIABILITY     $ 7,000,000 EACH OCCURRENCE

        AGGREGATE LIMIT        $ 7,000,000 WHERE APPLICABLE


------------------------------------------------------------------------
H1B                          TOTAL PREMIUM - - - - - - - - - - $ 22,707.



APPLICABLE FORMS - SEE SCHEDULE OF FORMS




See Reverse Side

DECLARATIONS



Erie
Insurance®

100 Erie Insurance Place
Erie, PA 16530

REVISED DECLARATIONS

ERIE INSURANCE EXCHANGE
ULTRAFLEX POLICY

| Agent | | ITEM 2. Policy Period | Policy Number |
|---|---|---|---|
| AA7822 | MICHAEL A STARR INS INC | 07/01/14 TO 07/01/15 | Q43 0152133 H |

**ITEM 1. Named Insured and Address**
FOREMOST INDUSTRIES INC
& APPALACHIAN MILL INC
2371 BUCHANAN TRAIL WEST
GREENCASTLE PA  17225-8306

**ITEM 3. Other Interest**

POLICY PERIOD BEGINS AND ENDS AT 12.01 A.M. STANDARD TIME AT THE STATED
ADDRESS OF THE NAMED INSURED.
    THE INSURANCE APPLIES TO THOSE PREMISES DESCRIBED AS PER THE ATTACHED
SUPPLEMENTAL DECLARATIONS. THIS IS SUBJECT TO ALL APPLICABLE TERMS OF THE
POLICY AND ATTACHED FORMS AND ENDORSEMENTS

DEDUCTIBLE (PROPERTY PROTECTION ONLY)- $    500.
COVERAGES:                                                              DEPOSIT
PROPERTY PROTECTION - AS PER THE ATTACHED SUPPLEMENTAL DECLARATIONS     PREMIUM
    1. BUILDINGS                                                        $   INCL
    2. BUSINESS PERSONAL PROPERTY AND PERSONAL PROPERTY OF OTHERS       $   INCL
    3. ADDITIONAL INCOME PROTECTION                                     $   INCL
    4. GLASS AND LETTERING                                              $
    5. SIGNS, LIGHTS AND CLOCKS                                         $

                    LIMITS OF INSURANCE                                 $   INCL
PREMIUM BASIS - COSTS, PAYROLL
    EACH OCCURRENCE LIMIT              $ 2,000,000
            DAMAGE TO PREMISES
            RENTED TO YOU LIMIT       $ 2,000,000 ANY ONE PREMISES
            MEDICAL EXPENSE LIMIT     $     5,000 ANY ONE PERSON
    PERSONAL & ADVERTISING INJURY LIMIT $ 2,000,000 ANY ONE PERSON OR ORGANIZATION
    GENERAL AGGREGATE LIMIT                         $ 2,000,000
    PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT   $ 2,000,000

OPTIONAL COVERAGES                                         SEE NEXT PAGE

                        TOTAL DEPOSIT PREMIUM  - - - - -    $ 80,837.

APPLICABLE FORMS - SEE SCHEDULE OF FORMS



**Erie Insurance®**

100 Erie Insurance Place
Erie, PA 16530

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY   WC 00 00 01A**
INCLUDES COPYRIGHT MATERIAL OF THE NATIONAL COUNCIL ON COMPENSATION INSURANCE, USED WITH ITS PERMISSION
INFORMATION PAGE

PRIOR POLICY NUMBER - Q91 5101093

| Agent | Insurance is Provided By | | Policy Number BR2 CC |
|---|---|---|---|
| AA7822 MICHAEL A STARR INS INC | FLAGSHIP CITY INS CO | 35947 | Q91 5101093 |

**ITEM 1. Named Insured and Address**

FOREMOST INDUSTRIES INC
2371 BUCHANAN TRL W
GREENCASTLE PA  17225-8306

AMENDMENT 01 *** EFFECTIVE 07/01/14 *** ATTACH THIS TO YOUR POLICY
REASON FOR AMENDMENT- INCREASED PAYROLL
CORPORATION          FRANKLIN CO
OTHER WORKPLACES NOT SHOWN ABOVE - AS SCHEDULED    FED ID # 23-1574111
RISK IDENTIFICATION NUMBER - 000035597

ITEM 2.  THE POLICY PERIOD IS FROM 07/01/14 TO 07/01/15 AT THE INSUREDS
MAILING ADDRESS.

ITEM 3.A.  WORKERS COMPENSATION INSURANCE- PART ONE OF THE POLICY APPLIES TO TH
WORKERS COMPENSATION LAW OF THE STATES LISTED HERE- PA, VA, WV.

ITEM 3.B.  EMPLOYERS LIABILITY INSURANCE- PART TWO OF THE POLICY APPLIES TO WOR
IN EACH STATE LISTED IN ITEM 3.A. THE LIMITS OF OUR LIABILITY UNDER PART TWO AR
        BODILY INJURY BY ACCIDENT     $100,000 EACH ACCIDENT
        BODILY INJURY BY DISEASE      $500,000 POLICY LIMIT
        BODILY INJURY BY DISEASE      $100,000 EACH EMPLOYEE

ITEM 3.C.  OTHER STATES INSURANCE- PART THREE OF THE POLICY APPLIES TO THE
STATES, IF ANY, LISTED HERE- ALL STATES EXCEPT ND, OH, WA, WY, STATES
DESIGNATED IN ITEM 3.A.,

ITEM 3.D.  SEE ATTACHED ENDORSEMENT SCHEDULE

ITEM 4.  THE PREMIUM FOR THIS POLICY WILL BE DETERMINED BY OUR MANUALS OF RULES
CLASSIFICATIONS, RATES AND RATING PLANS. ALL INFORMATION REQUIRED BELOW IS
SUBJECT TO VERIFICATION AND CHANGE BY AUDIT.

|  |  |  |
|---|---|---|
| SEE ATTACHED SCHEDULE OF OPERATIONS | | 257,300 |
| EXPENSE CONSTANT | | 200 |
| TOTAL ESTIMATED ANNUAL PREMIUM | | $257,500 |
| CODE 0938        PA EMPLOYER ASSESSMENT | 1.95% | $5,019 |
| WV REGULATORY SURCHARGE | 5.00% | $5 |
| WV DEFICIT REDUCTION SURCHARGE | 9.00% | $9 |
| DEPOSIT PREMIUM | | $262,533 |
| CHANGE IN PREMIUM FOR REMAINDER OF POLICY PERIOD | | $75,689.00 |

MINIMUM PREMIUM $1,357

RETURNED PAYMENT FEES WILL BE ADDED TO YOUR ACCOUNT.



**Erie Insurance®**

100 Erie Insurance Place
Erie, PA 16530

ERIE INSURANCE EXCHAN
COMMERCIAL AUTO POLI
FLE

CONTINUATION NOTICE

| Agent | ITEM 2. Policy Period | Policy Number |
|---|---|---|
| AA7822    MICHAEL A STARR INS INC | 07/01/14 TO 07/01/15 | Q07 0140225 H7 |

**ITEM 1. Named Insured and Address**
FOREMOST INDUSTRIES INC
2371 BUCHANAN TRL W
GREENCASTLE PA  17225-8306

**ITEM 3. Other Interest**
AS LISTED BELOW

```
*******************************************************************
* YOUR COLLISION COVERAGE AND DEDUCTIBLE APPLY TO PRIVATE PASSENGER  *
* AUTOS YOU, A PARTNER OR EXECUTIVE OFFICER RENT FOR 45 DAYS OR LESS. *
* THIS IS SUBJECT TO LIMITS, TERMS AND CONDITIONS IN THE POLICY.      *
*******************************************************************
```

See Reverse Side

*Execution Version*

## SCHEDULE 4.11(i)

### List of Filed Tax Returns

December 31, 2014 – On Extension
December 31, 2013 – Federal, PA, MD, WV, VA
December 31, 2012 – Federal, PA, MD, WV, VA
December 31, 2011 – Federal, PA, MD, WV, VA
December 31, 2010 – Federal, PA, MD, WV, VA
December 31, 2009 – Federal, PA, MD, WV, VA

Initials
_____ Buyer
_____ Seller
_____ Company

*Execution Version*

## SCHEDULE 4.12

### Vacation Pay

Initials
_____ Buyer
_____ Seller
_____ Company

**2014 - 2015 VACATION YEAR**

- CARRIED OVER FROM LAST YEAR PER LAURIE
- HALF DAYS
- ADJ VACATION REMAINING

## Vacation - 20 Days (over 10 years)

| EMPLOYEE NUMBER | HIRE DATE | EMPLOYEE | | DATES WHICH VACATION WAS TAKEN |
|---|---|---|---|---|

## Vacation - 15 Days (over 3 years)

| EMPLOYEE NUMBER | HIRE DATE | EMPLOYEE | | DATES WHICH VACATION WAS TAKEN |
|---|---|---|---|---|

## Vacation - 7 Days (over 1 year)

| EMPLOYEE NUMBER | HIRE DATE | EMPLOYEE | | DATES WHICH VACATION WAS TAKEN |
|---|---|---|---|---|

## Vacation - 2 Days (over 90 days)

| EMPLOYEE NUMBER | HIRE DATE | EMPLOYEE | | DATES/WHICH VACATION WAS TAKEN | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*(Table content is illegible due to image rotation and poor scan quality.)*

| LAST NAME | FIRST NAME | WORKSHEET | | DAYS AVAILABLE | |
|---|---|---|---|---|---|
| | | VACATION | PERSONAL | VACATION | PERSONAL |
| BROOKENS | KEN | O | O | 4.5 | 4 |
| GOSHORN | DONNIE | O | O | 0 | 3 |
| HARBAUGH | JACK | O | O | 2 | 3.5 |
| LEHMAN | JODY | O | O | 4 | 4.5 |
| MYERS | LAURIE | O | O | 15 | 3 |
| ROCKWELL | JAMES | O | O | 10 | 5 |
| SCHREIBER | KARL | O | O | 0 | 3 |
| YOUNG | TIMOTHY | O | ⊙ | 9 | 5 |
| ELLER | CHRIS | O | O | 3 | 5 |

*Execution Version*

## SCHEDULE 4.13(a)

### Contracts

Susquehanna Line of Credit
JP Morgan Chase Truck Loan -- 2014 Chevy Pickup

Initials

Buyer

Seller

Company



Susquehanna Bancshares, Inc.
1570 Manheim Pike
PO Box 3300
Lancaster, PA 17604-3300
Tel 856-758-3511

5/13/2015

Laurie A. Myers
Controller
Foremost Industries, Inc.
2371 Buchanan Trail West
Green Castle, PA 17225

Re: Loan Payoff 6026900102L Foremost Industries, Inc.

Dear Ms. Myers:

The line of credit loan extended to Foremost Industries, Inc. has been frozen since prior to May 1, 2015 and no advances are permitted or have been permitted since prior to May 1, 2015. The amount necessary to satisfy the loan and mortgage on the Foremost facility located 6100 Buchanan Trail West, Mercersburg, PA is as follows: (assumes Title Company will record satisfaction):

| | |
|---|---|
| Principal | $ 2,600,000.00 |
| Interest through 5/13/15 | $ 650.00 |
| | $ 2,600,650.00 |

Per diem interest $216.66

Payment should be wired as follows:

Susquehanna Bank
26 North Cedar Street
Lititz Pa 17543
Attn: Alyssa Cassler
ABA 031309123
ACCT # 701100300378
Foremost Industries, Inc.

In addition, we will need to make arrangements to replace the $100,000 letter of credit liability.

If you would like to discuss the foregoing or you have any questions, please call me. I can be reached at (717) 585-9578.

Sincerely yours,

Rob Sayre
Senior Vice President

## INSTALLMENT SALE CONTRACT
### SIMPLE FINANCE CHARGE

Dealer Number _____     Contract Number _____

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|
| FOREMOST INDUSTRIES INC 2375 BUCHANAN TRAIL W GREENCASTLE PA 17225 FRANKLIN | RALPH C. MICHAEL 3300 HILL ROAD GREENECASTLE PA 17225 FRANKLIN | BLAISE ALEXANDER CHEVROLET VOL 650 N. ANTRIM WAY GREENCASTLE PA 17225 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Mfg Gross Vehicular Weight | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| NEW | 2014 | CHEVROLET TRUCK S LVERAD | | 1GCNC EH 20 8 5 | ☒ personal, family or household ☐ business ☐ agricultural ☐ N/A |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 5000.00 is |
|---|---|---|---|---|
| 3.89 % | $ 1398.73 | $ 22269.83 | $ 23668.56 | $ 28668.56 |

Insurance. You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the insurance you want and sign below:
**Optional Credit Insurance**
☐ Credit Life    ☐ Buyer   ☐ Co-Buyer   ☐ Both
☐ Credit Disability (Buyer Only)

Premium:
Credit Life $ _____ N/A
Credit Disability $ _____ N/A
Insurance Company Name _____ N/A

Home Office Address N/A

N/A

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance pays the unpaid part of the Amount Financed if you die. This insurance pays only the amount you would owe if you paid all your payments on time. Credit disability insurance pays the scheduled payments due under this contract while you are disabled. This insurance does not cover any increase in your payment or in the number of payments. The policies or certificates issued by the named insurance companies may further limit the coverage that credit life insurance or credit disability insurance provides. See the policies or certificates for coverage limits or other terms and conditions.

### Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 36 | $ 657.46 | Monthly beginning 10/23/2014 |
| Or As Follows: N/A | | |
| N/A | N/A | N/A |
| N/A | N/A | N/A |

**Late Charge.** If payment is not paid in full within 10 days after it is due, you will pay a late charge. If the vehicle is a heavy commercial motor vehicle, the charge will be 4% of the part of the payment that is late. Otherwise, the charge will be 2% per month of the part of the payment that is late, figured based on a full calendar month for any part of a month that is more than 10 days.

**Prepayment.** If you pay off all your debt early, you will not have to pay a penalty.

**Security Interest.** You are giving a security interest in the vehicle being purchased.

**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

### ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| 1 Cash Price (including $ 1247.28 sales tax) | | $ 27035.28 (1) |
| 2 Total Downpayment = | | |
| Trade-In 2000 CHEVROLET TRUCK SILVERADO 15 | | |
| (Year) (Make) 1GCEC14W7YE204908 | | |
| (Model) (VIN) | | |
| Gross Trade-In Allowance | $ 500.00 | |
| Less Pay Off Made By Seller | $ N/A | |
| Equals Net Trade In | $ 500.00 | |
| + Cash | $ N/A | |
| + Other GMCC | $ 4500.00 | |
| (If total downpayment is negative, enter "0" and see 4H below) | $ 5000.00 (2) | |
| 3 Unpaid Balance of Cash Price (1 minus 2) | $ 22035.28 (3) | |
| 4 Other Charges Including Amounts Paid to Others on Your Behalf (Seller may keep part of these amounts): | | |
| A. Cost of Optional Credit Insurance Paid to Insurance Company or Companies | | |
| Life ___ N/A ___ Term ___ N/A ___ $ ___ N/A | $ N/A | |
| Disability ___ N/A ___ Term ___ N/A ___ $ ___ N/A | | |
| B. Other Optional Insurance Paid to Insurance Company or Companies | | |
| (Describe) N/A ___ Term ___ N/A ___ N/A | | |
| (Describe) N/A ___ Term ___ N/A ___ N/A | | |
| C. Official Fees Paid to Government Agencies | | |
| to STATE OF PA for TRANS FEE | $ 9.00 | |
| to STATE OF PA for TRF TAX | $ 5.00 | |

ACCT # 1142801262 16

### Other Optional Insurance

☐ N/A ___ N/A
Type of Insurance ___ Term
Premium $ ___ N/A
Description of Coverage $ ___ N/A
N/A
Insurance Company Name N/A
N/A
Home Office Address N/A
N/A
☐ N/A ___ N/A

| | | | |
|---|---|---|---|
| for Prior Credit or Lease Balance | $ | N/A | |
| ALEXANDE for DOC FEE | $ | 133.00 | |
| for ONLINE REG FEE | $ | 14.55 | |
| for N/A | $ | N/A | |
| for N/A | $ | N/A | |
| for N/A | $ | N/A | |
| and Amounts Paid to Others on Your Behalf | $ | 234.55 | (4) |
| 4) | $ | 22269.83 | (5) |
| | $ | 1398.73 | (6) |
| Balance (5 + 6) | $ | 23668.56 | (7) |

a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.
I want this insurance checked above.

X N/A                                N/A
Buyer Signature                      Date

X N/A                                N/A
Co-Buyer Signature                   Date

**THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE CAUSED TO OTHERS.**

meet your contract obligations, you may lose the vehicle.

Returned Check Charge: You agree to pay the costs we actually pay to others if any check you give us is dishonored.

finance charge if the Amount Financed, Item 5, is paid in full on or before
_____, Year ____. SELLER'S INITIALS N/A

T. A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose arge is shown in Item 4D of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.
N/A ____ Mos.                    N/A
                                                 Name of Gap Contract

## NO COOLING OFF PERIOD

not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, ancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because ur mind. This notice does not apply to home solicitation sales.

CAN BE CHANGED. This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing nal changes are binding.   Buyer Signs X____   Co-Buyer Signs X____
is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we taking some payments without extending the time for making others.
information about you, or the vehicle you are buying, from the state motor vehicle department or other motor vehicle registration authorities.
ortant agreements.

rcentage Rate may be negotiable with the Seller. The Seller may assign this contract ight to receive a part of the Finance Charge.

## NOTICE TO BUYER.
### DO NOT SIGN THIS CONTRACT IN BLANK.
OU ARE ENTITLED TO AN EXACT COPY OF THE CONTRACT YOU SIGN.
KEEP IT TO PROTECT YOUR LEGAL RIGHTS.

____ Date 10/09/14   Co-Buyer Signs X ____ Date 10/09/14

terms of this contract. You confirm that you signed this contract, we gave it to you, ee to take it and review it. You confirm that you received a completely filled-in copy when you

____ Date ____   Co-Buyer Signs X ____ Date ____
                                                                                       10/09/14
ers. A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but bl. The other owner agrees to the security interest given to us in this contract.

Address ____
N/A ____ Date ____   By X N/A ____   Title ____

this contract to                    10/09/14                    (Assignee) under the terms of Seller's agreement(s) with Assignee.
rse        JPMORGAN CHASE BANK NA        ☐ Assigned without recourse        ☐ Assigned with limited recourse
                      By ____                                         Title ____

VOLVO
Reynolds Company   TO ORDER: www.reysource.com 1-800-344-0996; fax 1-800-321-0595
WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR
F THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

**CUSTOMER/TRUTH IN LENDING COPY**



*Execution Version*

## SCHEDULE 4.14

### Patent, Trademarks & Trade Names

www.foremosthomes.com
www.foremostcomponents.com

Foremost Industries, Inc. owns each of the above domains.
Both domains are hosted by Power Marketing

Initials

Buyer

Seller

Company

*Execution Version*

## SCHEDULE 4.15(a)

**Environmental Permits**

NONE

Initials _____ Buyer

_____ Seller

_____ Company

*Execution Version*

## SCHEDULE 4.15(b)

NONE

Initials

Buyer

Seller

Company

*Execution Version*

## SCHEDULE 4.15(d)

Disposal Contract with Waste Management, Inc.

Initials

Buyer

Seller

Company

*Execution Version*

## SCHEDULE 4.18

### Bank Accounts

Susquehanna Bank

Checking Account # 00134554
Payroll Account # 0000168904

Authorized Signatories – Ralph C. Michael & Laurie A. Myers

Initials

Buyer

Seller

Company

*Execution Version*

## SCHEDULE 4.20(a)

### Indebtedness

JP Morgan Chase Truck Loan

Initials

Buyer

Seller

Company

Chase Online℠                                                  Friday, May 29, 2015

## Payoff Quotes

DEALER VEHICLE LOAN (...2516)

### Review your payoff quotes — The payoff quotes you see below are "good through" the dates we've listed. If you want to pay off your account, click "Pay by Mail" to continue.

Transactions posted to your account after you received these payoff quotes may affect the final payment amount (for example, if you have a payment returned or fees added to your account). We'll release our lien on any collateral for your account when you've paid off your loan and any fees in full.

### Payoff Quotes

| Payoff Good Through Date[2] | Payoff Amount[1] | Dollar Day Rate | Confirmation Number |
|---|---|---|---|
| 05/29/2015 | $18,176.56 | $1.94 | 669548 |
| 06/08/2015 | $18,195.93 | $1.94 | 669548 |

[1] If you've purchased optional products for this account, we may have included any monthly or other periodic fees in the payoff amount.

[2] Your payoff quote good through today's date is only applicable if you select a payment option to pay today. Note: If you've scheduled an ACH payment that is due in the next three business days, it may be too late to cancel that payment.

☺ This is a link to a third-party site as described in our Weblinking Practices. Note that the third party's privacy policy and security practices may differ from our standards. We assume no responsibility nor does it control, endorse or guarantee any aspect of your use of the linked site.

© 2015 JPMorgan Chase & Co.

*Execution Version*

## SCHEDULE 4.21

### Product Warranties

Residential Warranty Company – 10 year structural warranty
Foremost – 1 year service warranty
Product Manufacturers – have various warranties

*Execution Version*

## SCHEDULE 4.22

**Warranty Claims & Customer Complaints**

None

Initials
Buyer
Seller
Company

*Execution Version*

### SCHEDULE 4.23(b)

See Attached

Initials
Buyer
Seller
Company

## CORPORATE OFFICE PERSONNEL

5/14/2016

| NUMBER | NAME | D.O.E. | JOB TITLE | WAGE |
|--------|------|--------|-----------|------|
| 1110 | Jim Rockwell | 9/1/1988 | General Production Manager | 90,000.00 |
| 1115 | Jack Harbaugh | 1/28/1980 | Purchasing Agent | 69,000.00 |
| 1130 | Keith Johnson | 2/21/1977 | Sales Manager | disability |
| 1132 | Kenneth Brookens | 9/15/2008 | Sales | 37,500(draw) |
| 1134 | Karl Schreiber | 1/2/2013 | Sales Manager | 50,000 + comm |
| 1135 | Jeff White | 8/11/2014 | Sales | 35,000(draw) |
| 1136 | Stephanie Riffle | 3/30/2015 | Sales | 30,000(draw) |
| 1140 | Donnie Goshorn | 1/28/2010 | Project Engineer | 60,000.00 |
| 1141 | Christopher Eller | 8/25/2014 | Sales Designer | 42,500.00 |
| 1150 | Tim Young | 8/6/1990 | Panelized Sales Designer | 60,000 + comm |
| 1154 | Jody Lehman | 6/12/1989 | Panelized Sales Coordinator | 32,600.00 |
| 1155 | William Roth | 2/27/2015 | Panelized Sales | 30,000(draw) |

| | |
|---|---|
| **Total Corporate Office Personnel** | 12 |
| **Total Foremost Employees** | 94 |

1

5/14/2015

## TRUCK DRIVERS

| NUMBER | NAME | D.O.E. | JOB TITLE | WAGE |
|--------|------|--------|-----------|------|
| 1200 | Lee Poe | 2/21/1977 | Transportation Coordinator | 17.75 |
| 1202 | Rodney Glass | 11/3/2003 | Material Handler | 16.00 |
| 1100 | Jacob Blaylock | 4/16/2015 | Certified Crane Operator | 23.00 |
| 1227 | Joseph Peachey | 12/24/2014 | Pilot Driver | 7.75 |
| 1228 | George Spangler | | Pilot Driver | 7.75 |
| 1229 | Lee Kaiser | | Truck/Pilot Driver | 12.45/7.75 |
| 1230 | William Spielman | | Pilot Driver | 7.75 |
| 1305 | Ivan Wingert | 11/2/1976 | Crane Operator | 16.95 |
| 1307 | Robin Egolf | 8/9/1999 | Truck Driver | 16.50 |
| 1320 | Dean Wingert | 3/14/1977 | Foreman, Vehicle Maint. | 17.95 |

**Total Maintenance/Truck Driver Personnel**      **10**

## FIELD CREWS

| NUMBER | NAME | D.O.E. | JOB TITLE | WAGE |
|--------|------|--------|-----------|------|
| 1900 | Eddie Moats | 3/28/1983 | Foreman, Field Crew | 16.70 |
| 1906 | Ken Morse | 8/27/2012 | Carpenter | 14.50 |
| 1907 | Jesse Wolfe | 9/4/2012 | Carpenter | 13.00 |
| 1908 | Brian Snyder | 12/15/2014 | Carpenter | 13.50 |
| 2000 | Daniel Fitz | 12/15/2003 | Carpenter | 18.75 |
| 2001 | Rodney Egolf | 7/8/1996 | Carpenter | 15.90 |
| 2002 | Donald Reihart | 9/27/2005 | Carpenter | 14.10 |
| 2004 | Seth Heebner | 4/22/2013 | Carpenter | 11.00 |
| 2005 | Colton McCleaf | 12/22/2014 | Carpenter | 12.00 |
| 2050 | Jason Seville | 4/16/2012 | Carpenter | 17.75 |
| 2055 | James Spielman | 4/22/2013 | Carpenter | 12.00 |
| 2056 | Trevor Baker | 10/9/2014 | Carpenter | 11.00 |
| 2057 | Christopher Wilhide | 4/15/2013 | Carpenter | 12.00 |

**Total Field Crew Personnel**      **13**

2

5/14/2015

## MODULAR PLANT

| NUMBER | NAME | D.O.E. | JOB TITLE | WAGE |
|---|---|---|---|---|
| 1250 | Edward Kaiser | 1/29/2001 | Plant Superintendent | |
| 2321 | Alan Cronemiller | 8/31/1987 | Foreman, Walls | 16.35 |
| 2324 | Kevin Rhoades | 6/14/2010 | Laborer | 15.00 |
| 2325 | Josh Whitmore | 4/16/2012 | Laborer | 14.45 |
| 2328 | Nelson Hunsberger | 4/19/2010 | Laborer | 14.40 |
| 2330 | Brenten Lehman | 6/25/2012 | Laborer | 12.50 |
| 2331 | Leo Swope | 1/27/2014 | Laborer | 10.50 |
| 2332 | William Casher | 6/30/2014 | Laborer | 10.50 |
| 2333 | Gregory Crunkleton | 10/20/2014 | Laborer | 13.00 |
| 2502 | Brian Taylor | 3/9/2015 | Laborer | 16.00 |
| 2340 | Dean Seville | 6/13/1983 | Production Leader Roof/Siding | 17.25 |
| 2341 | Lonnie Hoffman | 7/12/2010 | Laborer | 15.95 |
| 2342 | Kerry Repine | 7/26/2012 | Laborer | 14.50 |
| 2343 | Donald Lehman | 1/26/2015 | Laborer | 14.00 |
| 2346 | Brett Hunsberger | 10/14/2014 | Laborer | 10.00 |
| 2347 | Jordyn McIntire | 4/20/2015 | Laborer | 11.00 |
| 2357 | Bruce Eyler | 7/17/2012 | Leadman | 14.50 |
| 2360 | Brad Myers | 1/4/2010 | Drywall Foreman | 16.75 |
| 2367 | Brian Poe | 6/1/2010 | Drywaller | 14.50 |
| 2368 | Kyle Miller | 5/13/2013 | Drywaller | 14.90 |
| 2369 | Nathan Mathews | 1/5/2015 | Drywaller | 14.50 |
| 2370 | Derrick Sweeney | 4/29/2013 | Drywaller | 12.25 |
| 2371 | Larry McKelvey | 4/8/2015 | Drywaller | 14.50 |
| 2400 | Charles Zeis | 1/11/1988 | Production Leader | 18.95 |
| 2406 | Alex Varner | 7/17/2014 | Electrician | 13.50 |
| 2414 | Mason Sheets | 4/16/2012 | Leadman | 16.00 |
| 2415 | Joshua Dilley | 5/24/2012 | Electrician | 14.50 |
| 2419 | Jonathan Horman | 5/6/2013 | Electrician | 15.50 |
| | Cory Welch | 3/23/2015 | Electrician | 14.00 |
| 2420 | Rodney Peck | 5/29/2001 | Production Leader | 17.50 |
| 2427 | Nicholas Gleason | 8/27/2010 | Plumber | 13.50 |
| 2428 | Deveane Burt | 1/5/2015 | Plumber | 10.00 |
| 2429 | Richard Wigfield | 10/4/1999 | Trim, Foreman | 16.00 |
| 2433 | Michael Maravelis | 9/23/1991 | Foreman | 15.90 |
| 2442 | Ronald Cornell | 6/13/1977 | Trim, Leadman | 14.85 |
| 2454 | Ronald Reeder | 7/30/2012 | Trim Carpenter | 13.50 |
| 2456 | Robert Jones | 6/10/2013 | Laborer | 14.50 |
| 2431 | James Clever | 6/8/1998 | Service | 14.35 |
| 2428 | Paul Gsell | 10/10/2012 | Laborer | 14.50 |

**Total Modular Plant Personnel**      39

3

| | | MILLROOM, TRUSS AND PANEL PLANT | | | 5/14/2015 |
|---|---|---|---|---|---|
| NUMBER | Vac. Days | NAME | D.O.E. | JOB TITLE | WAGE |
| 1400 | 1.5 | Brad Gift | 7/11/1988 | Foreman | 15.85 |
| 1406 | 4 | John Daniels | 4/22/2013 | Laborer | 10.50 |
| 1407 | 0 | Daniel Warner | 8/12/2013 | Laborer | 12.00 |
| 3760 | 5 | Jim Myers | 6/9/1975 | Foreman, Wall Panels | 17.00 |
| 3762 | 02 | David Spangler | 2/18/2002 | Foreman, Floor Trusses | 14.40 |
| 3763 | 3 | Dean Hess | 5/6/2013 | Laborer | 13.00 |
| 3765 | 0 | John Scott | 9/4/2012 | Carpenter | 15.50 |
| 3770 | 0 | Bobby Sweeney | 8/6/2013 | Laborer | 12.50 |
| 3774 | 1 | Larry Kline | 8/12/2013 | Laborer | 12.95 |
| 3778 | 0 | Nathan Reyer | 7/14/2014 | Laborer | 11.00 |
| 3779 | 0 | Luke Mellott | 10/6/2014 | Laborer | 10.00 |
| 3782 | 2 | Benjamin Cradduck | 12/10/2014 | Laborer | 9.50 |
| 3790 | 3 | Larry Jenkins | 5/23/2005 | Foreman, Roof Trusses | 15.50 |
| 3791 | 0 | Tony Martin | 6/11/2007 | Lead Man | 14.35 |
| 3793 | .5 | Stephen Miller | 4/16/2012 | Laborer | 13.80 |
| 3798 | 0 | James Weller | 8/12/2013 | Laborer | 13.55 |
| 3799 | 0 | Joshua Martin | 5/7/2013 | Laborer | 10.50 |
| 3801 | .5 | Dakota Christman | 10/13/2014 | Laborer | 9.50 |
| 3803 | 2 | Ira Claycomb | 12/8/2014 | Laborer | 11.00 |
| 1308 | | Allen Wilt | 1/26/2015 | Truck Driver | 13.00 |

Total Millroom, Truss and Panel Personnel          20



4