# EXHIBIT - C

Ronald L. Finck, Esquire
Sup. Ct. I.D. No. 89985
Mette, Evans & Woodside
3401 North Front Street
P. O. Box 5950
Harrisburg, Pa  17110-0950
(717) 232-5000 - Phone
(717) 236-1816 - Fax
*rlfinck@mette.com*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RALPH C. MICHAEL,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **GLD FOREMOST HOLDINGS,** | : | |
| **LLC and DANIEL GORDON** | : | **NO.:**_____ |
| **Defendants** | : | |
| | : | **JURY TRIAL DEMANDED** |

## COMPLAINT

### Parties

1.    Plaintiff, Ralph C. Michael ("Michael"), is an adult individual residing at 3300 Hill Road, Greencastle, Pennsylvania, 17225.

2.    GLD Foremost Holdings, LLC ("GLD") is a Delaware Limited Liability Company with a principal place of business at 1325 Avenue of the Americas, 28th Floor, New York, NY 10019.

3.    Daniel Gordon ("Gordon") is an adult individual believed to be residing at 151 East 85th Street, Apt. 10C, New York, NY, 10028-8105.

### Jurisdiction and Venue

4.    This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 as there is a complete diversity of citizenship and the amount in controversy exceeds $75,000.00.

5.    Venue is proper in this district by agreement of the parties and pursuant to 28 U.S.C. §1391(b)(2).

### Background

6.    At all relevant times prior to May of 2015, Michael was the owner of all issued and outstanding shares of the capital stock of Foremost Industries, Inc. (the "Company").

2

7.     Michael was a co-founder of the Company and acquired all shares of capital stock in the Company in the 1970's.

8.     The Company designs, markets, manufactures, and sells modular homes and panelized systems out of its corporate headquarters in Franklin County, Pennsylvania.

9.     In or about 2012, Michael, then age 85, resolved to retire and sell the Company.

10.     Michael advertised for the sale of the Company through various means including the placement of an advertisement in the Wall Street Journal.

11.     Michael described the potential sale as an "asset sale" to interested potential buyers.

12.     In or about December of 2014, Gordon responded to an ad Michael placed in the Wall Street Journal indicating that Gordon was interested in acquiring the Company from Michael.

13.     In January of 2015, Gordon travelled from New York to visit and tour the Company's facilities at its corporate headquarters in Franklin County, Pennsylvania.

14.     During the January, 2015 visit, Michael told Gordon his asking price for the Company was $10 million.

3

15.     During the January, 2015 visit, Michael provided Gordon with the Company's financial statements for years 2012 and 2013.

16.     In or about February of 2015, Michael and Gordon entered into exclusive negotiations with one-another for Gordon's purchase of Michael's interest in the Company.

17.     After visiting the company on two (2) more occasions, Gordon made a verbal offer for the Company.

18.     Gordon's initial offer was significantly less than Michael's asking price.

19.     Gordon explained that his lower offer was premised on the following: (a) a lack of historical financial statements; (b) that the Company was in financial distress; (c) that Gordon would have to invest significant money into the Company to reduce growing levels of accounts payable; (d) that Gordon would have to infuse significant working capital into the Company for the purpose of "ramping up" the business; (e) that Gordon would have to invest in significant marketing efforts; and (f) that Gordon would have to hire new management personnel.

20.     Gordon's initial offer was memorialized in a letter from Gordon to Michael dated February 4, 2015.  A copy of the February 4, 2015 letter is attached as Exhibit 'A'.

4

21.    Gordon's initial offer provided for a $4 million dollar cash payment and payment of thirty-five (35%) percent of the Company's net income to a charitable organization to be specified by the seller.

22.    The February 4, 2015 offer characterized the transaction as an asset purchase of the assets of the Company only.

23.    On March 30, 2015, Gordon presented Michael with a draft Stock Purchase Agreement setting forth the details of Gordon's contemplated purchase of the Company.

24.    The draft Stock Purchase Agreement proposed by Gordon to Michael on March 30, 2015 had a series of schedules of information Gordon wanted prior to completion of his purchase of the Company.

25.    On April 2, 2015, Gordon asked Myers about an anticipated sale of real property from the Company to Michael's daughter and son-in-law, Laurie Myers ("Myers") and her husband, Don E. Myers.  Specifically, Gordon wanted to know the consideration for the purchase.

26.    Myers responded stating that the purchase price for the real property was $100,000.00.

27.    Myers and her husband purchased the real property from the Company by deed dated April 10, 2015.  A copy of the Deed was provided to Gordon via email dated May 12, 2015.

5

28.    On April 7, 2015, Gordon visited the Company again.  During that visit, Gordon directed what health insurance plan he was going to offer to the Company's employees.

29.    In May of 2015, Gordon visited the Company for purposes of scheduling an auction of personal property belonging to the Company and to develop plans for engineering changes to the Company.

30.    Though the draft Stock Purchase Agreement had not been finalized and executed by the parties, throughout May of 2015, Gordon demanded and the Company provided various information about the Company's operations, debts, liabilities, income and other information as contemplated by the schedules attached to the draft Stock Purchase Agreement.

31.    On or about May 4, 2015, Gordon incorporated GLD as a Delaware Limited Liability Company to purchase, own, and operate the Company.

32.    On May 11, 2015, Myers, the Company's treasurer and controller, sent Gordon a draft of the completed schedules required by the draft Stock Purchase Agreement.

33.    Via email dated May 14, 2015, Myers, sent the final completed schedules to Gordon.

34.    Gordon made no objection concerning the adequacy of the information set forth on the schedules to Michael or to Myers.

6

35.     The parties tentatively agreed to close on the transaction on Monday, May 18, 2015.

36.     On Friday, May 15, 2015, Gordon emailed the Company's attorney and Myers a series of proposed changes and corrections to the draft Stock Purchase Agreement and supporting schedules and made various demands for additional supporting documentation.

37.     The closing did not occur on May 18, 2015, as contemplated because Gordon had not completed his due diligence in the period of time required.

38.     By email dated May 26, 2015 sent at 7:12 a.m., Gordon provided additional changes to the proposed Stock Purchase Agreement.  He concludes that email stating, "My hope is we can 'lock' this Agreement today and get the Schedules likewise reviewed and finalized."  A copy of the May 26, 2015, 7:12 a.m. email is attached as Exhibit 'B.'

39.     Myers accepted the proposed changes on behalf of Michael.

40.     By a second email dated May 26, 2015 at 8:18 a.m., Gordon confirmed that he was returning to the Company's corporate office the following day to review additional information "and perhaps sign everything" necessary for closing on the transaction.  A copy of the 8:18 a.m. email is attached as Exhibit 'C.'

7

41.     At 4:07 p.m. on May 26, 2015, Gordon informed Michael, through Myers, that Gordon would not be able to close on the transaction the following day because he was still in need of additional information, because he was still in the process of reviewing the schedules, and because he needed an appraisal of the real property owned by the Company.

42.     On May 27, 2015, Gordon emailed Myers with additional questions about the Company and the schedules to which Myers responded.

43.     On May 27, 2015, Gordon informed Michael's attorney, J. Edgar Wine, Esquire, that Gordon was still waiting on an appraisal of the Company's real estate.

44.     Late in the evening of May 27, 2015, Gordon sent Myers an "Execution Version" of the Stock Purchase Agreement and informed Myers that he was ready to proceed with the closing.

45.     On May 29, 2015, Myers informed Gordon that Michael was going to Michael's attorney's office to sign the Stock Purchase Agreement the following day.  Gordon informed Myers that he was still working on getting "final schedules" and was putting together a "Closing Checklist."  Additionally, Gordon requested copies of the Pennsylvania income tax returns for the Company.

46.     On May 29, 2015, Gordon sent Myers finalized schedules to review and to be initialed by Michael.

8

47.    The Stock Purchase Agreement and accompanying documents were executed by Michael on May 29, 2015 and sent to Gordon via overnight courier.

48.    As a result of Michael's execution of the Stock Purchase Agreement and accompanying documents, GLD received all of Michael's rights, titles, and interests in the Company.

49.    Gordon failed to counter-execute the Stock Purchase Agreement and return a copy to Michael.

50.    Though he had not yet executed the proposed Stock Purchase Agreement, Gordon, operating as GLD, took possession of the Company on or about June 7, 2015.

51.    Gordon resolved to continue the Company's operations.

52.    Notwithstanding his stated intention to continue the Company's operations, Gordon began dismantling the Company.

53.    In furtherance of his dismantling of the Company, Gordon scheduled an auction sale of Company assets, including equipment and inventory, for July 11, 2014.

54.    Additionally, upon receipt of possession of the Company, Gordon immediately began hiring and firing Company employees.

55.    Upon taking possession of the Company, Gordon obtained exclusive possession of the corporate books and records of the Company.

9

56.     On June 30, 2015, Gordon wired $1.0 million of the $3.0 million purchase price to Michael despite not having executed the draft Stock Purchase Agreement.

57.     Though the parties agreed to date the Stock Purchase Agreement as of May 29, 2015, Gordon did not provide an executed Stock Purchase Agreement to Michael until August 19, 2015. A copy of the executed Stock Purchase Agreement is attached as Exhibit 'D.'

58.     Though the Stock Purchase Agreement specifically provides that the Purchase Price of $3.0 million was to be paid by wire transfer at closing, Gordon and GLD never wired the remaining $2.0 million to Michael.

59.     Approximately one (1) week after providing the executed Stock Purchase Agreement to Michael, Gordon sent Michael a letter accusing Michael of misrepresenting the financial position of the Company. A copy of the August 26, 2015 letter is attached as Exhibit 'E.'

60.     Included in the letter were numerous matters that were well-known to Gordon prior to his taking possession of the Company and prior to executing the Stock Purchase Agreement, including but not limited to the sale of certain real estate to Myers and her husband.

61.    In the August 26, 2015 letter, Gordon demanded rescission of the Stock Purchase Agreement he executed and provided to Michael only one week earlier.

62.    Because Gordon, operating as GLD, has already taken possession of the Company and immediately began selling off assets of the Company, rescission of the Stock Purchase Agreement is no longer possible.

63.    By letter dated September 15, 2015, Michael, through his counsel, responded to the August 25, 2015 letter demanding payment of the remainder of the agreed upon purchase price for the Company.  A copy of the September 15, 2015 Letter is attached as Exhibit 'F.'

64.    To date, GLD has failed to remit the remaining sums due to Michael under the Stock Purchase Agreement.

65.    It is believed and therefore averred that GLD and Gordon have significantly slowed down the operations of the Company.

## COUNT I – BREACH OF THE STOCK PURCHASE AGREEMENT
## (MICHAEL V. GLD)

66.    The averments of all preceding paragraphs are incorporated by reference

67.    The Stock Purchase Agreement is a binding contract that is supported by adequate consideration.

68.     GLD is in breach of the Stock Purchase Agreement by failing to make payment in full of the purchase price to Michael.

69.     Upon demand, GLD has failed and refused to remit the remaining $2.0 million that was to be paid to Michael at closing.

70.     GLD's failure to remit the remaining $2.0 million of the purchase price to Michael is a material breach of the Stock Purchase Agreement.

71.     Michael has been damaged in the amount of $2.0 million as a result of GLD's breach.

WHEREFORE, Michael respectfully requests that this Honorable Court enter judgment against GLD in the amount of $2.0 million dollars together with court costs, pre-judgment interest, post-judgment interest, and such other relief as the Court deems just and appropriate under the circumstances.

## COUNT II – FRAUD
## (MICHAEL V. GORDON)

72.     The averments of all preceding paragraphs are incorporated by reference.

73.     Gordon obtained possession of the Company by representing that he was satisfied with the terms of the Stock Purchase Agreement, that he had performed all requisite due diligence prior to taking possession of the Company,

and that he was satisfied with the representations, the information, the schedules, and the supporting materials provided to him by Michael or on Michael's behalf.

74.     The transfer of possession of the Company prior to closing and final payment is not contemplated by the terms and conditions of the Stock Purchase Agreement.

75.     Gordon obtained possession of the Company by fraudulently inducing Michael into believing that Gordon intended to proceed with the sale of the Company by making a partial payment in accordance with the proposed Stock Purchase Agreement and based on the information provided to Gordon by Michael, or on his behalf, about the Company.

76.     Gordon represented to Michael that GLD was prepared to close on the transaction under the terms and conditions set forth in the Stock Purchase Agreement.

77.     Once GLD obtained possession of the Company's assets, Gordon immediately arranged for the sale of Company assets and the dismantling of the Company.

78.     As a result of Gordon's representations that GLD was prepared to complete the purchase of the Company from Michael, Michael surrendered possession of the Company to GLD prior to receipt of payment of the full purchase price.

79.   It is believed and therefore averred that Gordon never obtained the financing necessary for GLD to complete his purchase of the Property.

80.   It is believed and therefore averred that Gordon had no intention of proceeding with the purchase of the Company, when GLD took possession of same and began dissipating Company assets.

81.   After obtaining possession of the Company and dissipating Company assets, Gordon purported to object to various information provided to Gordon about the Company during the due diligence period.

82.   At all times prior to obtaining possession of the Company, Gordon had full access to any and all information concerning the Company.

83.   As of June 30, 2015, when Gordon wired the $1.0 million of the purchase price to Michael, Gordon made no further objection or otherwise indicated that he was unsatisfied with the information provided.

84.   Gordon's specious objections to the information provided during due diligence was manufactured to provide a basis for Gordon and GLD's refusal to make the remaining $2.0 million payment due to Michael in accordance with the terms and conditions of the Stock Purchase Agreement.

85.   It is believed and therefore averred that Gordon's activities as described above herein were calculated to deceive Michael into transferring possession of the Company without making payment to Michael due and owing

under the Stock Purchase Agreement so that he could dissipate Company assets for his personal benefit thereby causing substantial harm to Michael and the Company.

86.    Gordon's actions and inactions as described herein were willful, wanton, malicious, reckless and/or oppressive.

WHEREFORE, Michael respectfully requests that this Honorable Court enter judgment against Michael in the amount of $2.0 million dollars together with punitive damages, court costs, pre-judgment interest, post-judgment interest, and such other relief as the Court deems just and appropriate under the circumstances.

## COUNT III – UNJUST ENRICHMENT

## (MICHAEL V. GORDON AND GLD)

### (In the alternative)

87.    The averments of all preceding paragraphs are incorporated by reference.

88.    Gordon and GLD obtained a benefit from Michael in the form of Company assets.

89.    Gordon and GLD appreciated the benefits conferred upon them by Michael.

90.    Gordon and GLD accepted and retained the benefits conferred upon them by Michael under such circumstances as would be inequitable for Gordon and GLD to continue to retain said benefits without making payment to Michael.

91.    It is unconscionable for Gordon and GLD to retain the benefits they

obtained from Michael as described above without making payment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment

against the Gordon and GLD, jointly and severally, in favor of Michael in an

amount sufficient to make Michael whole together with court costs and interest at

the legal rate from the date of judgment until paid in full.  Michael further requests

such other relief as the Court deems just and appropriate under the circumstances.

### DEMAND FOR JURY TRIAL

Michael demands a trial by jury.


                              Respectfully submitted,

                              METTE, EVANS & WOODSIDE

                    By:       *Ronald L. Finck*
                              JEFFREY A. ERNICO, ESQUIRE
                              Pa. Sup. Ct. I.D. No. 07981
                              KATHRYN LEASE-SIMPSON,
                              ESQUIRE
                              Pa. Sup. Ct. I.D. No. 28960
                              RONALD L. FINCK, ESQUIRE
                              Pa. Sup. Ct. I.D. No. 89985
                              3401 North Front Street
                              P. O. Box 5950
                              Harrisburg, PA  17110-0950
                              (717) 232-5000 - Phone
                              (717) 236-1816 – Fax

                              *Attorneys for Plaintiff*

Date:  November 20, 2015

874875v1

16

Exhibit "A"



1325 Avenue of the Americas
28th Floor
New York, New York 10019
www.gldlp.com

Daniel Gordon
Managing Director
Email: dgordon@gldlp.com
Tele #:  (212) 245-3265
Fax #:   (212) 245-1053

February 4, 2015

<u>Via FEDEX</u>
Mr. Ralph Michael, President
Foremost Industries, Inc.
2375 Buchanan Trail West
Greencastle, PA  17225

Dear Mr. Michael:

I write further to our recent discussions concerning the sale of Foremost Industries, Inc. ("Foremost").

First, I'd like to thank you, Jim and Laurie for all of your efforts in helping me to develop a better understanding of the business and opportunities associated with Foremost. It is clear that you have built a special business and it is one that I strongly believe has great potential in the future. As I have explained, there are a number of challenges that have confronted me in this exercise. Absent historical financial statements (other than tax returns) it has been very difficult to analyze the financial performance of Foremost's primary business segments – the modular business and the components/panel business. What financial information that I have been able to review paints a distressing picture of Foremost's past few years of operations. It does not, however, recognize the business' future potential. Unfortunately, to achieve that future potential, a considerable amount of money (we estimate $3 million) will have to be invested to (a) reduce growing levels of Accounts Payable, (b) infuse working capital for ramping up the business, (c) investing in marketing (eg. A new website, etc) and (d) hiring key managerial personnel (eg. a Chief Financial Officer). Ordinarily, I would not be eager to involve myself in an opportunity such as the one presented. There are critical managerial challenges that face Foremost and these challenges will consume an incredible amount of time – both mine and others. Nevertheless, I believe that the reputation that Foremost has built for itself is compelling and provides a sound foundation from which to grow.



Therefore, based on the information that I have received thus far and in light of our conversations regarding your objections and thoughts about a sale of Foremost, our firm is prepared to acquire the assets of Foremost according to the terms and conditions set forth on the attached indicative term sheet. I would be happy to review with you the specific terms and conditions – as well as the rationale supporting same – either by telephone or in person.

I appreciate that this offer may not be what you were expecting. I do, however, believe that it is a fair offer given the risks associated with the business and the requirements associated with operating the business post-closing. We are prepared to acquire the business and invest in Foremost, as necessary, in order to grow the business, provide for Foremost's employees and continue the strong tradition of excellence that you have instilled thus far.

It has been a pleasure getting to know you. I look forward to hearing from you at your earliest opportunity.

Very truly yours,

GLD PARTNERS, LP

Daniel Gordon
Managing Director

DLG;sk
ENCLOSURE

## INDICATIVE TERM SHEET

*Acquisition of Foremost Industries, Inc.*

**BUYER:**    Affiliated entities of GLD Partners, LP (collectively, "Buyer") The assets will be acquired by three (3) separate legal entities. One entity will own the Real Estate, one will own the Modular Business and one will own the Component/Panel Business.

**SELLER:**    Foremost Industries, Inc. ("Foremost")

**ASSETS:**    Buyer will acquire from Seller all of the assets of Foremost with the exception of that certain commercial office building located at 2371 Buchanan Trail West, Greencastle, PA (the "Assets"). The Assets include all goodwill, intellectual property, designs, plans and specifications, real estate, tools, fixtures and equipment, accounts receivable and sales contracts.

**ASSUMED LIABILITIES:**    Buyer will assume, at Closing, certain accounts payable (the "Accounts Payable") as mutually agreed upon between the parties.

**PURCHASE PRICE:**    The purchase price will have two components – a cash component (the "Cash Component") and a deferred earnings component (the "Deferred Earnings Component"). The Cash Component and the Deferred Earnings Component are collectively referred to as the Purchase Price.

*Cash Component:*    $4.00 million

*Deferred Earnings Component:*    Effective as of the Closing Date, and continuing through the tenth (10th) anniversary thereof, the Buyer shall pay a sum equal to thirty five percent (35%) of its Net Income – as calculated in accordance with GAAP and certified by a licensed certified public accountant – to a recognized 501(c)(3) charitable organization to be specified by the Seller.

**CLOSING DATE:**    Forty-five (45) Days from the execution of a definitive term sheet

**NON-COMPETITION:**    Seller agrees that for a period of three (3) years from the Closing Date that neither it nor its shareholder(s), officer(s) or director(s) shall engage in any business that competes in any way with the business of the Buyer.

CONTINGENCIES:          The Buyer's obligation to complete the Transaction shall be contingent on the following:

(1) Completion of pro-forma due diligence

(2) Negotiation and execution of an Employment Agreement with James L. Rockwell

(3) Release of all liens against the Seller's Real Estate as of the Closing Date (eg. payoff of credit line, etc)

(4) Negotiation of a Transition Lease for the use of the office building at 2371 Buchanan Trail West, Greencastle, PA until such time as a new sales office can be built and occupied.

INDEMNIFICATION:        Seller shall indemnify and hold harmless Buyer from any and all liabilities, claims, costs and damages that arise after the Closing Date that are not otherwise disclosed in the Asset Purchase Agreement.

GOVERNING LAW:          Pennsylvania

Exhibit "B"

## Ed Wine

| | |
|---|---|
| **From:** | Laurie Myers <lmyers@foremosthomes.com> |
| **Sent:** | Tuesday, May 26, 2015 4:03 PM |
| **To:** | 'Daniel Gordon'; 'Ed Wine' |
| **Subject:** | RE: Stock Purchase Agreement |

I'm a little confused. What else do you need from me for closing? I thought you were supposed to get the appraisal today.

**From:** Daniel Gordon [mailto:dgordon@gldlp.com]
**Sent:** Tuesday, May 26, 2015 4:07 PM
**To:** Ed Wine
**Cc:** Laurie Myers
**Subject:** Re: Stock Purchase Agreement

I do not think we will be ready to close on Wednesday. I am going to review the schedules this afternoon. I still need the appraisal and a few remaining items from Laurie.

On May 26, 2015, at 3:32 PM, Ed Wine <eddsslaw@pa.net> wrote:

> Dan:
>
> The latest version of the SPA looks fine to me.
>
> If we are looking to close tomorrow (Wednesday), I would be available at 2:30 pm or later. Unfortunately, I have commitments in my McConnellsburg office up until then.
>
> Thanks.
>
> Ed

**From:** Daniel Gordon [mailto:dgordon@gldlp.com]
**Sent:** Tuesday, May 26, 2015 7:12 AM
**To:** Ed Wine
**Cc:** 'Laurie Myers'
**Subject:** Stock Purchase Agreement

Ed

I attached the latest version of the Stock Purchase Agreement including some of the changes that you requested and a few clean-up items from our side. My hope is that we can "lock" this Agreement today and get the Schedules likewise reviewed and finalized.

Please let me know if you have any questions or concerns or further modifications.

Thanks.

Dan

1

Exhibit "C"

**Ed Wine**

| | |
|---|---|
| **From:** | Laurie Myers <lmyers@foremosthomes.com> |
| **Sent:** | Tuesday, May 26, 2015 8:24 AM |
| **To:** | eddsslaw@pa.net |
| **Subject:** | FW: 2011 return/extension |

Hi Ed,

Hope you had a nice holiday weekend.

Looks like we could have an in person closing!!

Laurie

-----Original Message-----
From: Daniel Gordon [mailto:dgordon@gidlp.com]
Sent: Tuesday, May 26, 2015 8:18 AM
To: Laurie Myers
Subject: RE: 2011 return/extension

I hope so!!! I am trying to get down to Foremost on Wednesday to meet with Jim (and perhaps to sign everything). I would also like to bring one of our IT guys to look at the IT infrastructure and discuss with Jim software, time clocks, etc.

-----Original Message-----
From: Laurie Myers [mailto:lmyers@foremosthomes.com]
Sent: Tuesday, May 26, 2015 7:57 AM
To: Daniel Gordon
Subject: 2011 return/extension

Good morning Dan,

Hope you had a nice time away for the holiday. The weather was certainly gorgeous in PA.

I take it from your email this morning that we should be able to sign everything tomorrow. :-)

Laurie

Exhibit "D"

Exhibit "E"

# GLD FOREMOST HOLDINGS, LLC
1325 Avenue of the Americas
28th Floor
New York, NY 10019
(212) 245-3265 (T)
(212) 245-1053 (F)

August 26, 2015

VIA FEDEX
Mr. Ralph C. Michael
3300 Hill Road
Greencastle, PA 17224

      Re:    Dispute Notice – Claim for Indemnification

Dear Mr. Michael:

Reference is hereby made to the Stock Purchase Agreement (the "Agreement") dated as of May 29, 2015 by and between GLD Foremost Holdings, LLC ("Buyer"), Ralph C. Michael ("Seller") and Foremost Industries, Inc. (the "Company"). Capitalized terms used herein, but not otherwise defined, shall have the meaning ascribed to them in the Agreement.

In accordance with Section 22 of the Agreement, this letter shall constitute written notice of various Disputes that have arisen in connection with, or pursuant to, the Agreement. Specifically, the Seller has breached multiple representations and warranties made under the Agreement. As a result, the Buyer has suffered significant Losses and is entitled to indemnification by the Seller pursuant to Section 9.3 of the Agreement. Set forth below is a preliminary list of the instances in which the Seller breached or made inaccurate representations and warranties pursuant to the Agreement.

*Section 4.4(a) – Financial*

Pursuant to Section 4.4 of the Agreement, the Seller represented that "the Financial Statements were prepared in accordance with GAAP consistently applied through the applicable periods involved (except that the Interim Financial Statements are subject to normal year-end adjustments and do not include footnotes)...."

There are multiple instances, as outlined below, where the Seller breached this representation and warranty resulting in sizeable Losses to Buyer.

## I.    No Accrual for Real Estate Taxes

GAAP requires that financial statements contain accruals for expense items that can be reasonably anticipated to arise. Neither the Financial Statements nor the Interim Financial

1

Statements include accruals for real estate taxes despite the fact that real estate taxes are a reasonably anticipated expense of the Company. The Company should have included an accrual for real estate taxes in the amount of $23,100 on the Interim Financial Statements. The absence of such an accrual resulted in an understatement of expenses and an overstatement of shareholder equity by the Company.

### II.   No Accrual for Interest Expense

GAAP requires that financial statements contain accruals for expense items that can be reasonably anticipated to arise. Neither the Financial Statements nor the Interim Financial Statements include an accrual for interest expense despite the fact that interest expense relating to the Line of Credit was a reasonably anticipated expense of the Company. The Company should have included an accrual for interest expense in the amount of $13,000 on the Interim Financial Statements. The absence of such an accrual resulted in an understatement of expenses and an overstatement of shareholder equity by the Company.

### III.   Difference between Accounts Payable Report and Financial Statements

GAAP requires that financial statements reflect entries contained in the source documents that comprise the Company's books and records. For the period ending March 31, 2015, the Interim Financial Statements understated the Company's accounts payable by $45,000 when compared to the Accounts Payable Detail report in SAGE (**Exhibit A**). The result of this understatement was an understatement of expenses and liabilities by the Company.

### IV.   Understatement of Customer Deposits

GAAP requires that financial statements reflect entries contained in the source documents that comprise the Company's books and records. For the period ending March 31, 2015, the Interim Financial Statements understated the Company's Customer Deposits by $180,600 when compared to the Trial Balance report in Sage (**Exhibit B**). The result of this understatement was an understatement of liabilities by the Company.

### V.   Failure to Record JP Morgan Truck Loan Liability

GAAP requires that financial statements accurately reflect all known liabilities of the Company. Beginning in 2014, the Company was the borrower and primary obligor under an auto loan with JP Morgan Chase for which it was the primary obligor (**Exhibit C**). The Interim Financial Statements do not reflect the JP Morgan Chase auto loan. As a result, the Interim Financial Statements understate the Company's liabilities by $20,000 and therefore overstate the Company's shareholder equity.

### VI.   No Reserve for Doubtful Accounts

GAAP requires that financial statements contain a reserve for doubtful accounts when the Company believes that certain accounts receivable are uncollectible. The Financial Statements reflect no such reserve for doubtful accounts despite the fact that the Company's accounts

receivable include numerous accounts that are in excess of two hundred days past due and are subject to various non-standard payment terms in which compliance is irregular (**Exhibit D**). In light of the accounts receivable that are significantly past due, as well as the various non-standard payment plans between the Company and certain of its customers, the Company should have taken a reserve for doubtful accounts on its Financial Statements pursuant to GAAP. The failure to do so materially impacted the quality of the Financial Statements by overstating income, assets and shareholder equity. After a review of the Financial Statements and the Company's accounts receivable reports, the Buyer contends that over $100,000 in accounts receivable are uncollectible. Accordingly, a reserve for doubtful accounts in that amount should have been taken by the Company and, as a result, the Buyer has suffered Losses by a multiple of this amount (ie. the uncollectible accounts receivable).

## VII.    Vacation Pay Accrual

GAAP requires that financial statements include an accrual for expected employee vacation pay and related benefits for which the Company is liable. The Interim Financial Statements reflect no such accrual for employee vacation pay and related benefits despite the Company being liable for same. The Company should have made an accrual for employee vacation pay and related benefits. The failure to do so materially impacted the quality of the Interim Financial Statements by understating the Company's expenses. The Buyer contends that an accrual for employee vacation pay should have been made in the amount of $35,000 and that the Buyer has suffered Losses by a multiple of this amount as a result of the Company's failure to do so.

## VIII.   Dental Reimbursement Plan Accrual

GAAP requires that financial statements include an accrual for liabilities expected to arise in connection with a self-funded or self-insured benefit plan. The Buyer understands that the Company maintains, and has for the past several years maintained, a dental reimbursement plan for its employees (the "Dental Plan"). Pursuant to GAAP, the Company should have made an accrual to reflect an estimate for the payments that it would be required to make pursuant to the Dental Plan. The Interim Financial Statements reflect no such accrual for the anticipated Dental Plan obligations. The failure to make such an accrual materially impacted the quality of the Interim Financial Statements by understating the Company's expenses. The Buyer contends that an accrual for obligations under the Dental Plan should have been made in the amount of $20,000 and that the Buyer has suffered Losses by a multiple of this amount as a result of the Company's failure to do so.

## IX.     Inventory

GAAP requires that financial statements reflect the value for inventory equal to the lesser of cost or fair market value. The Company did not accurately account for Inventory according to GAAP. Upon further investigation, it appears that a significant portion of the Inventory was obsolete. In fact, much of the obsolete Inventory was sold at a public auction in July, 2015. The auction yielded proceeds of $32,810 from the sale of obsolete Inventory which the Company carried on its balance sheet at a value of $300,000. As a result of the foregoing, GAAP required the Company to make an adjustment to the value of its Inventory based on the market value of the

obsolete Inventory. No such adjustment was made or reflected on the Financial Statements or the Interim Financial Statements. As a result, the Company over-valued its Inventory, assets and shareholder equity and, as a result, the Buyer suffered Losses as a result of same.

In addition to the foregoing, the Company's failure to properly account for Inventory on the Financial Statements and Interim Financial Statements had a corresponding impact on the Company's income statement. The over-valuation of Inventory resulted in the Company exaggerating its gross profit margin. In determining its valuation for the Company, the Buyer relied on the Company's Financial Statements and Interim Financial Statements – including information relating to gross profit margin - to determine the price that it was willing to pay for the Purchased Stock. As the gross profit margin reported by the Company was inflated as a result of the improper accounting for Inventory, the Buyer was fraudulently induced into paying a disproportionately higher price for the Company than it was otherwise worth.

### Section 4.4(b) – Accounts Receivable

Pursuant to Section 4.4(b) of the Agreement, the Seller represented that "to the Knowledge of the Seller, [the Accounts Receivable] are not and will not be subject to any contests, claims, counterclaims or setoffs. There has been no material adverse change since March 31, 2015 in the amount or collectability of the Accounts Receivable due the Company."

The Seller breached this representation and warranty in so far as there are numerous accounts receivable of the Company that appear to be uncollectible, subject to infrequent payment plans and other special conditions outside the ordinary course of business. As no reserve was made for doubtful accounts on the Financial Statements, the Company (and the Buyer) will suffer a financial loss due to its ability to collect many of these dubious Accounts Receivable.

Additionally, the Buyer understands that two such accounts receivable suffered a material adverse change since March 31, 2015. For one account (ie. Brandon Fields), Mr. Fields advised the Company that the Company's work was incomplete and/or substandard and that as a result of same he would not make payment to the Company for the balance due (ie. $45,532.18). For another account (ie. Mary Ann Bobolis), the Customer advised the Company that the Company's work was incomplete and/or substandard and that as a result of same she would not make payment to the Company for the balance due (ie. $25,906.93).

### Section 4.4(c) – Inventory

Pursuant to Section 4.4(c) of the Agreement, the Seller represented and warranted that "all Inventory of the Company, whether or not reflected in the Financial Statements, consists of a quality and quantity usable and salable in the ordinary course of business, except for obsolete items and items of below-standard quality, all of which have been written off or reserved for in the Financial Statements...."

The Seller breached this representation and warranty as the value for Inventory set forth on the Financial Statements and Interim Financing Statements did not reflect "obsolete items" of Inventory. On July 11, 2015 the Company undertook a public auction whereby it sold its obsolete

4

and below-standard quality items of Inventory.  The Buyer has been advised that the Company originally paid in excess of $300,000 for the items sold at auction and that the Company carried such value on its Financial Statements.  The public auction yielded proceeds to the Company of $32,810 thereby establishing that the value of the Inventory as reflected on the Financial Statements was overstated (**Exhibit E**).  As a result of the foregoing, the Buyer contends that the Financial Statements overstated the value of the Inventory which results in an overstatement of the Company's Assets.  As a result, the Buyer has suffered Losses in a multiple of $267,190 on account of the overstatement of Inventory on the Company's Financial Statements.

### Section 4.8 – Litigation

Pursuant to Section 4.8 of the Agreement, the Seller represented and warranted that, "…there are not currently pending or, to the Knowledge of the Seller, threatened against the Company any investigations of charges or complaints, and there are no outstanding ***uncorrected or unresolved citations***, charges, complaints, orders or judgments, issued or made by any governmental agency, or by a court, with respect to its application or enforcement of the Laws relating to the Company's business operations, environmental protection, labor relations, employee safety and health, wages, hours and other labor standards, and fair employment."

The Seller breached this representation and warranty by failing to disclose the existence of the DEP Violations (**Exhibit F**).

### Section 4.9(a) – Governmental Licenses

Pursuant to Section 4.9(a) of the Agreement, the Seller represented and warranted "Except as set forth in Schedule 4.9(a) attached hereto, to the Knowledge of the Seller, the Company has all governmental licenses and permits necessary to conduct its business, and such licenses and permits are in full force and effect and listed on Schedule 4.9(a) attached hereto. Except as set forth in Schedule 4.9(a) attached hereto, no violations are or have been recorded and remain outstanding in respect of such licenses or permits and no proceeding looking toward the revocation or limitation of any of them is pending or threatened. Set forth in Schedule 4.9(a) is a complete list of all inspection reports, complaints, citations and notices of violations or alleged violations received by the Company within the period of two (2) years prior to the date hereof from any governmental agency having jurisdiction over the Company or its business."

The Seller breached this representation and warranty by failing to disclose the existence of the DEP Permits (**Exhibit G**) and the DEP Violations (**Exhibit F**).

### Section 4.9(b) – Compliance with Laws and Regulations

Pursuant to Section 4.9(b) of the Agreement, the Seller represented and warranted "the Company is in compliance with all applicable Laws relating to the operation of its business and its products, the Owned Real Estate, and its other assets, including, without limitation, all zoning, building, fire, plumbing, product, health and safety Laws including applicable product, safety and consumer protection specifications, guidelines and standards, and no notice has been served upon its claiming violation of any of the foregoing. The Owned Real Estate and all buildings and

5

improvements situated thereon, and the use thereof by the Company complies with all Laws, easements and restrictions, if any."

The Seller breached this representation and warranty by failing to disclose the existence of the DEP Violations (**Exhibit F**).

*Section 4.10(c) -- Condition; Sufficiency*

Pursuant to Section 4.10(c) of the Agreement, the Seller represented and warranted that "since January 1, 2015, no such asset essential to the operation of the Acquired Business has been destroyed, diverted by the Company to other uses, or otherwise disposed of by the Company without having been adequately replaced."

The Seller breached this representation and warranty by failing to disclose the sale and/or transfer of certain essential assets relating to the Acquired Business. Such sales include, but may not be limited to, the following:

**Roll Back Truck**

The Buyer is advised that, as of January 1, 2015, the Company possessed a large flat-bed truck -- otherwise known as a "roll back" truck -- that was used by the Company for the delivery of trusses. The Buyer is further advised that at some time after January 1, 2015 the Seller caused the Company to sell this truck despite its central function within the operation of the Acquired Business. The cost to replace the truck is over $80,000 and no replacement truck has been acquired by the Seller or the Company.

The Seller breached this representation and warranty by failing to disclose the sale and/or transfer of the roll back truck. The Buyer (and the Company) have now been damaged as a result of the Seller's breach of this representation and warranty. The Company will have to replace the subject truck at considerable cost and expense in order to maintain its operations and delivery capabilities. The need to replace the roll back truck -- and the cost related to same -- will result in Losses to the Buyer.

**Scissor Lift**

The Buyer is advised that, as of January 1, 2015, the Company possessed two scissor lifts at its manufacturing facility in Upton, Pennsylvania. The Buyer is further advised that at some time after January 1, 2015 the Seller caused the Company to sell, gift or transfer one of the two scissor lifts to Donald Myers or businesses owned, controlled or affiliated with him[1]. The Company requires two scissor lifts to maintain its operations. The cost to replace the transferred scissor lift is estimated to be over $20,000 and no replacement scissor lift has been acquired by the Seller or the Company.

---

[1] Myers is the son-in-law of the Seller and the husband of Laurie Myers, the Company's former Controller and the Seller's daughter.

The Seller breached this representation and warranty by failing to disclose the sale and/or transfer of the scissor lift. The Buyer and the Company have now been damaged as a result of the Seller's breach of this representation and warranty. The Company will have to replace the scissor lift at considerable cost and expense in order to maintain its operations. The need to replace the scissor lift – and the cost related to same – will result in Losses to the Buyer.

### Sale of Buchanan Trail West Land

The Buyer is advised that, as of January 1, 2015, the Company owned land located on Buchanan Trail West in Greencastle, Pennsylvania. The Buyer is further advised that at some time after January 1, 2015, the Seller caused the Company to sell, gift, or transfer a certain parcel of Company-owned land (the "Transferred Land") on Buchanan Trail West to Don and Laurie Myers (collectively, "Myers"). The purchase price (the "Purchase Price") for the transfer was reported to be $100,000 (**Exhibit H**). There is no record in the Company's bank statements or books and records that the Purchase Price was ever paid by Myers. The Buyer is further advised that the Transferred Land was improved with a 6,000 square foot warehouse built by the Company. The Buyer understands that the cost to construct the warehouse on the Transferred Land was in excess of $300,000. Counsel to the Seller has previously advised that the payments made by Myers to the Company were recorded in the Customer Deposits account in the Company's general ledger. While there are some entries in the Customer Deposits account in the Company's general ledger that are labeled "Myers", the Company dealt with a number of customers named "Myers" and it is not possible to confirm the origin of these funds. Regardless, the value attributable to "Myers" in the Customer Deposits account does not approach the $300,000 in costs and expenses incurred by the Company in connection with the improvements to the Transferred Land.

The Seller breached this representation and warranty by failing to disclose the sale of the Transferred Land in the Agreement. The Buyer (and the Company) has been damaged as a result of the Seller's breach of this representation and warranty to the extent that (a) Myers failed to pay the Purchase Price, (b) Myers fails to paid the Company for the full value of the construction of the improvements on the Transferred Land and (c) the Purchase Price paid by Myers for the Transferred Land was less than the fair market value for same.

Furthermore, the sale of the Transferred Land to Myers was not properly recorded on the Financial Statements or the Interim Financial Statements in accordance with GAAP. In the event that Myers paid less for the Transferred Land – together with the improvement made thereupon - than the costs incurred by the Company, the differential is income to Myers that should have been reported as "Wages" to Laurie Myers. No such entry was made. The result of the foregoing is that the Financial Statements and the Interim Financial Statements concealed this "expense" relating to the improvements to the Transferred Land.

### Section 4.15(a) – Environmental Matters

Pursuant to Section 4.15(a) of the Agreement, the Seller represented and warranted that "to the Knowledge of the Seller, the Company is and has been in compliance with all Environmental Laws. The Company has not received any communication (written or oral), whether from a governmental authority, citizens group, employee or otherwise, that alleges that the Company is

7

not in compliance with applicable Environmental Laws, and to the Knowledge of the Seller there are no present circumstances that may prevent or interfere with such compliance in the future. All permits and other governmental authorizations currently held by the Company pursuant to the Environmental Laws are identified in Schedule 4.15(a)."

The Seller breached this representation and warranty by failing to disclose the DEP Violations (**Exhibit F**) and the DEP Permits (**Exhibit G**).

*Section 4.15(b) – Environmental Matters*

Pursuant to Section 4.15(b) of the Agreement, the Seller represented and warranted that "except as set forth in Schedule 4.15(b) attached hereto, there is no Environmental Claim pending or, to the Knowledge of the Seller, threatened against the Company, or against any person or entity whose liability for any Environmental Claim the Company has or may have retained or assumed either contractually or, to the Knowledge of the Seller, by operation of law."

The Seller breached this representation and warranty by failing to disclose the DEP Violations (**Exhibit F**).

*Section 4.22 – Warranty Claims and Customer Complaints*

Pursuant to Section 4.22 of the Agreement, the Seller represented and warranted that "subject to Schedule 4.22, there are no existing or, to the Knowledge of the Seller, threatened claims or customer complaints against the Company (i) for or related to any alleged defective product or (ii) for or related to any product which alleges failure to meet any service or product warranties of the Company or any applicable standard or specification of any contract or purchase order for such product or any applicable foreign, federal, state or local Law. Schedule 4.22 accurately describes all such claims or customer complaints received by the Company during the past two years including, with respect to each such claim or customer complaint, a description of (i) the nature of the claim or customer complaint and (ii) the date of the claim or customer complaint."

The Seller breached this representation and warranty by failing to disclose the warranty claims made by Brandon Fields, Kristen Slater and Mary Ann Bobolis. Each of these customers notified the Company that the Company's workmanship was either incomplete or substandard. As a result of same, each of the customers demanded that the Company repair defective workmanship and provide the Customer with a discount to the outstanding balances owed. As a result of the foregoing, the Buyer and the Company have suffered Losses on account of (i) the cost of the work that will be required to address the claims by the customers and/or (ii) the refusal by the customers to pay accounts outstanding and due.

*Section 4.24(a) – Employees*

Pursuant to Section 4.23 of the Agreement, the Seller represented and warranted that "…the Company is in compliance with all applicable laws respective labor and employment…." The Seller breached this representation and warranty by failing to provide Keith M. Johnson – an

8

employee of the Company - a Notice of Eligibility for Unpaid Leave pursuant to the Family Medical Leave Act ("FMLA"). Mr. Johnson became disabled in January 2015. At that time, pursuant to FMLA, the Company was obligated to inform Mr. Johnson of his eligibility for leave under FMLA. As part of the FMLA, eligible employees are entitled to a continuation of their employer-provided health insurance provided that they continue to pay the employee portion of the premium. By not providing Mr. Johnson with notice of his eligibility for FMLA leave, the Company incurred the entire cost of providing Mr. Johnson with health insurance. This cost totals $3,260.00 and will continue to increase until such time as Mr. Johnson's eligibility for FMLA leave expires. As a result of the foregoing, the Company has suffered Losses on account of the payment of health insurance premiums for Mr. Johnson for which it would not have otherwise been liable and the continue payment for same.

### Section 4.24(a) – Benefit Plans

Pursuant to Section 4.24(a) of the Agreement, the Seller represented and warranted that "except for the Existing Plans, the Company does not maintain any Benefit Plan...."

The Agreement defines "Benefit Plan" as "any pension plan, profit sharing plan, bonus plan, incentive compensation plan, stock ownership plan, stock purchase plan, stock option plan, stock appreciation plan, employee benefit plan, employee benefit policy, retirement plan, deferred compensation plan or agreement, cafeteria plan, dependent care plan, fringe benefit program, employee insurance plan, severance plan or agreement, change in control plan or agreement, employment agreement, disability plan, health care plan, sick leave plan, death benefit plan, multi-employer pension or welfare benefit plan, or any other plan or program to provide retirement income, fringe benefits or other benefits to former or current employees."

As set forth above, the Company offers its employees the opportunity to participate in the Dental Plan. The Dental Plan constitutes a "benefit plan" according to the definition set forth in the Agreement. The Seller breached this representation and warranty by failing to disclose the existence of the Dental Plan.

### Section 4.24(f) – Benefit Plans

Pursuant to Section 4.24(f) of the Agreement, the Seller represented and warranted that "the Company does not maintain and has not established any "welfare benefit plan" (within the meaning of Section 3(1) of ERISA), other than those listed on Schedule 1.1 to this Agreement, which provides for continuing benefits or coverage for any participant or any beneficiary of a participant after such participant's termination of employment except as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), and the regulations thereunder."

As set forth above, the Company offers its employees the opportunity to participate in the Dental Plan. The Dental Plan is a "self-insured" plan and the Buyer is advised that there is no insurance or reinsurance available to cover the Company's costs associated with the administration of or the payment of benefits pursuant to the Dental Plan. As such, the Dental Plan constitutes a

"welfare benefit plan" as defined under ERISA. The Seller breached this representation and warranty by failing to disclose the existence of the Dental Plan.

### Section 4.26 – Benefit Claims

Pursuant to Section 4.26 of the Agreement, the Seller represented and warranted that "no person has asserted any claim under which the Company has any liability under any Benefit Plan maintained by the Company or to which the Company is a party, or under any worker's compensation or similar Law, which, to the Knowledge of the Seller, is not fully covered by insurance maintain with unaffiliated, financially sound, reputable insurers."

As set forth above, the Company offers its employees the opportunity to participate in the Dental Plan. Pursuant to the Dental Plan, the Company reimburses employees for a percentage of certain eligible dental expenses which they incur. Each such reimbursement would constitute a "claim" under a "benefit plan" as defined in the Agreement. The Seller breached this representation and warranty by failing to disclose the benefit claims that have been made pursuant to the Dental Plan. The Buyer has suffered Losses in an amount equal to the benefit claims that the Company has had to pay on account of the Dental Plan.

### Section 8.5(a) – Tax Matters

Pursuant to Section 8.5(a) of the Agreement, the Seller "shall indemnify the Company and the Buyer and each of their respective affiliates and hold them harmless from and against any Loss, Claim, liability, expense or other damage attributable to all Taxes (or the non-payment thereof) as of the Closing Date for any taxable period that includes (but does not end on) the Closing Date...."

The Company failed to file numerous tax returns with the State of West Virginia. (**Exhibit I**). One such return was a Use Tax Return for the Period March 31, 2006. In addition to the costs incurred by the Company to prepare and file the Use Tax Return, the Company incurred $6,143.61 in taxes, late penalties and interest relating to the unfiled return. Pursuant to the Agreement, the Seller is obligated to indemnify the Buyer and the Company for this expense.

The Company also filed a tax return for 2013 with the State of Virginia past the due date, resulting in a Penalty in the amount of $1,200.00 (**Exhibit J**).

*********************************

The foregoing represent the claims for indemnification presently known to the Buyer. Furthermore, the monetary values set forth above represent estimates of the damages that Buyer has suffered or will suffer as a result of the Seller's breach of various representations and warranties. These estimates may, in fact, be significantly larger after further evaluation and the inclusion of attorneys' fees related to same.

Based on the foregoing, the Buyer contends that the collective impact of the items giving rise of indemnification suggest a pattern of fraud by the Seller in connection with the marketing of the Company. In light of the foregoing, the Buyer demands the rescission of the Agreement and the refund of all monies previously advanced to the Seller, to the Company and on behalf of same.

The Disputes set forth herein represent only the initial discovery by the Buyer of breaches of representations and warranties by the Seller giving rise to claims for indemnification. In light of the extensive nature of the breaches discovered thus far, and the clear indication that the Financial Statements and Initial Financial Statements were not prepared in accordance with GAAP, the Buyer intends to retain Marcum, LLP to conduct a full forensic audit of the Financial Statements and Initial Financial Statements.

The Buyer reserves all rights and remedies available under the Agreement – and at law or equity – with respect to the matters set forth herein.

Very truly yours,

GLD FOREMOST HOLDINGS, LLC

Daniel Gordon
Manager

cc.    Sean Bellew, Esq.
       Ed Wine, Esq.

11

Exhibit "F"

# METTE, EVANS & WOODSIDE
### A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

3401 NORTH FRONT STREET
P.O. BOX 5950
HARRISBURG, PA 17110-0950

JEFFREY A. ERNICO

DIRECT DIAL
(717) 231-5206

IRS NO.
23-1985005

EMAIL ADDRESS
jaernico@mette.com

TELEPHONE
(717) 232-5000

FAX
(717) 236-1816

HTTP://WWW.METTE.COM

September 15, 2015

**Sent via email to:** <u>SJBellew@duanemorris.com</u>
**and Regular First Class U.S. Mail**

Sean J. Bellew, Partner
Duane Morris LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659

**16706.1**

Re:     <u>Sale of Stock of Foremost Industries, Inc.</u>

Dear Sean:

I am sending you a reply to your client's, GLD Foremost Holdings, LLC's ("GLD"), dispute letter of August 26, 2015, addressed to our client, Ralph Michael. This letter should be considered an official reply to the August 26, 2015 letter of GLD and its principal, Daniel Gordon.

This transaction is a stock sale of Foremost Industries, Inc. (the "Company"). Daniel Gordon and Ralph Michael, the seller, negotiated and Daniel visited the business frequently for approximately seven months' time. However, Daniel did not, by his own election, conduct any in-depth due diligence investigation of the Company. The parties negotiated a purchase price, and a Stock Purchase Agreement ("SPA") was prepared for review and execution by the parties.

The transaction was scheduled to close on May 29, 2015. On May 29, 2015, Ralph Michael executed the SPA and completed all applicable attachments and schedules to that agreement, and on May 30, 2015, all the documents were sent by overnight courier to Daniel in New York. Daniel was expected, upon his receipt of the documents, to return executed copies of the SPA to Mr. Michael. Daniel received an executed assignment of all of Ralph Michael's rights, titles and interest in his stock ownership of the Company as a part of the overnight delivery.

By June 7, 2015, Daniel and his people had assumed control of the Company and began hiring and firing people and selling (at auction) equipment and inventory of the business. At that same time, Daniel took full possession of all property of the Company including the entire office and all corporate books and records of the Company.

Sean J. Bellew, Partner
September 15, 2015
Page 2

It wasn't until August 19, 2015, that Daniel, through some representative from his organization, returned to the offices of Ed Wine, Mr. Michael's attorney, the executed SPA. Consequently, Daniel had a period of time in excess of 2 1/2 months during which he had full possession and control the Company before even delivering his signed SPA to the seller.

It was not until August 26, 2015, that Daniel sent his dispute notice letter raising all the issues we will discuss below in this letter.

Recently, we have also learned the following from various media releases found on the Internet: according to Kennedy Funding Financial in a press release, it loaned $3.41 million to Daniel or companies he controlled charging interest only for a period of two years. According to Kennedy Funding, the borrower, " Foremost Realty Holdings, LLC," recently acquired the Company owning the collateral (Foremost Industries) for $5.5 million, paid $2.9 million in cash to the seller and assumed an existing Susquehanna First mortgage of $2.6 million. Supposedly, the $3.41 million loan was used to pay off the Susquehanna mortgage.

It seems that, to Daniel Gordon, the truth is based upon his perception and desire to dispense it. Mr. Gordon's version does not often resemble the actual facts. For instance, Mr. Gordon has only paid $1 million to the actual seller, not $2.9 million.

Inasmuch as the parties have not been able to resolve their differences and Mr. Gordon still owes our client $2 million of the actual purchase price, we began to investigate Mr. Gordon's history. What we learned is of great concern.

According to an Associated Press story from July 22, 2012, Mr. Gordon has been convicted of embezzling $43 million from Merrill Lynch while an employee for Merrill Lynch, by convincing the company to pay a $43 million premium to an offshore insurance company to provide Merrill Lynch with a guarantee that it could buy energy it might need. In fact, the money went into accounts that Mr. Gordon controlled. The article continues by saying that Mr. Gordon pleaded guilty in 2003 to wire fraud, money laundering and conspiracy. He spent 3 1/2 years in prison for this crime.

According to a Wall Street Journal article, Mr. Gordon hid millions from a bankruptcy court and was denied his Chapter 7 bankruptcy in 2013. The court order of Judge Gerber of May 2013 provides as follows: "he displayed a cavalier disregard for his disclosure obligations in a bankruptcy case" that included "so many false oaths that they are difficult to count".

We have also been left with the impression that this transaction may not be the only transaction in Mr. Gordon's history in which a seller has been persuaded to turn over ownership and control of his company to Mr. Gordon before the seller has been fully paid and that Mr. Gordon has then subsequently refused to pay the balance due to the owner.

Regrettably Mr. Michael, now 87 years old, was probably easy pickings for someone with the history and nature of Mr. Gordon. What was clearly known to Mr. Gordon was that the

Sean J. Bellew, Partner
September 15, 2015
Page 3

Company did not have a certified public accountant firm working for it and that it prepared its
own income tax returns. Consequently, the Company's lack of sophistication and understanding
of terms like "Generally Accepted Accounting Principles" were foreign to them.

In fact, the 32 page SPA was created and delivered to Mr. Michael by Mr. Gordon and/or
his legal counsel. Mr. Michael did not even require legal counsel to assist him in the sale
transaction and related negotiations which occurred directly between the parties, until after he
was presented with the SPA. Mr. Michael did not have available to him a law firm which was
intimately familiar with him and the Company, and its assets and operations. The Company
simply didn't require the assistance of legal counsel on a routine basis.

It is noteworthy that Mr. Gordon took possession of the business in early June and never
has paid the full purchase price called for at closing. He currently still owes $2 million to Mr.
Michael. It is also noteworthy that he did make some payments during this period of time and
has made arrangements to have Mr. Michael removed as a guarantor of the Susquehanna Bank
loan. He also paid off a truck loan which had Mr. Michael named as a guarantor. These
payments were made in July 2015; however, he has never paid the remaining $2 million owed
under the contract. The foregoing claim of Mr. Michael is the subject of his September 1, 2015
Dispute Notice to Mr. Gordon.

Nevertheless, in a good-faith effort to resolve this "dispute" we will endeavor to address
Mr. Gordon's August 26, 2015 letter, seriatim, as follows:

Section 4.4 (a). As was stated at the beginning of this letter, our client is relatively
unsophisticated, an elderly man at this point, and did not employ a certified public accounting
firm to prepare or review the Company's financial records. As a matter fact, the Company does
not produce "financial statements" or "interim financial statements" as defined under GAAP.
The Company essentially operates off of a general ledger and monthly trial balance reports.
These reports were provided to Mr. Gordon, who presumably realized that they were not
prepared according to GAAP long before the closing on this transaction and certainly before he
had made substantial payments under the transaction documents and had taken full possession
and control of the Company. Although it may seem foolish for someone such as Mr. Gordon to
not do any substantial due diligence prior to making the purchase, in retrospect, it seems to be
intentional and part of a plan from the very beginning to secure control of the Company without
paying for it in full.

I. "No Accrual for Real estate taxes"

The Company paid its real estate taxes on a cash basis and all information provided to
Mr. Gordon was consistent in this regard. Moreover, at the end of each year, there is no material
impact on the operational costs of the Company by virtue of this approach. The information
provided to Mr. Gordon certainly provided him with sufficient information to know what the real
estate tax expenses were from year-to-year.

Sean J. Bellew, Partner
September 15, 2015
Page 4

II. No Accrual for Interest Expense

Inasmuch as Mr. Gordon paid off the corporate line of credit with Susquehanna Bank, there would have been no accrual of interest expense of any significance to note.

III. Difference between Account Payable Report and Financial Statements

We will require additional detail in this regard in order to respond effectively to this claim. To the best of our client's knowledge, all information was completely and accurately shared with Mr. Gordon.

IV. Understatement of Customer Deposits

We will require additional detail in regard to this matter in order to respond effectively. Again, to the best of our client's knowledge, all information was completely and accurately shared with Mr. Gordon.

V. Failure to Record JP Morgan Truck Loan Liability

Mr. Gordon was given a list of the Company liabilities from Mr. Michael months before the SPA was prepared. The truck loan was prominently shown on that list. Moreover, Mr. Gordon paid off that loan probably after taking possession and control of the Company evidencing his awareness of the loan long before he provided our client with an executed copy of the SPA.

VI. No Reserve for Doubtful Accounts

Although it is true that there may not have been any reserve for doubtful accounts, the doubtful accounts were reported to Mr. Gordon in schedule 4.4 (c) of the SPA. More will be discussed about this with reference to that item and section later in this letter.

VII. Vacation Pay Accrual

Since the accounting records were not maintained on an accrual basis, this information would not have been available; however, Mr. Gordon was provided with a full list of all employees, their wages, and their benefits entitlements. Had Mr. Gordon done any simple math at all either before or after he took possession of the Company, he would have been able to clarify and understand this matter.

VIII. Dental reimbursement plan accrual

Our client knows that the dental plan had been funded every month through the time that the Company was turned over to Mr. Gordon and it is not possible that there was a $20,000 accrual of actual, reimbursable claims under that plan at the time that Mr. Gordon took possession of the Company.

Sean J. Bellew, Partner
September 15, 2015
Page 5

### IX. Inventory

Obsolete inventory items have never been included on the books of the Company as inventory. Company practice was to remove such items whenever a new inventory was run up on the basis of whether or not they were obsolete. Hence there can be no overstatement in this regard. Mr. Gordon also refers to an auction that was held. This auction was arranged, scheduled and conducted under his supervision. While we are not certain how much inventory was sold, we are quite certain that other fully depreciated and obsolete equipment was sold at that auction. None of that would have reflected any value on the Company's books. Our client has always been concerned about the fact that the auction was scheduled so quickly and conducted in Central Pennsylvania on relatively short notice. The prudence of conducting such an auction under those circumstances is in doubt. Our client can hardly assume responsibility for losses allegedly experienced in this way. Moreover, if this continues to be an issue, we demand full access to all details to support this particular complaint.

### Section 4.9 (b). Compliance with Laws and Regulations.

Mr. Gordon raises an issue involving DEP permits and violations in a number of sections of his August 26 letter. This is just the first one. Regrettably, we have already fully explained to him and you the status of all of the DEP permits and "violations". To rehash them here is disturbing, as we have spent a great deal of legal time and engineering time providing Mr. Gordon and you with a full and complete summary of the status of the permits, whether or not they need to be transferred at this time, and the gravity of any "violations". In this section we will simply state that the "violations" are nearly 2 years old and were simply relating to a failure of a prior engineering consultant to provide timely and periodic reports to DEP. There were no actual violations or discharges of sewage into the waters of the Commonwealth or anything else of such severity. The penalties were paid and there is no recurring and lingering problem with DEP.

### Section 4.10 (c). Condition; Sufficiency

First it must be said that the items referenced by Mr. Gordon in this particular category are either of no use and have not been of any use to the Company for a long time and/or were fully paid for at the time or before that time by a purchaser. The Company received fair consideration for the items.

### Roll Back Truck

This particular truck was not essential to the Company and was sold once it was determined that it was too expensive to repair it and there were other reasonable and more cost-effective alternatives for its limited use. For example, one of its main limited uses in the past, when the Company had three different plant facilities, was to bring equipment like forklifts from the various plants to a central Company garage formerly located near the Company's corporate offices. When all plant operations were consolidated into the Company's current plant in

Sean J. Bellew, Partner
September 15, 2015
Page 6

approximately 2008, there was no need to use the truck for such transportation; the equipment was repaired right at the one plant.

Moreover, the truck had not been used by the Company for well in excess of six months prior to the date it was sold. It had been out of service most of 2014 with engine problems. The truck had a 16 foot bed and the trusses the Company generally uses are 24 feet in length or greater. It simply would not be useful in the daily ongoing operations of the business.

Scissor Lift

The two scissor lifts that the Company owned were no longer necessary in the business. They were purchased for the purpose of building the Company's manufacturing plant between 2004 to 2008. They have been rarely used since then and were virtually never used in manufacturing. The scissor lift was purchased for the cost of a repair bill that had been incurred by the Company and which the Company could not afford. The scissor lifts had laid idle in the Company for the last six years.

Sale of Buchanan Trail West Land

Mr. Gordon knew about the sale of that particular land long before he ever provided an executed SPA. He was made aware of the sale in May 2015 before the SPA was executed by anyone, and this was not the subject of any expressed concern by Mr. Gordon until August 26, 2015. We also understand that fair value was, in fact, paid for this property. And we are prepared to prove that to Mr. Gordon. Frankly, it is a non-issue.

Section 4.15 (a). Environmental Matters

As was stated above, this matter has been thoroughly discussed during the months of July and August 2015 with you and Mr. Gordon. Moreover, officials of the Pennsylvania Department of Environmental Protection ("DEP"), including the managing official for the department relating to the permits in question, have provided statements to clearly indicate that there is no need for any "transfer" of a permit at this time inasmuch as this was a stock sale and not an asset sale. Additionally, assistant legal counsel for DEP has also provided additional clarification and comfort on this issue. It is a non-issue. Since this letter is running so long and this matter has been clearly covered in prior communications, we will not spend any more time on it at this time.

Section 4.22. Warranty Claims and Customer Complaints

The warranty claims and customer complaints were all disclosed to Mr. Gordon on schedule 4.10 (c). Moreover, the Slater claim has been completely resolved since Mr. Gordon took possession and control of the business. It is paid in full.

Sean J. Bellew, Partner
September 15, 2015
Page 7

Section 4.24 (a). Employees

Mr. Michael acknowledges the FMLA issue and indicates a willingness to be responsible for the $3260 claimed. However, errors such as this often occur in the management and operation of the business, and it is simply a cost of doing business issue for the Company whose stock Mr. Gordon purchased.

Section 4.24 (a) and (f). Benefit Plans

We have combined two items here, as they are essentially comparable and simply covered in two different sections of the SPA. Although the schedules did not identify the Dental Plan, it was fully described and a part of the Employee Handbook which was provided to Mr. Gordon long before the end of May 2015. It was not intended to be kept secret from Mr. Gordon. Moreover, as stated in the previous sections of this letter, any impact or cost of the plan are relatively minimal.

Section 4.26. Benefit Claims

The dental plan pays a percentage of "Eligible" dental expenses. It is of diminimus impact on the overall operations of the business. Information was provided to Mr. Gordon to enable him to inquire about the plan and its impact, if any, both on the operations and costs of the business.

Section 8.5 (a). Tax Matters

The West Virginia tax issue was listed in schedule 4.2(a) of the SPA. In fact, it was noted as an issue for which Mr. Michael would assume responsibility. Nevertheless, Mr. Michael is surprised to learn of the sales and use taxes from 2006 through 2011, as the Company had never received notices about them while Mr. Michael was in charge. Our client concedes to Virginia's $1200 late payment penalty item, and agrees to be responsible for it.

Section 22 of the SPA addresses the Dispute Process. We stand ready to meet with you and your client to attempt to resolve the disputed items.

Sincerely,

Jeffrey A. Ernico

JAE:jrp

cc: Mr. Ralph C. Michael
    J. Edgar Wine, Esquire

866036v1